Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
Email: lrosen@rosenlegal.com
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610

*Counsel for Lead Plaintiff and the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KILLYOUNG OH, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HANMI FINANCIAL CORPORATION, BONITA I. LEE, and ROMOLO C. SANTAROSA,<br><br>Defendants. | Case No: 2:20-cv-02844-AB-JC<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>CLASS ACTION</u><br><br>Judge: Hon. Andre Birotte, Jr.<br><br>JURY TRIAL DEMANDED |

Plaintiff Killyoung Oh ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by

defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hanmi Financial Corporation ("Hanmi" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Hanmi between May 10, 2019 and May 11, 2020, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2. In 2019 and 2020, Hanmi's new leadership took extraordinary actions to mislead investors about the Company's exposure to a $40 million troubled loan relationship. Defendants actions included routinely violating accounting principles, understating the Company's key liability metrics, firing the Company's long-time independent auditor, parting with the Company's long-time Chief Risk Officer, and consolidating the oversight function within senior management. Through the course of the year-long fraud, Hanmi incrementally took provisions for—and belatedly charged off—more than 60% of the troubled loan, identified two separate material weaknesses in the Company's internal controls, and routinely downplayed the significance of these weaknesses and of the risk of losses from the troubled loan relationship.

3. In April 2019, the Company announced that its Chief Operating Officer, Bonita Lee, would assume the role of Chief Executive Officer and join the Company's board of directors. Just one week after Lee began her tenure as CEO, Hanmi issued its earnings report for the first quarter of 2019, showing cracks in the veneer of the Company's longstanding reputation of stability. Hanmi disclosed $43.3 million in impaired loans and leases, a 72.3% increase from the $25.1 million the Company had disclosed for year-end 2018. Nonperforming (nonaccrual) loans increased from $15.5 million at the end of December 2018 to $40 million at the end of March 2019.

4. Lee immediately began consolidating power amongst her upper management team. In June 2019, the Company dismissed KMPG LLP as its independent auditor, just one month after the Board and shareholders had ratified KPMG to serve as Hanmi's auditor for the 19th consecutive year. On July 10, 2019, Hanmi announced the Company was giving new oversight authority over information technology, deposit operations, legal, and facilities to Chief Financial Officer Romolo Santarosa—who had insufficient relevant experience in any of these areas. On November 18, the Company announced the unexpected departure of its Chief Risk Officer, Jean Lim, who had served in that role since August 2008.

5. On July 19, the Company disclosed that it was forced to delay its quarterly disclosures for the second quarter of 2019 because its bank examiner requested that Hanmi reevaluate its allowance for loan and lease losses ("ALLL") with respect to a "single credit relationship."

6. On July 31, 2019, an analyst reported that the Company's call report indicated that second quarter earnings would be a "little light" and that Hanmi's stock price would be weighed down until the "ongoing uncertainty" of the ALLL review is clarified. In reaction, Hanmi's stock fell 4.1% to close at $20.60 per share.

7. On August 12, 2019, the Company disclosed that it could not timely file a Form 10-Q for the second quarter of 2019 because it was "evaluating the classification of a single $40.7 million credit relationship . . . as well as a possible internal control deficiency primarily relating to construction lending, which may affect prior periods." On this news, shares of Hanmi fell 6.4% to close at $18.59 per share on August 12, 2019, damaging investors. Hanmi announced that it had received a notice from Nasdaq that the Company was no longer in compliance with Nasdaq rules due to its untimely quarterly disclosure and was in danger of being delisted. Hanmi's stock dropped another 4.6%, to $17.33, in reaction.

8. On October 4, 2019, the Company finally filed its Form 10-Q for the second quarter of 2019, which disclosed that Hanmi had placed the entire $40.7 million loan relationship into nonaccrual status and was taking a $15.7 specific provision for the loans. Further, the Company confirmed that it had identified a material weakness in internal control over financial reporting based on its inability to identify loans for impairment evaluations to facilitate the timely measurement of a specific allowance. Defendants admitted that the Company lacked the methodology, training, and documentation to make timely impairment evaluations, each of which violated Hanmi's accounting obligations.

9. On January 28, 2020, the Company disclosed that it had taken an additional $6.9 million allowance on the troubled loan relationship based on "a current appraisal on the personal property securing the relationship." increasing the total to $22.6 million. Defendant Lee insisted that "the borrower had continued to make payments and we have incurred no charge-offs, for the loans maturing at year-end" and that the Bank would "continue to work closely with the borrower to achieve a positive resolution to this loan." On this news, shares of Hanmi fell $1.77 per share or 9.4% to close at $16.99 per share, damaging investors.

10. On March 2, 2020, Hanmi filed its Form 10-K for 2019. The Bank stated that it had remediated the material weakness related to the valuation of collateral-dependent impaired loans as of December 31, 2019. However, the Bank disclosed that its auditor has found a separate material weakness related to ineffective information technology general controls in the area of user access and segregation of duties over certain information technology systems that support the Company's recording of transactions and financial reporting processes—the area over which Defendant Santarosa had recently assumed oversight. The Company's stock tumbled another 5.7% in reaction, closing at $15.41 per share.

11. On April 30, 2020, Hanmi disclosed that it was taking an additional $2.6 million provision for the troubled loan, raising the total to $25.2 million. Significantly, the Company announced that it had finally charged-off the entire $25.2 million—the first charge-off Hanmi had taken related to the troubled loan. The Bank also disclosed that its material weakness related to information technology was ongoing. On this news, shares of Hanmi fell 14.3% to close at $10.34 per share on May 1, 2020, damaging investors.

12. Finally, on May 11, 2020, Hanmi filed its Form 10-Q for the first quarter of 2020, which confirmed the $2.6 million additional specific provision and $25.2 million charge off and disclosed that the material weakness first disclosed in the 2019 Form 10-K had not yet been remediated. On this news, shares of Hanmi fell 7.4% to close at $8.43 per share on May 12, 2020, damaging investors

## JURISDICTION AND VENUE

13. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

14. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

15. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Hanmi is headquartered and conducts business in this District. The alleged misstatements entered and subsequent damages took place within this District.

16. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17. Plaintiff, as set forth in the previously filed Certification, incorporated by reference herein, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelations of the alleged corrective disclosures.

18. Defendant Hanmi is a bank holding company whose subsidiary is Hanmi Bank (the "Bank"). Hanmi's primary operations are related to traditional banking activities, including the acceptance of deposits and the lending and investing of money through the operation of the Bank. Hanmi is a Delaware corporation with principal executive offices located at 3660 Wilshire Boulevard, Penthouse Suite A, Los Angeles, CA 90010. The Company's stock traded on the NASDAQ under the ticker symbol "HAFC."

19. Defendant Bonita I. Lee ("Lee") has served as President and Chief Executive Officer of Hanmi and Hanmi Bank since May 2019. Lee previously served as Chief Operating Officer of Hanmi Bank from August 2013 to May 2019.

20. Defendant Romolo C. Santarosa ("Santarosa") has served as the Company's Chief Financial Officer ("CFO") and Senior Executive Vice President since November 2015. Santarosa previously served as an Audit Senior Manager with Price Waterhouse.

21. Defendants Lee and Santarosa are collectively referred to hereinafter as the "Individual Defendants."

22. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

23. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

24. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

25. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background**

26. The Bank originates loans and leases for its own portfolio and for sale in the secondary market. The Bank's lending activities include real estate loans (commercial property, construction and residential property), commercial and industrial loans (commercial term, commercial lines of credit and international), equipment lease financing, consumer loans and Small Business Administration ("SBA") loans.

27. The Bank's construction loans typically have the following structure: maturities of two years or less; a floating rate of interest based on the Bank Prime Rate or the WSJ Prime Rate; minimum cash equity consistent with high volatility commercial real estate guidelines; a reserve of anticipated interest costs during construction or an advance of fees; a first lien position on the underlying real estate; loan-to-value ratios at time of origination that do not exceed 75 percent; and recourse against the borrower or a guarantor in the event of default. The bank purports to have underwriting procedures designed to identify factors that it believes to maintain acceptable levels of risk in construction lending, including, among other procedures, engaging qualified and bonded third parties to provide progress reports and recommendations for construction loan disbursements

28. The Bank's commercial business loans finance current operations and typically provide for principal payment at maturity, with interest payable monthly. Term loans typically provide for floating interest rates, with monthly payments of both principal and interest. Generally, the Bank takes collateral whenever possible, regardless of the loan purpose(s). Collateral may include liens on inventory, accounts receivable, fixtures and equipment, leasehold improvements and real estate. Where real estate is the primary collateral, the Bank purports to obtain formal appraisals in accordance with applicable regulations to support the value of the real estate collateral. Typically, the Bank requires all principals of a business to be co-

obligors on all loan instruments and all significant stockholders of corporations to execute a specific debt guaranty. The Bank claims that all borrowers must demonstrate the ability to service and repay not only their obligations to the Bank, but also any and all outstanding business debt, without liquidating the collateral, based on historical earnings or reliable projections.

29. The Bank claims to adhere to strict underwriting and appraisal policies to mitigate its risk. The review of each loan and lease application includes analysis of the applicant's business and experience, prior credit history, income level, cash flows, financial condition, tax returns, cash flow projections, and the value of any collateral to secure the loan, based upon reports of independent appraisers and/or audits of accounts receivable or inventory pledged as security. In the case of real estate loans over a specified threshold, the review of collateral value includes an appraisal report prepared by an independent Bank-approved appraiser. All appraisal reports on commercial real property secured loans are reviewed by an appraisal review officer. The review generally covers an examination of the appraiser's assumptions and methods that were used to derive a value for the property, as well as compliance with the USPAP.

30. Hanmi uses a 9-point internal grading system to identify the credit risk for each of its loans and leases:

- **Pass and Pass-Watch (Grades 0-4):** Pass and Pass-Watch loans and leases are in compliance with the Bank's credit policy and regulatory requirements, and do not exhibit any potential or defined weaknesses as defined under "Special Mention," "Substandard" or "Doubtful." This category is the strongest level of the Bank's loan and lease grading system. It consists of all performing loans and lease with no identified credit weaknesses. It includes cash and stock/security secured loans or other investment grade loans.

- **Special Mention (Grade 5):** A Special Mention loan or lease has potential weaknesses that deserve management's close attention. If not corrected, these potential weaknesses may result in deterioration of the repayment of the debt and result in a Substandard classification. Loans and leases that have significant actual, not potential, weaknesses are considered more severely classified.
- **Classified: Substandard or Doubtful**
  - **Substandard (Grade 6):** A Substandard loan or lease has a well-defined weakness that jeopardizes the liquidation of the debt. A loan or lease graded Substandard is not protected by the sound worth and paying capacity of the borrower, or of the value and type of collateral pledged. With a Substandard loan or lease, there is a distinct possibility that the Bank will sustain some loss if the weaknesses or deficiencies are not corrected.
  - **Doubtful (Grade 7):** A Doubtful loan or lease is one that has critical weaknesses that would make the collection or liquidation of the full amount due improbable. However, there may be pending events which may work to strengthen the loan or lease, and therefore the amount or timing of a possible loss cannot be determined at the current time.
- **Loss (Grade 8):** A loan or lease classified as Loss is considered uncollectible and of such little value that their continuance as active bank assets is not warranted. This classification does not mean that the loan or lease has absolutely no recovery or salvage value, but rather it is not practical or desirable to defer writing off this asset even though partial recovery may be possible in the future. Loans and leases classified as Loss will be charged off in a timely manner.

31. Hanmi states that it will charge off a loan and declare a loss when its collectability is questionable and when the Bank can no longer justify presenting the loan as an asset on its balance sheet. To determine if a loan should be charged off, all possible sources of repayment are analyzed, including the potential for future cash flow from income or liquidation of other assets, the value of any collateral, and the strength of co-makers or guarantors. When these sources do not provide a reasonable probability that principal can be collected in full, the Bank will fully or partially charge off the loan. For a real estate loan, when the fair value of collateral is less than the loan balance and the borrower has no other assets or income to support repayment, the amount of the deficiency is considered a loss and charged off.

**Key Metrics**

32. Allowance for loan and lease losses ("ALLL") is an estimate of probable losses that reduces the book value of loans and leases to the amount that is expected to be collected. ALLL is a materially important financial metric for banks whose principal assets are loans. ALLL represents the Bank's assessment of probable losses on its loans, and increases to ALLL reflect an assessed deterioration of its loan portfolio. Any increase in ALLL (a balance sheet item) is accompanied by the recording of a provision for loan losses (an income statement item), thereby impacting the Company's reported income or losses.

33. Both banking regulators and the SEC have emphasized the importance of ALLL to bank financial disclosure. For example, on December 13, 2006, the Board of Governors of the Federal Reserve System, the FDIC, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, and the National Credit Union Administration issued the *Interagency Policy Statement on the Allowance for Loan and Lease Losses* (the "Interagency Statement"), in which they stated that ALLL "represents one of the most significant estimates in an institution's

financial statements and regulatory reports." In the wake of the financial crisis, in August 2009, the Commission's Division of Corporation Finance sent an illustrative letter to the CFOs of certain public companies, a sample of which it posted on the Commission's website, stating that "[c]lear and transparent disclosure about how you account for your provision and allowance for loan losses has always been critically important to an investor's understanding of your financial statements."

34. Hanmi lists its ALLL calculation as a "critical accounting policy," which the Company defines as "those policies that are most important to the determination of our financial condition and results of operations." The Bank considers the ALLL calculation to be "an integral part of the quarterly credit review process."

35. As explained in the Interagency Statement, each institution's management is responsible for maintaining the ALLL at an appropriate level and for documenting its analysis. management should evaluate the ALLL reported on the balance sheet as of the end of each quarter, or more frequently if warranted, and charge or credit the PLLL to bring the ALLL to an appropriate level as of each evaluation date. An institution's failure to analyze the collectibility of the loan portfolio and maintain and support an appropriate ALLL in accordance with GAAP and supervisory guidance is generally an unsafe and unsound practice.

36. Hanmi's Board has established several committees, including the Risk, Compliance, and Planning Committee (the "RCP Committee"). The RCP Committee goes through an extensive review of the enterprise risk assessment on a quarterly basis with the guidance of the RCP Committee Chairperson and the Bank's Chief Risk Officer. Defendant Lee served as the RCP Committee Chairperson throughout the Class Period. The risk assessment is also reviewed by the Board quarterly. In this process, risk is assessed throughout the Company by focusing on credit, liquidity, market, operations, compliance/legal and reputational. Risks that

simultaneously affect different parts of the Company are identified, and an interrelated response is made.

37. While the Board has the ultimate oversight responsibility for the risk management process, various committees of the Board also have responsibility for risk management. In particular, the RCP Committee assists the Board in fulfilling its oversight responsibility with respect to regulatory, compliance, operational risk and enterprise risk management issues that affect the Company and works closely with the Company's legal and risk departments.

**Hanmi Understates And Downplays Losses**

38. At the start of the Class Period on May 10, 2019, Hanmi appeared to be in great shape. The Company reported $57.9 million in net income for the year ending December 31, 2018, which was a 5.9% increase over the previous year; loan and lease receivables increased 6.9% over the previous year; and the Company had declared $0.96 in cash dividends during 2018, a 20% increase over the previous year. As of March 31, 2019, Hanmi reported $32.9 million in ALLL, reflecting $1.1 million in PLLL. Notably, the Company disclosed that its entire $82.7 million construction loan portfolio was rated as either Pass or Pass-Watch, and the Company was carrying just $1.2 million in allowances for its construction loan portfolio.

39. The Company's stability soon began to deteriorate. On April 3, 2019, the Company announced that Bonita Lee would replace C.G. Kum as Chief Executive Officer of the Company and the Bank on May 3, 2019 and would immediately assume a position on the Company's Board of Directors. Kum had served as CEO since June 2013. Lee had served as the Chief Operating Officer of the Company and the Bank since August 2013 and had been expected to take over as CEO upon Kum's retirement. Five days later, on April 8, 2019, Hanmi announced that the Chairman of its Board of Directors—Joseph K. Rho, who had served on Hanmi's Board since 1984 and as Chairman since 2007—was retiring.

40. On May 10, 2019, just one week after Lee has assumed her role as CEO, Hanmi filed its Form 10-Q for the first quarter of 2019. Hanmi disclosed $43.3 million in impaired loans and leases, a 72.3% increase from the $25.1 million the Company had disclosed for year-end 2018. Nonperforming (nonaccrual) loans increased from $15.5 million at the end of December 2018 to $40 million at the end of March 2019.

41. On the April 2019 conference call discussing the earnings report, Kum stated that the increase was "due to a $25 million commercial loan relationship primarily secured by business assets and, to a lesser extent, commercial real estate." Kum assured investors that "we do not have a loss exposure" and that the Company was "going through a detailed process right now to validate and to update the value of the collateral that we have." When asked about the "broader trend in criticized/classified assets this quarter," Kum reiterated that "it's a one-off issue, and there are no other significant increases in the criticized or any other grade categories."

42. Despite Kum's assurances, Hanmi's increase in nonperforming and impaired loans had already reached a tipping point that the Company's new leadership worked tirelessly to conceal from investors.

43. On April 12, 2019, the Company filed a Proxy Statement urging investors to ratify the appointment of KPMG LLP ("KPMG") as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2019 because it "is in the best interests of the Company and its stockholders." KPMG had served as Hanmi's independent accounting firm since 2001. On May 22, 2019, investors overwhelmingly voted to ratify the appointment of KPMG by a margin of 27,743,487 for and only 731,601 against.

44. Just one month later, on June 26, 2019, Hanmi abruptly announced that it was dismissing KPMG as its independent auditor, and that the Company was

replacing them with Crowe LLP ("Crowe"). Far from independent, Hanmi had engaged Crowe for several different consulting, tax, and auditing services from 2014 through 2018.

45. On July 10, 2019, Hanmi disclosed that it had expanded Defendant Santarosa's duties to include "information technology, deposit operations, legal and facilities." The Bank's 2020 Proxy statement later revealed that "Santarosa received a grant of 17,914 restricted shares in July 2019 in recognition of his expanded responsibilities, which includes additional oversight over other areas including information technology, deposit operations, legal and facilities." Defendant Santarosa's base salary also increased from $325,000 to $400,000. Defendant Santarosa had no previous experience in information technology.

46. On July 19, 2019, Hanmi issued a press release announcing that the Company was delaying its earnings release and conference call for the quarter ending June 30, 2019, in order to "evaluate potential adjustments to the allowance for loan and lease losses recently requested by its banking examiners related to a single credit relationship." The Company did not disclose any information about the troubled loans, including the size, segment, collateral, or maturity. Hanmi was planning to release its earnings for the second quarter of 2019 on July 23, 2019 without making any adjustments for these troubled loans until its bank examiners intervened.

47. On July 30, 2019, Hanmi filed a Consolidated Reports of Condition and Income ("Call Report") suggesting lower earnings as a result of its ALLL review.

48. On August 12, 2019, Hanmi announced that it was unable to timely file its quarterly financial results for the second quarter of 2019. The Company disclosed that the "single credit relationship" was a robust $40.7 million credit relationship, comprised of a $28.0 million construction loan and a $12.7 million business loan. The Company also disclosed that it was evaluating a possible internal control

deficiency primarily relating to construction lending, which, significantly, may affect prior periods:

> Hanmi Financial Corporation (the "Company") is unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 ("Form 10-Q") with the Securities and Exchange Commission within the prescribed time period without unreasonable effort or expense because the Company and its auditor are evaluating the classification of a single $40.7 million credit relationship (comprised of a $28.0 million construction loan and a $12.7 million business loan) and the related adjustment to the allowance for loan and lease losses that could affect the financial statements to be included in such Form 10-Q, as well as a possible internal control deficiency primarily relating to construction lending, which may affect prior periods.

49. On August 22, 2019, Hanmi disclosed that it had received a notification from Nasdaq that it was not in compliance with Nasdaq's listing requirements and would have to either file its Form 10-Q or submit a plan to regain compliance by October 15, 2019.

50. Hanmi finally disclosed its earnings for the second quarter of 2019 on October 4, 2019, stating that it had taken a "$15.7 million specific allowance relating to a $40.7 million loan relationship comprised of a $27.9 million land loan and a $12.8 million business loan." The Company moved the entire $40.7 million into nonaccrual status and rated them as "classified" after having rated them as "pass/pass-watch" in the first quarter of 2019. The Company's nonperforming loans increased from $16.2 million as of March 30, 2019 to $63.0 million as of June 30.

51. The Company's Form 10-Q admitted that the Company had a material weakness in internal controls over financial reporting and that the Company's disclosure controls and procedures were not effective. The Company conceded that it was violating generally accepted accounting policies by failing to implement the required policies for identifying loans to be individually measured for impairment. The Q2 2019 Form 10-Q stated, in relevant part:

> As of the end of the period covered by this report and pursuant to Rule 13a-15 of the Securities Exchange Act of 1934, as amended, (the "Exchange Act"), our management, including our principal executive officer and principal financial officer, conducted an evaluation of the effectiveness and design of our disclosure controls and procedures (as that term is defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act). Based upon that evaluation and the identification of a material weakness in internal controls over financial reporting as described below, our principal executive officer and principal financial officer concluded, **as of the end of the period covered by this report, that the Company's disclosure controls and procedures were not effective. The material weakness in internal control over financial reporting resulted from the lack of operating effectiveness of a control that allowed for the inadequate review of the fair value of collateral dependent impaired loans. The material weakness was identified through evaluation of a non-real estate collateral dependent impaired loan. Specifically, our existing control for determining whether a fair value review of collateral dependent impaired loans should occur to facilitate the timely measurement of a specific allowance did not operate effectively.**

52. The Company also stated that it had begun to remediate the material weakness over financial reporting. The remediation "enhancements" provide a detailed description of Hanmi's accounting violations: failing to properly document criteria for when individual loan reviews are required, failing to properly train employees on the impairment review process, and failing to document decisions not to conduct fair value reviews.

> Subsequent to the period covered by this Quarterly Report on Form 10-Q, management has been actively engaged in developing remediation plans to address the material weakness noted above. The Company is enhancing its current controls over the review of the fair value of collateral dependent impaired loans. ***These enhancements include strengthening our policy documentation describing the criteria for when collateral dependent impaired loan fair value review is required, developing and implementing additional training on our collateral dependent impaired loan fair value review process, and***

> ***reinforcing the required documentation when concluding a fair value review is not warranted.***

53. Notably, despite previously warning investors about "a possible internal control deficiency primarily relating to construction lending, which may affect prior periods," the Hanmi did not restate its financials for any prior period. Hanmi also did not mention construction lending in the description of its material weakness despite the obvious deterioration of its construction lending portfolio. As of March 30, 2019, 100% of the Company's $82.7 million construction loans were classified as Pass/Pass-Watch. By June 30, 2019, just 45% of the Company's $65.5 million construction loans were rated Pass/Pass-Watch, while $7.7 million were rated Special Mention and $27.9 million were rated Classified.

54. Piper Jaffray & Co. issued an analyst report on October 6, 2019 noting the problems in Hanmi's construction portfolio:

> The C&D portfolio is only $65M or 1.4% of total loans but 55% or $36M of the book is special mention ($7.7M) or classified ($27.9M). The $27.9M classified C&D amount is tied to one land loan and has a $14.7M specific allowance that equates to 53% of the related balance

55. On November 22, 2019, in yet another suspicious departure, the Company announced that Executive Vice President and Chief Risk Officer, Jean Lim, was leaving Hanmi. Lim had served as the Bank's Chief Risk Officer since August 2008 and as Executive Vice President since August 2013. Lim was one of just five Named Executive Officers at the Company. The Board's Risk, Compliance, and Planning Committee received regular reports from Lim related to information technology and information security to fulfill its role of assisting management in identifying, assessing, measuring and managing certain risks facing the Company. Lim reported directly to Defendant Lee.

56. On January 28, 2020, the Company reported its earnings for the fourth quarter of 2019 and disclosed that it had taken another $6.9 million specific provision for the troubled loans, increasing the total specific provision for the troubled loans to $22.6 million. The Company's net income for the quarter was just $3.1 million, down from $12.4 million the previous quarter. The Company's PLLL for the full year of 2019 was $30.2 million compared to just $4 million for the full year of 2018.

57. During the conference call regarding the fourth quarter results, Defendants disclosed that the $6.9 million specific provision was the result of an appraisal of the personal property securing the relationship that the Company commissioned during the fourth quarter of 2019. Defendants also disclosed that the real estate portion of the loan had not been appraised since the second quarter of 2019 and that the personal property portion had been appraised three times: at inception, during the second quarter of 2019, and during the fourth quarter of 2019.

58. Analysts were disappointed by Hanmi's $6.9 million provision for a troubled loan relationship that should have already been properly accounted. Piper Jaffray stated "The $10.8M LLP was above consensus ($0.9M) on more specific LLRs (+$6.9M) for its previously identified problem loan relationship ($39.7M) that now has $22.6M or 57% set aside; LLRs increased 22 bps to 1.33% as a result."

59. On March 2, 2020, the Company issued its annual report for the year ending December 31, 2019 and admitted that Hanmi had yet another material weakness in its internal control over financial reporting:

> **Material Weakness Identified Relating to Information Technology General Controls**
>
> ***During the fourth quarter of 2019, we identified a material weakness in internal control related to ineffective information technology general controls ("ITGCs") in the area of user access and segregation of duties over certain information technology ("IT") systems that***

***support the Company's recording of transactions and financial reporting processes. We believe that this control deficiency was a result of insufficient training of personnel around changes in our IT environment.*** The material weakness did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results. ***Based on this material weakness, the Company's management concluded that at December 31, 2019, the Company's internal control over financial reporting was not effective.***

***The Company's independent registered public accounting firm, Crowe LLP has issued an adverse audit report on the effectiveness of the Company's internal control over financial reporting as of December 31, 2019 which appears in Item 8 of this Form 10-K.***

*　　*　　*

**Remediation**

Management has been implementing and continues to implement measures designed to ensure that control deficiencies contributing to the material weakness are remediated, such that these controls are designed, implemented, and operating effectively. **The remediation actions include: (i) changing access to impacted financial systems to ensure access is limited to appropriate users with appropriate functionality; (ii) enhancing the IT management review and testing plan to monitor ITGCs, with a specific focus on systems supporting our financial reporting processes; (iii) developing a training program addressing ITGCs and policies that enforce segregation of duties, including educating control owners concerning the principles and requirements of each control, with a focus on those related to user access over IT system changes impacting financial reporting; and (iv) enhancing quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors.**

We believe that these actions will remediate the material weakness. The weakness will not be considered remediated, however, until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are

> operating effectively. We expect that the remediation of this material weakness will be completed prior to the end of fiscal 2020.

60. The adverse opinion of the Company's auditor, Crowe, regarding Hanmi's ineffective information technology general controls suspiciously followed the Company granting Defendant Santarosa control over the information technology function in July 2019 and the departure of Hanmi's long-time Chief Risk Officer—who delivered regular reports to the Board regarding information technology—in November 2019.

61. Crowe also discussed the material weakness in IGTC in its discussion of Critical Audit Matters:

> As discussed in Management's Annual Report on Internal Control Over Financial Reporting, the Company identified a material weakness in internal control related to ineffective information technology general controls (ITGCs) in the area of user access and segregation of duties over certain information technology (IT) systems that support the Company's recording of transactions and financial reporting processes.
>
> This material weakness impacts the Company's controls over access to IT systems and financial reporting processes related to the recording of transactions in all the financial statement accounts and required us to increase the extent of our audit effort. Significant auditor judgment was required to design and execute the incremental audit procedures and to assess the sufficiency of the procedures performed and the audit evidence obtained.
>
> Addressing the matter involved performing expanded audit procedures beyond what would have been performed had the controls been designed and operating effectively and evaluating the audit evidence in connection with forming our overall opinion on the financial statements which included:
>
> - Evaluation of other controls impacting the processing of transactions recorded in the financial statements.

- Performing incremental substantive audit procedures to address the identified risks for financial statement accounts impacted.
- Performing computer assisted audit techniques at the transaction level to identify and test transactions that met certain risk characteristics for specific populations of transactions.

62. Significantly, the 2019 Form 10-K included a discussion of Critical Audit Matters by Crowe that provided new details about the troubled loan that had been concealed by Defendants:

> ***During June 2019, management graded a loan substandard and classified it as impaired.*** This was a single $40.7 million credit relationship (comprised of a $28.0 million construction loan and a $12.7 million commercial and industrial loan). The impairment classification was made as of June 30, 2019 resulting in a specific allowance on the relationship of $15.7 million. At December 31, 2019 the loan relationship has a recorded investment of $39.7 million and a specific allowance of $22.6 million.
>
> ***Auditing the appropriateness of the timing of the impairment classification*** required evaluation of the Company's ability to collect all amounts according to the contractual terms of the loan agreement, including scheduled interest payments. This evaluation involved especially challenging and subjective auditor judgment due to the nature of the credits, ***the sources of repayment (including liquidation of collateral)***, and the significant judgment necessary in evaluating the audit evidence obtained.
>
> ***Auditing the adequacy of the established specific allocation also involved especially challenging and subjective auditor judgment as the underlying collateral backing the commercial and industrial loan was unique in nature, has a limited resale market, and variability in the estimated fair value.*** Further, at the time of the impairment classification (June 30, 2019), management concluded a material weakness in their internal control over financial reporting existed. The material weakness resulted from the lack of operating effectiveness that allowed for the inadequate review of the fair value of collateral dependent impaired loans. In addition, the evaluation of repayment

sources also involved especially challenging and subjective auditor judgment.

The primary procedures we performed to address this critical audit matter involved substantively testing management's assertions, including evaluating their judgments and assumptions, when classifying the loan as substandard, identifying the impaired loan relationship, and developing its specific allocation estimate, including:

- Verification of the liquidity of the borrower and occurrence, or lack thereof, for certain events to generate additional liquidity.
- Utilization of an internal credit risk specialist to evaluate the history of the loan relationship and conclude on the appropriateness of the timing of the classification as substandard.
- Evaluation of management's methodology for determining impairment.
- Testing of the appropriateness and consistency of management's judgments related to the classification of the loan relationship as collateral dependent.
- Testing the completeness and accuracy of data used as the basis for management's calculation of the specific allowance.
- Testing the mathematical accuracy of management's calculation of the specific allocation.
- Engaging a specialist (auditor engaged specialist) to evaluate the reasonableness of the appraisal obtained by management to support the collateral value of the construction loan.
- ***Engaging a specialist to independently value the unique collateral supporting the commercial and industrial loan at the point of the impairment decision***.
- Evaluation of confirming and disconfirming evidence.

63. First, Crowe's assertion that the Company graded the troubled loans substandard and classified them as impaired in June 2019 is an admission that the Company should have conducted a fair value review of the troubled loans prior to the second quarter of 2019. The Company had previously stated that its material

weakness related to the Company's ineffective control for "determining whether a fair value review of collateral dependent impaired loans should occur." If the Company had conducted such a review in June 2019, the material weakness must have manifested itself in a prior reporting period when Hanmi recklessly failed to conduct such a review.

64. Second, Crowe's disclosure that the underlying collateral backing the commercial and industrial loan was "unique in nature, has a limited resale market, and variability in the estimated fair value"—information that the Company had previously concealed from investors, demonstrates that the Company failed to follow GAAP in identifying which loans to test for impairment.

65. The Company's announcement of its financial results for the first quarter of 2020 disclosed another $2.6 million specific provision for the troubled loans, increasing the total provision for the loans to $25.2 million. Additionally, the Hanmi finally acknowledged the full truth that the Company had been concealing from investors for more than a year: that Hanmi would never be able to collect the majority of the troubled loans and would have to write them off as a loss. Hanmi charged off the entire $25.2 million provision for the troubled loans, declaring the amount uncollectible without offering any explanation as to how the uncollectible portion of the loan had ballooned from $0 to $25.2 million in the course of a single quarter. The Company charged off more than 85% of the commercial line of credit portion of the loan that had been secured by the "unique" personal property the Company had appraised just months before.

**Defendants Violated Applicable Accounting Standards**

66. GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements. The SEC has the statutory authority to codify GAAP, and has delegated that authority to the Financial Standards Accounting Board ("FAS"). SEC Regulation S-X states that financial

statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.

67. GAAP provides a series of rules for how and when to set estimates of credit losses.

68. ASC 310 requires banks to set criteria for determining which loans should be reviewed for impairment and requires banks to implement their methodology to identify loans to be individually evaluated for impairment. ASC 310-10-35-14 identifies sources of information that are useful in identifying loans for individual evaluation for impairment, which include (but are not limited to): loan files lacking current financial data related to borrowers and guarantors; management reports of total loan amounts by borrower; borrowers experiencing problems such as operating losses, marginal working capital, inadequate cash flow, or business interruptions; loans secured by collateral that is not readily marketable or that is susceptible to deterioration in realizable value.

69. The loss provision for individually impaired loans is accounted for under ASC 310-10-35, *Receivables-Overall-Subsequent Measurement*. ASC 310-10-35-16 provides that a loan is impaired when “it is probable a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement.” According to GAAP, if a loan is impaired, the loss must be measured, reported, and added to the ALLL. Any increase in the ALLL must be accompanied by the recording of a provision for loan losses (“PLLL”) on the income statement, thereby increasing reported losses.

70. In deciding the estimated amount of loss, SEC Staff Accounting Bulletin No. 102, “Selected Loan Loss Allowance Methodology and Documentation Issues” (defined above as “SAB 102”), provides that “[i]t is critical that loan loss allowance methodologies incorporate management's current judgments about the credit quality of the loan portfolio through a disciplined and consistently applied

process." SAB 102 further provides that a loan loss allowance methodology should "[c]onsider all known relevant internal and external factors that may affect loan collectability . . . [and] be based on current and reliable data[.]"

71. If appropriate, a loss can be recognized immediately following origination of the loan. As the American Institute of Certified Public Accountants' Audit and Accounting Guide for Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Companies and Mortgage Companies" instructs: "if a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the date of loan origination."

72. For individually impaired loans, the Interagency Statement requires the impairment of a collateral-dependent loan to be measured using the fair value of collateral method. As defined in ASC 310, a loan is collateral dependent if repayment of the loan is expected to be provided solely by the underlying collateral. In general, any portion of the recorded investment in a collateral-dependent loan (including any capitalized accrued interest, net deferred loan fees or costs, and unamortized premium or discount) in excess of the fair value of the collateral that can be identified as uncollectible, and is therefore deemed a confirmed loss, should be promptly charged off against the ALLL.

73. For purposes of measuring the impairment on a collateral-dependent loan, the banks are required to consider the current condition of the property, which can be accomplished by using an "as-is" appraisal value. ASC 820-10-20 defines fair value as the price that would be received to sell an asset in an orderly transaction between market participants as of the measurement date. An "as-is" appraisal considers the conditions of the property as of the measurement date, while an "upon-completion" appraisal does not. For impairment analysis purposes, the fair value of

collateral should reflect the current condition of the property, not the potential value of the collateral at some future date.

74. ASC 820-10-50 requires disclosures about fair value measurements for securities measured at or written-down to fair value. These disclosures include the valuation techniques and inputs used to develop the fair value measurements, the observability of the inputs used, quantitative information about significant unobservable inputs and the effect of those fair value measurements using significant unobservable inputs on earnings or other comprehensive income for the period.

75. Regulation S-K Item 303(a) requires discussion in the MD&A sections of public filings any "information that the registrant believes to be necessary to an understanding of its financial condition." Bank holding companies, such as Hanmi, are directed to SEC Industry Guide 3, which directs that bank holding companies discuss the policy for placing loans on nonaccrual status (meaning the Bank would no longer accrue interest on the loan) and state the aggregate of loans in the following categories: nonaccrual, accruing loans which are contractually past due 90 days or more, and other loans that are TDRs.

76. Hanmi represented to investors that it evaluated loan impairment and measured losses in accordance with GAAP and the Interagency Statement, but Defendants and Crowe both concede that Defendants were violating these applicable accounting standards during the Class Period. Hanmi's reckless failure to design and implement an effective loan review system left the Company incapable of timely identifying or evaluating impaired loans.

77. As the Interagency Statement describes, the foundation for any loan review system is accurate and timely loan classification or credit grading, which involves an assessment of credit quality and leads to the identification of problem loans. The Interagency Statement required Hanmi to, at a minimum, have policies and procedures that ensure it has an effective loan review system and controls

(including an effective loan classification or credit grading system) that identify, monitor, and address asset quality problems in an accurate and timely manner.

78. Hanmi admitted in a July 19, 2019 press release that the Company only became aware that one of the its largest loan relationships was impaired when its banking examiners informed them the Company was required to adjust the ALLL to account for the impairment. Given the severity of the omission, Defendants were forced to admit a material weakness in internal control over financial reporting from the lack of operating effectiveness of a control that allowed for the inadequate review of the fair value of collateral dependent impaired loans.

79. Several accounting violations caused Defendants' failure to even identify the troubled loan relationship for an impairment evaluation. First, Defendants concede that the Company did not have the required policy documentation describing the criteria for when collateral dependent impaired loan fair value review is required. This failure violated the Interagency Statement's directive that an effective credit risk review system starts with a written credit risk review policy. In order for an institution's ALLL methodology to be effective, the institution's written policies and procedures should describe the methodology for determining and measuring impairment and the methods used to identify loans to be analyzed individually.

80. ASC 310 describes the criterion that are useful in identifying loans for evaluation and demonstrates that a compliant identification protocol would have ensured that Hanmi flagged the troubled loan relationship for impairment review. ASC 310-10-35-14. As Hanmi and Crowe later admitted, the troubled loan relationship had several attributes that, independently, should have flagged the loan to management for evaluation: it was material to the bank because it was one of the Bank's largest loan relationships and represented over 30 percent of the construction portfolio; the Company's understanding that construction loans are inherently

uncertain and require constant examination of progress and valuation; the liquidity concerns and operating losses of the borrower; the fact that the collateral "was unique in nature, has a limited resale market, and variability in the estimated fair value;" and the fact that the Company had not appraised the collateral since origination.

81. Second, Defendants' failure to adequately train its credit risk review personnel on the collateral dependent impaired loan fair value review process violated the Interagency Statement's basic requirements that personnel be knowledgeable in both sound lending practices and the institution's lending guidelines for the types of loans offered by the institution and knowledge of relevant laws, regulations, and supervisory guidance.

82. Third, Defendants' admitted failure to "require[] documentation when concluding a fair value review is not warranted" precluded the Company from improving its ineffective credit review function. Hanmi's bank examiners require it to maintain written supporting documentation all decisions regarding its loan grading system or process. The Interagency Statement requires Hanmi's loan review function to prepare a list of all loans reviewed (including the date of the review) and documentation (including a summary analysis) that substantiates the grades or classifications assigned to the loans reviewed. A report that summarizes the results of the loan review should be submitted to the board of directors at least quarterly. The failure to document basic evaluation decisions also makes it impossible for the Company's independent auditor to evaluate the reasonableness of accounting estimates made by management, including its estimates of loan impairments and the associated allowance for loan losses.

83. Defendants violated ASC 310-10-35-41 by failing to charge off uncollectible portions of the troubled loan relationship until the first quarter of 2020. Defendants knew by the second quarter of 2019—and were reckless in not knowing

earlier—that the fair value of the collateral securing the loans had eroded along with the liquidity and personal guarantee of the borrower. The appraisals Hanmi received in the second quarter of 2019 and the fourth quarter of 2019 informed the Bank that at least a portion of the collateral-dependent impaired loans were uncollectible.

84. Finally, Hanmi violated ASC 820's Fair Value Measurement by using "upon completion" appraisals in measuring the fair value the troubled loan relationship. Hanmi disclosed in its 2019 Form 10-K that it had been using appraisal reports that include both "as is" and "upon completion" valuation scenarios. ASC 820-10-20 defines fair value as the "price that would be received to sell an asset in an orderly transaction between market participants ***as of the measurement date***." The "upon completion" valuation scenarios measure reflect the price as of a potential future date, inflating the fair value of the loan and Hanmi's earnings.

**Materially False and Misleading Statements Issued During the Class Period; The Truth Slowly Enters the Market Causing Hanmi's Stock Price to Decline**

85. On May 10, 2019, the Company filed its quarterly report for the quarter ended March 31, 2019 on a Form 10-Q with the SEC ("Q1 2019 Form 10-Q"). The Q1 2019 Form 10-Q was signed by Defendants Lee and Santarosa. Attached to the Q1 2019 Form 10-Q, were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Lee and Santarosa attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

86. The Q1 2019 Form 10-Q stated, in relevant part:

> We evaluate loan and lease impairment in accordance with GAAP. Impaired loans and leases are measured based on the present value of expected future cash flows discounted at the receivable's effective interest rate or, as a practical expedient, at the receivable's observable market price or the fair value of the collateral if the loan or lease is collateral dependent, less estimated costs to sell. If the estimated value of the impaired loan or lease is less than the recorded investment in the

loan or lease, the deficiency is either charged off against the allowance for loan and lease losses or we establish a specific allocation in the allowance for loan and lease losses. Additionally, loans and leases that are considered impaired are specifically excluded from the quarterly migration analysis when determining the amount of the allowance for loan and lease losses required for the period.

The allowance for collateral-dependent loans is determined by calculating the difference between the outstanding loan balance and the value of the collateral as determined by recent appraisals. The allowance for collateral-dependent loans varies from loan to loan based on the collateral coverage of the loan at the time of designation as nonperforming. We continue to monitor the collateral coverage, using recent appraisals, on these loans on a quarterly basis and adjust the allowance accordingly.

*    *    *

The ratio of nonperforming loans and leases to loans and leases increased to 0.88 percent as of March 31, 2019 compared with 0.34 percent as of December 31, 2018. The allowance for collateral-dependent loans is calculated as the difference between the outstanding loan balance and the value of the collateral as determined by recent appraisals less estimated costs to sell. The allowance for collateral-dependent loans varies from loan to loan based on the collateral coverage of the loan at the time of designation as nonperforming. We continue to monitor the collateral coverage, based on recent appraisals, on these loans on a quarterly basis and adjust the allowance accordingly.

*    *    *

As part of the on-going monitoring of the quality of our loan and lease portfolio, we utilize an internal loan and lease grading system to identify credit risk and assign an appropriate grade (from 0 to 8) for each loan or lease in our loan and lease portfolio. A third-party loan review is required on an annual basis. Additional adjustments are made when determined to be necessary.

87. The Q1 2019 Form 10-Q also included the following table showing loans and leases rated pass/pass-watch, special mention and classified according the Company's internal grading system, disaggregated by loan class, as of March 31, 2019:

| | Pass/Pass-Watch | Special Mention | Classified | Total |
|---|---|---|---|---|
| | | *(in thousands)* | | |
| **March 31, 2019** | | | | |
| Real estate loans: | | | | |
| Commercial property | | | | |
| Retail | $ 891,084 | $ 3,320 | $ 4,228 | $ 898,632 |
| Hospitality | 803,895 | 163 | 8,534 | 812,592 |
| Other | 1,422,697 | 3,037 | 10,859 | 1,436,593 |
| Total commercial property loans | 3,117,676 | 6,520 | 23,621 | 3,147,817 |
| Construction | 82,709 | — | — | 82,709 |
| Residential property | 482,614 | 808 | 408 | 483,830 |
| Total real estate loans | 3,682,999 | 7,328 | 24,029 | 3,714,356 |
| Commercial and industrial loans: | | | | |
| Commercial term | 179,424 | 449 | 6,598 | 186,471 |
| Commercial lines of credit | 178,558 | 743 | 16,912 | 196,213 |
| International loans | 39,818 | — | — | 39,818 |
| Total commercial and industrial loans | 397,800 | 1,192 | 23,510 | 422,502 |
| Leases receivable | 420,747 | — | 4,783 | 425,530 |
| Consumer loans | 11,731 | 737 | 764 | 13,232 |
| **Total** | **$ 4,513,277** | **$ 9,257** | **$ 53,086** | **$ 4,575,620** |

88. The statements contained in ¶¶ 85-87 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Hanmi had a material weakness in internal control over financial reporting—due, in part, to inadequate credit review methodology, training, and documentation—that prevented it from adequately evaluating loans for impairment; (2) Hanmi failed to place the $40.7 million troubled loan relationship on nonaccrual, classify it as a Troubled Debt Restructuring, grade it as classified or a loss, or take a specific provision for it despite the fact that the loans' fair values were less than the recorded investments and partially uncollectible; (3) the undisclosed material weakness would cost millions of dollars to remediate; and (4) as a result, Defendants' public statements were materially false and misleading at all relevant times.

89. On July 19, 2019, Hanmi issued a press release announcing that the Company was delaying its earnings release and conference call for the quarter ending June 30, 2019, in order to evaluate adjustments to its ALLL requested by its banking examiner:

> Hanmi Financial Corporation (NASDAQ: HAFC) ("Hanmi"), the holding company for Hanmi Bank, today announced that it will delay the release of its earnings for the quarter ended June 30, 2019 and subsequent conference call previously scheduled for July 23, 2019. The delay is required to provide Hanmi time to evaluate potential adjustments to the allowance for loan and lease losses recently requested by its banking examiners related to a single credit relationship.

90. The statement contained in ¶ 89 was materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Hanmi had a material weakness in internal control over financial reporting—due, in part, to inadequate credit review methodology, training, and documentation—that prevented it from adequately evaluating loans for impairment; (2) minimizing the $40.7 million troubled loan relationship as "a single credit relationship" created a false impression of its severity; (3) the undisclosed material weakness would cost millions of dollars to remediate; and (4) as a result, Defendants' public statements were materially false and misleading at all relevant times

91. July 31, 2019 analyst Keefe Bruyette & Woods stated that Hanmi's July 30, 2019 Call Report (Reports of Condition and Income) for its 2019 Q2 earnings was a "little light" on net interest margin and that the "ongoing uncertainty" related to the review of the Company's ALLL would "weigh on the shares until greater clarity is achieved."

92. On this partially corrective news, shares of Hanmi fell $0.89 per share or 4.1% to close at $20.60 per share on August 1, 2019, damaging investors.

93. On August 12, 2019, the Company filed a partially corrective Form NT 10-Q with the SEC, stating that it would not be able to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019. The Company stated the following:

> Hanmi Financial Corporation (the "Company") is unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 ("Form 10-Q") with the Securities and Exchange Commission within the prescribed time period without unreasonable effort or expense because **the Company and its auditor are evaluating the classification of a single $40.7 million credit relationship (comprised of a $28.0 million construction loan and a $12.7 million business loan) and the related adjustment to the allowance for loan and lease losses that could affect the financial statements to be included in such Form 10-Q, as well as a possible internal control deficiency primarily relating to construction lending, *which may affect prior periods***.

(Emphasis added.)

94. On this news, shares of Hanmi fell $1.27 per share or 6.4% to close at $18.59 per share on August 12, 2019, damaging investors.

95. After the market had closed on August 22, 2019, the Company issued a partially corrective press release disclosing that it received a notification letter dated August 16, 2019 from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") stating that, as a result of not having timely filed its quarterly report on Form 10-Q for the period ended June 30, 2019, Hanmi no longer complies with Nasdaq Listing Rule 5250(c)(1), which requires timely filing of periodic financial reports with the Securities and Exchange Commission:

> LOS ANGELES, Aug. 22, 2019 (GLOBE NEWSWIRE) -- Hanmi Financial Corporation (NASDAQ: HAFC) ("Hanmi"), the holding

> company for Hanmi Bank, announced today that it received a notification letter dated August 16, 2019 from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") stating that, as a result of not having timely filed its quarterly report on Form 10-Q for the period ended June 30, 2019, Hanmi no longer complies with Nasdaq Listing Rule 5250(c)(1), which requires timely filing of periodic financial reports with the Securities and Exchange Commission.
>
> Under Nasdaq's listing rules, the Company has 60 calendar days from the date of the notice, or October 15, 2019, to file its Form 10-Q or submit a plan to Nasdaq to regain compliance. If the plan is accepted by Nasdaq, Hanmi can be granted up to 180 calendar days from the Form 10-Q's due date (as extended by Rule 12b-25 under the Securities Exchange Act of 1934) to regain compliance. The Company expects to file its Form 10-Q within the 60 calendar day period. If Hanmi is unable to file its Form 10-Q prior to October 15, 2019, Hanmi intends to submit a compliance plan on or prior to that date.

96. On this news, shares of Hanmi fell $0.84 per share or 4.6% to close at $17.33 per share on August 23, 2019, damaging investors.

97. On October 4, 2019, the Company filed its quarterly report for the quarter ended June 30, 2019 on a Form 10-Q with the SEC ("Q2 2019 Form 10-Q"). The Q2 2019 Form 10-Q was signed by Defendants Lee and Santarosa. Attached to the Q2 2019 Form 10-Q, were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Lee and Santarosa attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

98. The Q2 2019 Form 10-Q stated the following, in relevant part, about the previously disclosed troubled $40.7 million credit relationship:

> Net income was $2.7 million, or $0.09 per diluted share, for the three months ended June 30, 2019 compared with $15.5 million, or $0.48 per diluted share, for the same period a year ago. For the six months ended June 30, 2019 and 2018, net income was $17.3 million, or $0.56 per

diluted share, and $30.4 million, or $0.94 per diluted share, respectively. The decline in net income for the quarter and year-to-date periods reflects primarily the increase in the provision for loan and lease losses arising during the three months ended June 30, 2019 from a $15.7 million specific allowance relating to a $40.7 million loan relationship comprised of a $27.9 million land loan and a $12.8 million business loan.

***The Bank, as part of its credit administration practices, evaluated the project status of the land loan, considered the approaching December 2019 contractual maturities of both loans and the timeliness of certain liquidity events for the guarantor of both loans during the 2019 second quarter. As a result, although both loans were current, the Bank placed the entire loan relationship on nonaccrual status. After evaluating the recent appraisals for the real and personal property securing the loans, the liquidity and personal guarantee of the borrower, and the appropriate accounting and regulatory guidance, the Bank established an aggregate specific allowance of $15.7 million.***

* * *

The provision for loan and lease losses was $16.7 million and $0.1 million for the three months ended June 30, 2019 and 2018, respectively. ***For the six months ended June 30, 2019, the provision for loan and lease losses was $17.8 and $0.7 million, respectively. The increase in the provision for loan and lease losses results principally from a $15.7 million specific allowance relating to a $40.7 million loan relationship added to nonaccrual loans in the 2019 second quarter.***

* * *

***Classified loans and leases increased to $75.7 million at June 30, 2019, or 1.66 percent of total loans and leases receivable, from $29.5 million at December 31, 2018 principally because of the $40.7 million loan relationship placed on nonaccrual status during the three months ended June 30, 2019.*** At June 30, 2019, the $65.5 million of construction loans included two land loans totaling $29.7 million ($27.9 million classified and $1.8 million pass), two completed

construction loans totaling $26.0 million (all pass), and five active construction loans totaling $9.8 million (two totaling $7.7 million special mention and three totaling $2.1 million pass) with project completion ranging from 37% to 85%. In addition, two construction loans with outstanding commitments aggregating $1.5 million which had no advances outstanding at June 30, 2019.

*       *       *

Nonperforming loans and leases were $63.0 million and $15.5 million as of June 30, 2019 and December 31, 2018, respectively. For the six months ended June 30, 2019, $71.0 million of loans and leases were placed on nonaccrual status. Offsetting these additions were $21.2 million of principal payoffs and pay-downs and $0.5 million in charge-offs and upgrades. The three months ended March 31, 2019 included the addition of a $25.0 million commercial loan relationship, primarily secured by business assets and, to a lesser extent, commercial real estate. As of June 30, 2019, this relationship declined to $10.4 million from pay-downs and the specific allowance related to this relationship declined to $1.8 million. ***The three months ended June 30, 2019 included the addition of a $40.7 million loan relationship comprised of a $27.9 million land loan with a specific allowance of $14.7 million and a $12.8 million business loan with a specific allowance of $1.0 million.***

*       *       *

***Total impaired loans and leases increased $41.1 million, or 163.4 percent, to $66.2 million as of June 30, 2019, from $25.1 million at December 31, 2018, principally due to the addition of a $40.7 million loan relationship comprised of a $27.9 million land loan and a $12.8 million business loan.*** Specific allowances associated with impaired loans and leases were $18.5 million and $1.8 million as of June 30, 2019 and December 31, 2018, respectively.

*       *       *

***The allowance for loan and lease losses was $49.4 million as of June 30, 2019 and $31.9 million as of December 31, 2018. The increase***

> ***primarily reflects a specific allowance of $15.7 million relating to a $40.7 million loan relationship.***

(Emphasis added.)

99. The statements contained in ¶¶ 97-98 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the $15.7 million specific provision was less than the difference between the fair value of the troubled loans and the recorded investment; (2) portions of the troubled loans were uncollectible based on the appraisals of the collateral and the liquidity and personal guarantee of the borrower and should have been promptly charged off; (3) the material weakness would cost millions of dollars to remediate; and (4) as a result, Defendants' public statements were materially false and misleading at all relevant times.

100. On October 22, 2019, Hanmi issued a press release entitled "Hanmi Reports Third Quarter 2019 Results" which stated the following, in relevant part, regarding the previously disclosed troubled $40.7 million credit relationship:

> Net income of $12.4 million, or $0.40 per diluted share, up from $2.7 million, or $0.09 per diluted share for the prior quarter and down from $16.1 million or $0.50 per diluted share from the same quarter a year ago; second quarter net income included a $16.7 million provision for loan and lease losses arising from a $15.7 million specific allowance relating to a $40.7 million loan relationship.
>
> * * *
>
> Ms. Lee concluded, "Notwithstanding the troubled loan relationship identified in the prior quarter, overall asset quality remains strong. Hanmi continues to maintain disciplined underwriting standards and we

> remain focused on originating high-quality, well-priced loans and leases."

(Emphasis added.)

101. On October 22, 2019, Hanmi hosted a conference call with analysts to discuss the Company's Q3 2019 earnings (the "Q3 2019 Call"). Defendants Lee and Santarosa participated on the call. In her prepared remarks, Defendant Lee stated:

> Hanmi remains very well capitalized. The bank's regulatory capital ratios remain very strong and we are well positioned to continue growing in a safe and sound manner. Our second quarter results were greatly affected by a single loan relationship, consisting of a land loan and a business loan. After considering the approaching the year end maturities of both loans, the project status of the land loan and the timeliness of a certain equity events of the guarantor, we place the entire relationship unknown accrual status.
>
> Although, both loans were current, we established the specific allowance of $15.7 million. We have and continue to work closely with the borrower to achieve a positive resolution to the loan. Notwithstanding this particular loan relationship, we believe our overall asset quality remains strong.
>
> *   *   *
>
> Aside from the trouble loan relationship identified last quarter, overall, the key metrics remained stable. Net charge-offs held relatively steady at $276,000 or 2 basis points for the third quarter. We recorded a $1.6 million loan loss provision in the quarter and allowance for loan and lease losses increased slightly to 111 basis points of loans and leases at quarter end.
>
> Furthermore, we continued to maintain conservative and disciplined underwriting standards on new loan originations.

102. In his prepared remarks during the Q3 2019 Call, Defendant Santarosa stated that the Company "also saw an increase in professional fees relating to a $600,000 of charges realized in connection with the reporting delay."

103. During the question and answer session of the Q3 2019 Call, Gary Tenner of D.A. Davidson & Company asked Defendant Santarosa about the Company's efforts to remediate the material weakness related to its internal controls over financial reporting. Santarosa responded, in relevant part:

> So, the material weakness that we cited in the filing of our second quarter Form 10-Q, that will continue again for the third quarter, remediation efforts are underway. It will not command an unreasonable amount of effort on our part or additional resources. It's something that we can resolve pretty much what we have, so I don't anticipate any real charges coming from the remediation efforts.

104. After markets closed on November 12, 2019, Hanmi filed its quarterly report for the quarter ended September 30, 2019 on a Form 10-Q with the SEC (the "Q3 2019 Form 10-Q"). The Q3 2019 Form 10-Q was signed by Defendants Lee and Santarosa. Attached to the Q3 2019 Form 10-Q were certifications pursuant to SOX signed by Defendants Lee and Santarosa attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

105. The Q3 2019 Form 10-Q stated the following, in relevant part, about the previously disclosed troubled $40.7 million credit relationship:

> ***Net income for the nine months ended September 30, 2019 was $29.7 million, or $0.96 per diluted share compared with $46.5 million, or $1.43 per diluted share. The decline in net income for the nine-month period reflects primarily an increase in the provision for loan and lease losses during the second quarter of 2019 arising from a $15.7 million specific allowance relating to a $40.0 million troubled loan relationship comprised of a $27.5 million land loan and a $12.5 business loan.***
>
> * * *
>
> The provision for loan and lease losses was $1.6 million and $0.2 million for the three months ended September 30, 2019 and 2018,

respectively. The increase in the provision for loan and lease losses reflects the increase in the general level of estimated loss rates. ***For the nine months ended September 30, 2019 and 2018, the provision for loan and lease losses was $19.4 million and $0.9 million, respectively. The increase in the provision for loan and lease losses for the nine months ended September 30, 2019 resulted principally from a $15.7 million specific allowance relating to a $40.0 million troubled loan relationship added to nonaccrual loans during the three-month period ended June 30, 2019.***

* * *

***Classified loans and leases increased to $80.7 million at September 30, 2019, or 1.73 percent of total loans and leases receivable, from $29.5 million at December 31, 2018 principally because of the $40.0 million troubled loan relationship placed on nonaccrual status during the three months ended June 30, 2019.*** At September 30, 2019, the $76.8 million of construction loans included four land loans totaling $37.7 million ($27.4 million classified and $10.3 million pass/watch), three completed construction loans totaling $27.5 million (all pass) and four active construction loans totaling $11.6 million (two totaling $8.9 million special mention and two totaling $2.7 million pass) with project completion ranging from 44 percent to 93 percent. In addition, two construction loans with outstanding commitments aggregating $1.6 million had no advances outstanding at September 30, 2019.

* * *

Nonperforming loans and leases were $64.7 million and $15.5 million as of September 30, 2019 and December 31, 2018, respectively. ***For the nine months ended September 30, 2019, $83.8 million of loans and leases were placed on nonaccrual status.*** Offsetting these additions were $32.2 million of principal payoffs and pay-downs and $0.5 million in charge-offs and upgrades, with the remainder representing transfers to OREO and loan sales. Nonperforming loans at September 30, 2019, reflect the second quarter 2019 addition of a $40.0 million troubled loan relationship.

* * *

> ***Total impaired loans and leases increased $42.2 million, or 167.8 percent, to $67.3 million as of September 30, 2019, from $25.1 million at December 31, 2018, principally due to the addition of a $40.0 million troubled loan relationship*** comprised of a $27.5 million land loan and a $12.5 million business loan. Specific allowances associated with impaired loans and leases were $17.1 million and $1.8 million as of September 30, 2019 and December 31, 2018, respectively.
>
> * * *
>
> The allowance for loan and lease losses was $50.7 million as of September 30, 2019 and $31.9 million as of December 31, 2018. The increase primarily reflects a specific allowance of $15.7 million relating to a $40.0 million troubled loan relationship.

(Emphasis added.)

106. The Q3 2019 Form 10-Q stated that the material weakness in Hanmi's internal control over financial reporting first disclosed in the Q2 2019 Form 10-Q had not yet been remediated:

> During the period covered by this Quarterly Report on Form 10-Q, management has been actively engaged in developing remediation plans to address the material weakness noted above. The Company is enhancing its current controls over the review of the fair value of collateral dependent impaired loans. These enhancements include strengthening our policy documentation describing the criteria for when collateral dependent impaired loan fair value review is required, developing and implementing additional training on our collateral dependent impaired loan fair value review process, and reinforcing the required documentation when concluding a fair value review is not warranted.

107. The statements contained in ¶¶ 100-105 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically,

Defendants made false and/or misleading statements and/or failed to disclose that: (1) the $15.7 million specific provision was less than the difference between the fair value of the troubled loans and the recorded investment; (2) portions of the troubled loans were uncollectible based on the appraisals of the collateral and the liquidity and personal guarantee of the borrower and should have been promptly charged off; (3) restructuring the troubled loans would not result in a positive outcome because the eroding fair value was not temporary; and (4) as a result, Defendants' public statements were materially false and misleading at all relevant times.

108. On January 28, 2018, after the market closed, Hanmi announced its financial results for the fourth quarter of 2019. Hanmi reported net income of $3.1 million for the quarter, which included a "$6.9 million specific provision for loan and lease losses related to a previously identified $39.7 million troubled loan relationship." Hanmi disclosed that just $300,000 of the $40 million troubled loan relationship had been repaid during the fourth quarter of 2019, and the Company had increased the specific allowance for the troubled loans from $15.7 million to $22.6 million. Still, Hanmi refused to charge-off any amount for the troubled loans. The press release stated, in pertinent part:

> **Hanmi Financial Corporation (NASDAQ: HAFC, or "Hanmi")**, the parent company of Hanmi Bank (the "Bank"), today reported net income for the 2019 fourth quarter of $3.1 million, or $0.10 per diluted share, compared with $12.4 million, or $0.40 per diluted share for the 2019 third quarter and $11.4 million, or $0.37 per diluted share for the 2018 fourth quarter. ***2019 fourth quarter net income included a $6.9 million specific provision for loan and lease losses related to the previously identified $39.7 million troubled loan relationship.*** For the 2019 year, net income was $32.8 million, or $1.06 per diluted share, compared with $57.9 million, or $1.79 per diluted share, for 2018.

* * *

Ms. Lee continued, "***Net income for the quarter included a $6.9 million specific provision related to the previously identified $39.7 million troubled loan relationship. We continue to work with the borrower on an orderly resolution to the relationship and the borrower has continued payments, reducing the relationship to $39.7 million from $40.7 million at midyear. With the loans comprising this relationship maturing on December 31, 2019, we received current appraisals on the personal property securing the relationship and have provided for a specific allowance at the lower range of the appraised values***. Notwithstanding this particular relationship, Hanmi's overall credit quality metrics remain strong."

* * *

The troubled loan relationship identified in the 2019 second quarter, included in both the classified and nonaccrual categories above, was $39.7 million at December 31, 2019, compared with $40.0 million at September 30, 2019, and $40.7 million at June 30, 2019. The decline reflects payments applied to the loans outstanding; there have been no charge-offs. The specific allowance for this troubled loan relationship increased to $22.6 million at year-end from $15.7 million at September 30, 2019.

Gross charge-offs for the fourth quarter of 2019 were $1.0 million compared with $0.9 million for the preceding quarter. Recoveries of previously charged-off loans for the fourth quarter of 2019 were $1.0 million compared with $0.6 million for the preceding quarter. As a result, there were net charge offs of $55,000 for the fourth quarter of 2019, compared with net charge offs of $276,000 for the preceding quarter. For the fourth quarter of 2019, net charge offs represented 0.00% of average loans and leases compared to net charge offs of 0.02% for the preceding quarter.

(Emphasis added.)

109. On January 28, 2020, Hanmi hosted a conference call with analysts to discuss the Company's Q3 2019 earnings (the "Q3 2019 Call"). Defendants Lee and Santarosa participated on the call. In her prepared remarks, Defendant Lee stated:

> Net interest income before the loan and lease loss provision was relatively consistent quarter-over-quarter, but a higher loss provision stemming from the previously disclosed troubled loan relationship along with some non-recurring expenses impacted fourth quarter net income.
>
> . . . Looking in more detail at our fourth quarter results, we reported net income of $3.1 million or $0.10 per diluted share. Net income in fourth quarter was significantly affected by the troubled loan relationship, consisting of a $27.2 million land loan and a $12.5 million business loan. While the borrower had continued to make payments and we have incurred no charge-offs, for the loans maturing at year-end, we commissioned a current appraisal on the personal property securing the relationship. As a result, we increased the specific allowance by $6.9 million in the fourth quarter, which places the total allowance at $22.6 million. We will continue to work closely with the borrower to achieve a positive resolution to this loan. . . .
>
> **Importantly, even in today's highly competitive market for loan and leases, we continue to maintain our commitment to conservative, disciplined credit underwriting.**

110. During the question-and-answer portion of the Q4 2019 Call, analyst Gary Tenner of D.A. Davidson & Company asked when the most recent appraisal—prior to the one conducted in the fourth quarter of 2019—of the collateral underlying the troubled loan had been performed. Defendant Lee began to answer by saying it had been performed

> **Gary Tenner**: I had a couple of questions on credit. In terms of the large credit, the increase in the specific reserve and the current valuation, which I think is $22.5 million, when was the most prior appraisal to the updated one that is mentioned in the press release?
>
> **Defendant Lee**: So we obtained the most recent one within the last month or so. The prior one was within the last -- second half of the last year (inaudible) second half of the last year.

> **Defendant Santarosa**: So the real estate side of life that was a year-ago second quarter. On the personal property, we had one of course at inception. We had one in the second quarter, which gave rise to the question about how we should view it, et cetera. So we commissioned another one here at -- as we got into the fourth quarter.

111. On this news, shares of Hanmi fell $1.77 per share or 9.4% to close at $16.99 per share on January 29, 2020, damaging investors.

112. The statements contained in ¶¶ 108-110 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the $22.5 million aggregate specific provision was less than the difference between the fair value of the troubled loans and the recorded investment; (2) portions of the troubled loans were uncollectible based on the appraisals of the collateral and the liquidity and personal guarantee of the borrower and should have been promptly charged off; (3) restructuring the troubled loans would not result in a positive outcome because the eroding fair value was not temporary; (4) Hanmi had an undisclosed material weakness in its internal control over financial reporting that made its disclosures unreliable, and (5) as a result, Defendants' public statements were materially false and misleading at all relevant times.

113. After the market closed on March 2, 2020, Hanmi filed its annual report for the year ended December 31, 2019 on a Form 10-K with the SEC (the "2019 Form 10-K"). The 2019 Form 10-K was signed by Defendants Lee and Santarosa. Attached to the 2019 Form 10-K were certifications pursuant to SOX signed by Defendants Lee and Santarosa attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

114. The 2019 Form 10-K stated the following, in relevant part, about the previously disclosed troubled $40.7 million credit relationship:

> For the years ended December 31, 2019, 2018 and 2017, net income was $32.8 million, $57.9 million and $54.7 million, respectively. The decrease of $25.1 million, or 43.3 percent, in net income for the year ended December 31, 2019 as compared with the year ended December 31, 2018, was primarily due to a $26.2 million increase in the provision for loan and lease losses relating to a troubled loan relationship and impaired leases receivable.
>
> * * *
>
> The allowance for loan and lease losses was $61.4 million, $32.0 million and $31.0 million, respectively, as of December 31, 2019, 2018 and 2017, representing an increase of $29.4 million, or 92.1 percent, in 2019 and an increase of $931,000, or 3.0 percent, in 2018. The allowance for loan and lease losses as a percentage of loans and leases increased to 1.33 percent as of December 31, 2019 from 0.70 percent as of December 31, 2018. The increase in the allowance for loan and lease losses was mainly due to a $22.6 million specific allowance related to a $39.7 million troubled loan relationship as of December 31, 2019.

115. The 2019 Form 10-K stated that the Company had remediated the previously disclosed material weakness in its internal control that allowed for the inadequate review of the fair value of collateral dependent impaired loans. However, the 2019 Form 10-K disclosed that Hanmi had identified a new material weakness in its internal control during the fourth quarter of 2019, this one related to the ineffective information technology general controls.

116. On this news, shares of Hanmi fell $0.93 per share or 5.7% to close at $15.41 per share on March 3, 2020, damaging investors.

117. The statements contained in ¶¶ 113-115 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which

were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the $22.5 million aggregate specific provision was less than the difference between the fair value of the troubled loans and the recorded investment; (2) portions of the troubled loans were uncollectible based on the appraisals of the collateral and the liquidity and personal guarantee of the borrower and should have been promptly charged off; and (3) as a result, Defendants' public statements were materially false and misleading at all relevant times.

118. On April 30, 2020, after the market closed, Hanmi announced its financial results for the first quarter of 2020. Hanmi reported net income of $2.4 million for the quarter, which included a "$2.6 million specific provision for loan and lease losses related to a previously identified $39.7 million troubled loan relationship." Additionally, Hanmi announced that it had finally charged off $25.2 million related to the troubled loan relationship—the first charge-off the Company had taken for the troubled loans. The press release stated, in pertinent part:

> **Hanmi Financial Corporation (NASDAQ: HAFC, or "Hanmi")**, the parent company of Hanmi Bank (the "Bank"), today reported net income for the 2020 first quarter of $2.4 million, or $0.08 per diluted share, compared with $3.1 million, or $0.10 per diluted share for the 2019 fourth quarter and $14.7 million, or $0.48 per diluted share for the 2019 first quarter.
>
> * * *
>
> For the first quarter of 2020, credit loss expense was $15.7 million, comprised of a $14.9 million provision for loan losses and a $0.8 million provision for off-balance sheet items. The provision for loan losses for the fourth quarter of 2019 was $10.8 million and was $1.1 million for the first quarter of 2019. The provision for off-balance sheet items was an expense of $0.9 million and income of $0.3 million for the fourth quarter and first quarter of 2019, respectively. **The 2020 first quarter expense included a $7.4 million specific qualitative provision for the COVID-19 crisis, a $4.9 million provision**

> **primarily for changes in other qualitative factors, and a $2.6 million specific provision for the previously identified troubled loan relationship. The 2019 fourth quarter included a $6.9 million specific provision for the previously identified troubled loan relationship.**
>
> * * *
>
> **Gross charge-offs for the first quarter of 2020 were $27.5 million, $25.2 million of which related to the troubled loan relationship.** Gross charge-offs for the fourth quarter of 2019 were $1.0 million. Recoveries of previously charged-off loans for the first quarter of 2020 were $0.2 million compared with $1.0 million for the preceding quarter. **As a result, there were net charge-offs of $27.3 million for the first quarter of 2020, compared with net charge-offs of $55,000 for the preceding quarter. For the first quarter of 2020, net charge-offs represented an annualized 2.41% of average loans – 0.19% excluding the charge-off of the troubled loan relationship – compared to nil net charge-offs for the preceding quarter.**

(Emphasis added.)

119. On this news, shares of Hanmi fell $1.73 per share or 14.3% to close at $10.34 per share on May 1, 2020, damaging investors.

120. After markets closed on May 11, 2020, Hanmi filed its quarterly report for the quarter ended March 31, 2020 on a Form 10-Q with the SEC (the "Q1 2020 Form 10-Q"). The Q1 2020 Form 10-Q was signed by Defendants Lee and Santarosa..

121. The Q1 2020 Form 10-Q confirmed that the Company had taken an additional $2.6 million specific provision and a $25.2 million charge off for the troubled loan relationship and disclosed that the Company had not remediated the material weakness first disclosed in the 2019 Form 10-K.

122. On this news, shares of Hanmi fell $0.67 per share or 7.4% to close at $8.43 per share on May 12, 2020, damaging investors.

## ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

123. The high number of suspicious personnel decisions during the first six months of Defendant Lee's tenure as CEO provide additional inferences of scienter. On April 12, 2019, the Company filed a Proxy Statement urging investors to ratify the appointment of KPMG LLP ("KPMG") as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2019 because it "is in the best interests of the Company and its stockholders." KPMG had served as Hanmi's independent accounting firm since 2001. On May 23, 2019, investors overwhelmingly voted to ratify the appointment of KPMG by a margin of 27,743,487 for and only 731,601 against.

124. Just one month later, on June 26, 2019, Hanmi abruptly announced that it was dismissing KPMG as its independent auditor, and that the Company was replacing them with Crowe LLP ("Crowe"). Far from independent, Hanmi had engaged Crowe for several different consulting, tax, and auditing services from 2014 through 2018.

125. Lee and Santarosa pushed out the CRO to take over the information technology control, leading to a material weakness. On July 10, 2019, Hanmi disclosed that it had expanded Defendant Santarosa's duties to include "***information technology***, deposit operations, legal and facilities." The Bank's 2020 Proxy statement later revealed that "Santarosa received a grant of 17,914 restricted shares in July 2019 in recognition of his expanded responsibilities, which includes ***additional oversight over other areas including information technology***, deposit operations, legal and facilities." Defendant Santarosa's base salary also increased from $325,000 to $400,000. Fewer than six months after Defendant Santarosa expanded his duties to include information technology, Hanmi identified a material weakness in its internal control related to ineffective information technology general controls. Defendant Santarosa had no previous experience in information

technology, and the Company blamed the material weakness in internal control over financial reporting and ineffective information technology general controls on insufficient training of personnel around changes in our IT environment.

126. On November 18, 2019, Hanmi announced that its Chief Risk Officer, Jean Lim, was leaving the company. Lim had been Hanmi's CRO since August 2008.

127. The magnitude of the troubled loan relationship and the outsized portion of Hanmi's construction portfolio that it represented are additional inferences of scienter. An August 13, 2019 analyst report from Janney Montgomery Scott LLC noted that the relationship was one of the top 25 to 30 relationships at the Bank and was not a joint venture with another bank. Further, Janney noted that the construction piece of the relationship was equivalent to 34% of Hanmi's construction book as of 1Q-19

128. The magnitude of the losses was huge in relation to classified loans and charge offs. It should have been a focus senior management as soon as losses started piling up, if it hadn't been prior to that simply based on the size of the relationship. The $25.2 million the Company charged off in the first quarter of 2020 related to the troubled loan relationship was more than the Company had charged off in the previous three full years, combined.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

129. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Hanmi during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate

families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

130. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Hanmi securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

131. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

132. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

133. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of Hanmi securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

134. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

135. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Hanmi securities are traded in efficient markets;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased and/or sold Hanmi securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

136. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

137. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**

**Against All Defendants**

138. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

139. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

140. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false

statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

141. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Hanmi securities during the Class Period.

142. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

143. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of

the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

144. As a result of the foregoing, the market price of Hanmi securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Hanmi securities during the Class Period in purchasing Hanmi securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

145. Had Plaintiff and the other members of the Class been aware that the market price of Hanmi securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased Hanmi securities at the artificially inflated prices that they did, or at all.

146. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

147. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Hanmi securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**

**Against The Individual Defendants**

148. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

149. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

150. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

151. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Hanmi securities.

152. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to

direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

153. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: September 17, 2020

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

-and-

GLANCY PRONGAY & MURRAY LLP
Kara M. Wolke (SBN 241521)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kwolke@glancylaw.com

*Additional Counsel for Plaintiff*