Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
Email: lrosen@rosenlegal.com
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610

*Counsel for Lead Plaintiff and the Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KILLYOUNG OH, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HANMI FINANCIAL CORPORATION, BONITA I. LEE, and ROMOLO C. SANTAROSA,<br><br>Defendants. | Case No: 2:20-cv-02844-AB-JC<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>JUDGE:  Hon. André Birotte Jr.<br>DATE:   January 29, 2018<br>TIME:   10:00 a.m.<br>CTRM:   7B |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................1

II.    FACTUAL BACKGROUND .............................................................2

    A.    Hanmi's Lending Business ......................................................2

    B.    Bank Examiner Forces Hanmi to Reveal Troubled Loans ...................4

    C.    Defendants Overstate Revenues and Downplay Material Weaknesses..................................................................................4

    D.    Defendants' False and Misleading Statements .....................7

        1.    Defendants Violated Applicable Accounting Standards and Critical Accounting Policies ...................................7

            a.    Defendants Did Not Have an Adequate System to Identify Loans to Evaluate for Impairment......................7

            b.    Defendants Failed to Adequately Value and Disclose the Troubled Loans...........................................9

        2.    Defendants Misled Investors By Downplaying Hanmi's Material Weaknesses and Losses ...........................................10

III.    ARGUMENT ....................................................................................11

    A.    Defendants Made False and Misleading Statements .........................12

        1.    Plaintiffs Plead Falsity With Particularity...............................12

        2.    Defendants Violated Accounting Standards..............................14

        3.    Defendants Made Materially Misleading Statements...............15

        4.    Defendants' False SOX Certifications Are Actionable as Materially False and Misleading Statements..........................15

    B.    Plaintiff Adequately Alleges Scienter................................................17

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

1.  Plaintiff Pleads Defendants' Significant Accounting Violations With Particularity ........................................ 17

2.  Knowledge Can Be Imputed to Defendants ............................ 20

3.  Suspicious Firings and Departures Support an Inference of Scienter ................................................................................. 21

4.  The Inference of Scienter Is At Least As Compelling as Defendants' Suggested Inference ........................................... 23

C.  Plaintiff Adequately Alleges Control Person Liability ....................... 24

IV.  CONCLUSION ......................................................................................... 25

# TABLE OF AUTHORITIES

CASES

*Archibald v. Cty. of San Bernardino*,
  No. EDCV1601128ABSPX, 2018 WL 6017032 (C.D. Cal. Oct. 2, 2018) .......... 14

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 11

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ................................................................................. 20

*Bielousov v. GoPro, Inc.*,
  No. 16-CV-06654-CW, 2017 WL 3168522 (N.D. Cal. July 26, 2017) ................ 21

*Chiteishvili v. Vertifx LLC*,
  No. CV 17-8711-JFW(RAOX), 2018 WL 6219983 (C.D. Cal. Oct. 9, 2018) ..... 25

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005) ................................................................................................ 11

*In re Acadia Pharm. Inc. Securities Litig.*,
  No. 18-CV-01647-AJB-BGS, 2020 WL 2838686 (S.D. Cal. June 1, 2020) ........ 13

*In re Akorn, Inc. Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) ..................................................................... 22

*In re Am. Serv. Grp., Inc.*,
  No. 3:06-0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) .......................... 16

*In re BofI Holding, Inc. Sec. Litig.*,
  No. 3:15-CV-02324, 2017 WL 2257980 (S.D. Cal. May 23, 2017) .................... 24

*In re Capstone Turbine Corp. Sec. Litig*,
  No. CV158914DMGRAOX, 2018 WL 836274, at*5 (C.D. Cal. Feb. 9, 201 ...... 18

*In re Daou Sys., Inc.*,
  411 F.3d 1006 (9th Cir. 2005) ..................................................................... 14, 17, 18

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Downey Sec. Litig.*,
No. CV 08-3261-JFW(RZX), 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ..... 15

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ................................................................. 11

*In re Intuitive Surgical Sec. Litig.*,
65 F. Supp. 3d 821 (N.D. Cal. 2014) ...................................................... 12

*In re McKesson HBOC, Inc. Sec. Litig.*,
126 F. Supp. 2d 1248 (N.D. Cal. 2000) .................................................. 18

*In re Mercator Software, Inc. Sec. Litig.*,
161 F. Supp. 2d 143 (D. Conn. 2001) ..................................................... 22

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) .................................................. 15

*In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*,
221 F. Supp. 2d 1090 (N.D. Cal. 2002) .................................................. 21

*In re Obalon Therapeutics, Inc.*,
No. 3:18-CV-0352-AJB-WVG, 2019 WL 4729461 (S.D. Cal. Sept. 25, 2019) .. 18

*In re OCA, Inc. Sec. & Derivative Litig.*,
No. 05-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) ................................ 16

*In re Proquest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007) .................................................. 16

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ..................................................... 16

*In re Seitel, Inc. Sec. Litig.*,
447 F. Supp. 2d 693 (S.D. Tex. 2006) .................................................... 21

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) .......................................................... 17, 24

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir. 1994) ................................................................. 18

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In the Matter of Trinity Capital Corp., Respondent.*,
   Release No. 3706, 2015 WL 5692553 (Sept. 28, 2015) .........................................19

*Innovation Ventures, LLC v. N2G Distrib., Inc.*,
   No. 812CV00717ABEX, 2014 WL 12564121 (C.D. Cal. Nov. 4, 2014) ............14

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..............................................................................11

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000) ............................................................................25

*Middlesex Ret. Sys. v. Quest Software Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ...................................................16, 17, 22

*Mulderrig v. Amyris, Inc.*,
   No. 19-CV-1765 YGR, 2020 WL 5903844 (N.D. Cal. Oct. 5, 2020) ..................14

*Murphy v. Precision Castparts Corp.*,
   No. 16 Civ. 521, 2017 WL 3084274 (D. Or. June 27, 2017)................................12

*Nguyen v. Endologix, Inc.*,
   No. 17-00017-AB (PLAX), 2018 WL 10321880 (C.D. Cal. Sept. 6, 2018) ..12, 13

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ..............................................................................23

*Rihn v. Acadia Pharm. Inc.*,
   No. 15CV00575 BTM(DHB), 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016).....13

*Ross v. Career Educ. Corp.*,
   No. 12 C 276, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) .................................23

*S.E.C. v. Mozilo*,
   No. CV09-3994HFWNABX, 2009 WL 3807124 (C.D. Cal. Nov. 3, 2009)........15

*S.E.C. v. Platforms Wireless Int'l Corp.*,
   559 F. Supp. 2d 1091 (S.D. Cal. 2008)................................................................24

*Schueneman v. Arena Pharm., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ..............................................................................17

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................................................11, 17, 24

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) ................................................................21

*Tripp v. Indymac Fin. Inc.*,
  No. CV07-1635GW, 2007 WL 4591930 (C.D. Cal. Nov. 29, 2007) ...................15

*Turner Ins. Agency, Inc. v. Farmland Partners Inc.*,
  No. 18-CV-02104-DME-NYW, 2019 WL 2521834 (D. Colo. June 18, 2019) ...21

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) .............................................................................12

*Wieland v. Stone Energy Corp.*,
  No. CIV.A. 05-2088, 2007 WL 2903178 (W.D. La. Aug. 17, 2007)...................16

*Zhengyu He v. China Zenix Auto Int'l Ltd.*,
  No. CV21815530KMJAD, 2020 WL 3169506 (D.N.J. June 12, 2020)...............16

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ...............................................................................23

STATUTES

15 U.S.C. §78u-4(b)(1)(B) ...........................................................................................12

15 U.S.C. §7241 ...........................................................................................................16

18 U.S.C. §1350 ...........................................................................................................16

REGULATIONS

17 C.F.R. § 210.4-01 .....................................................................................................14

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

Throughout the Class Period[1], Defendants[2] took extraordinary actions to mislead investors about Hanmi's exposure to a $40 million troubled loan relationship. Defendants routinely violated accounting standards, understated the Bank's key liability metrics, fired the Bank's long-time independent auditor, pushed out the Bank's long-time Chief Risk Officer, and consolidated the oversight function within senior management. Through the course of the year-long fraud, Hanmi incrementally took provisions for—and belatedly charged off—more than 60% of the troubled loan, identified two separate material weaknesses in the Company's internal controls, and routinely downplayed the significance of these weaknesses and of the risk of losses from the troubled loan relationship

Bonita Lee began her tenure as Hanmi's CEO in April 2019 and signed her first quarterly financial statement just one week later. Unbeknownst to investors, that financial statement was rife with accounting violations papering over the Bank's deficient internal controls and exposure to an uncollectible loan to one of the Bank's largest clients. Lee and Romolo Santarosa, the Bank's CFO, spent the next year consolidating power and misleading investors in a desperate attempt to cover up the fraud.

In October 2019, Hanmi revealed that it had a material weakness in its internal controls that prevented the Bank from performing one of its most essential and basic functions: identifying which loans to measure for impairment. As investors learned in dribs and drabs throughout the Class Period, Hanmi's accounting violations were deeper and more longstanding than Defendants initially revealed. Hanmi not only lacked an effective system to identify which loans to measure for impairment,

[1] The Class Period is May 10, 2019 through May 11, 2020, both dates inclusive.

[2] "Defendants" are Hanmi Financial Corporation (with its wholly owned subsidiary Hanmi Bank, "Hanmi," the "Company," or the "Bank"), Bonita I. Lee, and Romolo C. Santarosa.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defendants also violated GAAP and internal company policies by inflating the fair value of its impaired loans and refusing to charge off the uncollectible portions of those loans. The Bank's initial $15.7 million allowance for the impaired loan relationship inevitably ballooned to a $25.2 million charge off by the end of the Class Period—representing more than 75% of Hanmi's net income for the 2019 fiscal year. Hanmi's stock price fell with each partially corrective disclosure, losing more than half of its value during the Class Period and damaging investors.

Plaintiff pleads a strong inference of scienter based on particularized allegations of significant accounting violations, Defendants' deliberately reckless misstatements about Hanmi's core business, and the numerous uncharacteristic and suspiciously timed personnel changes at key moments of the fraud.

The Court should deny Defendants' motion to dismiss the Complaint.

## II.    FACTUAL BACKGROUND

### A.    Hanmi's Lending Business

Hanmi is a bank holding company whose subsidiary is Hanmi Bank. ¶18.[3] Defendant Bonita I. Lee ("Lee") has served as President and Chief Executive Officer of Hanmi and Hanmi Bank since May 2019. ¶19. Lee previously served as Chief Operating Officer of Hanmi Bank from August 2013 to May 2019. *Id*. Defendant Romolo C. Santarosa ("Santarosa") has served as the Company's Chief Financial Officer ("CFO") and Senior Executive Vice President since November 2015. ¶20. Santarosa previously served as an Audit Senior Manager with PricewaterhouseCoopers. *Id*.

The Bank originates loans and leases, including real estate loans (commercial property, construction and residential property), commercial and industrial loans

---

[3]    Unless otherwise stated, all paragraph ("¶") references are to Plaintiff's Amended Class Action Complaint for Violation of the Federal Securities Laws ("Complaint"). Unless otherwise indicated, all emphasis is added and all internal citations and quotations are omitted.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

(commercial term, commercial lines of credit and international), equipment lease financing, consumer loans and Small Business Administration loans. ¶26.

Hanmi purports to have underwriting procedures designed to identify factors that it believes to maintain acceptable levels of risk in construction lending, including, among other procedures, engaging qualified and bonded third parties to provide progress reports and recommendations for construction loan disbursements. ¶27.

The Bank's commercial business loans finance current operations and typically provide for principal payment at maturity, with interest payable monthly. ¶28. Generally, the Bank takes collateral whenever possible, regardless of the loan purpose(s). *Id*. Collateral may include liens on inventory, accounts receivable, fixtures and equipment, leasehold improvements and real estate. *Id*. Where real estate is the primary collateral, the Bank purports to obtain formal appraisals in accordance with applicable regulations to support the value of the real estate collateral. *Id*. Typically, the Bank requires all principals of a business to be co-obligors on all loan instruments and all significant stockholders of corporations to execute a specific debt guaranty. *Id*. The Bank claims that all borrowers must demonstrate the ability to service and repay not only their obligations to the Bank, but also any and all outstanding business debt, without liquidating the collateral, based on historical earnings or reliable projections. *Id*.

The Bank claims to adhere to strict underwriting and appraisal policies to mitigate its risk. ¶29. The review of each loan and lease application includes analysis of the applicant's business and experience, prior credit history, income level, cash flows, financial condition, tax returns, cash flow projections, and the value of any collateral to secure the loan, based upon reports of independent appraisers and/or audits of accounts receivable or inventory pledged as security. *Id*. In the case of real estate loans over a specified threshold, the review of collateral value includes an appraisal report prepared by an independent Bank-approved appraiser. *Id*. All appraisal reports on commercial real property secured loans are reviewed by an

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

appraisal review officer, which generally covers an examination of the appraiser's assumptions and methods that were used to derive a value for the property, as well as compliance with the Uniform Standards of Professional Appraisal Practice. *Id.*

**B.   Bank Examiner Forces Hanmi to Reveal Troubled Loans**

On May 10, 2019, one week after Lee has assumed her role as CEO, Hanmi filed its Form 10-Q for the first quarter of 2019. ¶40. Hanmi disclosed $43.3 million in impaired loans and leases, a 72.3% increase from the $25.1 million the Company had disclosed for year-end 2018. *Id.* Nonperforming loans increased from $15.5 million at the end of December 2018 to $40 million at the end of March 2019. *Id.*

On July 19, 2019, just four days before its scheduled release of its second quarter earnings, Hanmi disclosed that it was delaying the earnings release in order to "evaluate potential adjustments to the allowance for loan and lease losses recently requested by its banking examiners related to a single credit relationship." ¶46. The Company did not disclose any information about the Troubled Loans, including the size, segment, collateral, or maturity. *Id.*

On August 12, 2019, Hanmi announced that it would be unable to timely file its Form 10-Q for the second quarter because the Bank and Crowe were "evaluating the classification" of the Troubled Loans. ¶48. Hanmi finally disclosed the most basic information about the Troubled Loans: they were comprised of a $28 million construction loan and a $12.7 million business loan. *Id.* The Bank stated that the evaluation could result in an adjustment to ALLL and "a possible internal control deficiency primarily relating to construction lending, which may affect prior periods." *Id.* On this news, shares of Hanmi fell 6.4% to close at $18.59 per share on August 12, 2019. ¶7.

**C.   Defendants Overstate Revenues and Downplay Material Weaknesses**

When Hanmi finally issued its Form 10-Q for the second quarter of 2019 on October 4, the Bank stated that it had a "material weakness in internal control over

- 4 -

financial reporting" resulting from Hanmi's inability to determine "whether a fair value review of collateral dependent impaired loans should occur to facilitate the timely measurement of a specific allowance." ¶51. Defendants told investors that its remediation plan included strengthening its "policy documentation describing the criteria for when collateral dependent impaired loan fair value review is required," "training on our collateral dependent impaired loan fair value review process," and "reinforcing the required documentation when concluding a fair value review is not warranted." ¶52.

Hanmi's nonperforming loans nearly tripled from $16.2 million as of March 30, 2019 to $63.0 million as of June 30, 2019. ¶50. Despite warning investors that the Bank was evaluating a potential material weakness related to construction lending, Hanmi's material weakness disclosures made no mention of the Bank's cratering construction lending portfolio. ¶53. Hanmi rated the entire $40.7 million Troubled Loans as Classified after rating them as Pass/Pass Watch the previous quarter. Notably, the Bank took only a $15.7 million special allowance for the Troubled Loans and did not take a charge off. *Id*. As an analyst Piper Jaffrey & Co. noted, more than half of Hanmi's construction lending portfolio was now rated as special mention or classified despite the entire portfolio being rated Pass/Pass-Watch the previous quarter. ¶54.

On January 28, 2020, the Company reported its earnings for the fourth quarter of 2019 and disclosed that it had taken another $6.9 million specific provision for the Troubled Loans, increasing the total specific provision for the troubled loans to $22.6 million. ¶56. During the conference call regarding the fourth quarter results, Defendants disclosed that the $6.9 million specific provision was the result of an appraisal of the personal property securing the relationship that the Bank commissioned during the fourth quarter of 2019. ¶57. Defendants also disclosed the real estate portion of the loan had not been appraised since the second quarter of 2019

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

and that the personal property portion had been appraised three times: at inception, during the second quarter of 2019, and during the fourth quarter of 2019. *Id*.

On March 2, 2020, Hanmi filed its Form 10-K for 2019 and revealed critical information about the Troubled Loans that the Company had previously concealed from investors. ¶59. The 10-K's discussion of Critical Audit Matters finally disclosed that "the underlying collateral backing the commercial and industrial loan was unique in nature, has a limited resale market, and variability in the estimated fair value. ¶¶61-64.

While Crowe stated that Hanmi's material weakness related to collateral-dependent loans had been remediated, Crowe issued another adverse audit report and revealed a new material weakness in Hanmi's internal controls. ¶¶59-61. Specifically, the Bank had "ineffective information technology general controls in the area of user access and segregation of duties over certain information technology systems that support the Company's recording of transactions and financial reporting processes." *Id*. Crowe stated that the material weakness affected Hanmi's ability to identify "transactions that met certain risk characteristics for specific populations of transactions." *Id*.

On April 30, 2020, Hanmi added another $2.6 million provision for the Troubled Loans, bringing the total to $25.2 million. ¶¶11, 65, 118. Additionally, Hanmi finally acknowledged the full truth that the Company had been concealing from investors for more than a year: that Hanmi would never be able to collect the majority of the troubled loans and would have to write them off as a loss. *Id*. Hanmi charged off the entire $25.2 million provision as uncollectible after having told investors that none of the Troubled Loans were uncollectible the previous quarter. ¶65. Finally, on May 11, 2020, Hanmi confirmed the $25.2 million charge off in its Form 10-Q for the first quarter of 2020 and disclosed that the material weakness related to improper user access had still not been remediated. ¶¶12, 120.

**D.    Defendants' False and Misleading Statements**

**1.  Defendants Violated Applicable Accounting Standards and Critical Accounting Policies**

Hanmi represented to investors that it evaluated loan impairment and measured losses in accordance with GAAP and the Interagency Statement[4], but Defendants and Crowe both concede that Defendants were violating these applicable accounting standards during the Class Period. ¶76. Defendants' reckless failure to design and implement an effective loan review system left Hanmi incapable of timely identifying or evaluating impaired loans. *Id.*

**a.  Defendants Did Not Have an Adequate System to Identify Loans to Evaluate for Impairment**

Defendants' reckless accounting failures left Hanmi incapable of performing the most fundamental accounting function of a lending bank: timely identifying and valuing impaired loans.

Accurate and timely loan classification, which involves an assessment of credit quality and leads to the identification of problem loans, is the foundation for any loan review system. ¶77. GAAP requires banks to set criteria and implement a consistent methodology to determine which loans should be reviewed for impairment. ¶68; ASC 310. Similarly, the Interagency Statement required Hanmi to, at a minimum, implement policies and procedures that ensure it has an effective loan review system and controls that identify, monitor, and address asset quality problems in an accurate and timely manner. ¶77.

The Troubled Loans had several attributes that should have alerted Defendants to the need for an impairment review. GAAP identifies sources of information that alert banks to which loans must be individually evaluated for impairment: loan files lacking current financial data related to borrowers and guarantors; management

---

[4] The "Interagency Statement" is the Interagency Policy Statement on the Allowance for Loan and Lease Losses. The Interagency Statement is available at https://www.fdic.gov/news/financial-institution-letters/2006/fil06105a.pdf.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

reports of total loan amounts by borrower; borrowers experiencing problems such as operating losses, marginal working capital, inadequate cash flow, or business interruptions; and loans secured by collateral that is not readily marketable or that is susceptible to deterioration in realizable value. ¶68. The Troubled Loans featured several of these red flags, each of which should have been sufficient to trigger an individual impairment review: it was one of the Bank's largest loan relationships and represented over one-third of the construction portfolio (¶127); the Bank's understanding that construction loans are inherently uncertain and require constant examination of progress and valuation (¶27); the liquidity concerns and operating losses of the borrower (¶62); the fact that the collateral "was unique in nature, has a limited resale market, and variability in the estimated fair value" (¶¶62-65); and the fact that the Company had not appraised the collateral since origination (¶110). ¶80.

GAAP and the Interagency Statement also require Hanmi to maintain policy documentation of its credit review policies. Defendants concede they failed to maintain adequate "policy documentation describing the criteria for when collateral dependent impaired loan fair value review is required." ¶52, 106. Further, GAAP and the Interagency Statement require Hanmi to maintain documentation substantiating the grades and classifications of all reviewed loans. ¶82. The Interagency Statement requires Hanmi's loan review function to prepare a list of all loans reviewed (including the date of the review) and documentation (including a summary analysis) that substantiates the grades or classifications assigned to the loans reviewed. *Id*. A report that summarizes the results of the loan review should be submitted to the board of directors at least quarterly. *Id*. Defendants' failure to "require[] documentation when concluding a fair value review is not warranted" precluded the Company from improving its ineffective credit review function. Hanmi's bank examiners require it to maintain written supporting documentation all decisions regarding its loan grading system or process. ¶82. The failure to document basic evaluation decisions also makes it impossible for the Company's independent auditor to evaluate the

- 8 -

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

reasonableness of accounting estimates made by management, including its estimates of loan impairments and the associated allowance for loan losses. *Id*.

### b. Defendants Failed to Adequately Value and Disclose the Troubled Loans

Throughout the Class Period, Hanmi violated accounting standards and its own policies by improperly classifying and disclosing the Troubled Loans.

GAAP requires banks to classify loans as "impaired" when "it is probable a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement." ¶69; ASC 310- 10-35-16. When a loan is impaired, GAAP requires banks to measure the loss, disclose the loss to investors by recording a provision, and add the loss to the ALLL. *Id*; ASC 310-10-35-41.

Hanmi repeatedly assured investors that the Bank charges off loans and declares a loss when a loan's collectability is questionable and when the Bank can no longer justify presenting the loan as an asset on its balance sheet. ¶31. The Bank purported to analyze all possible sources of repayment—including the potential for future cash flow from income or liquidation of other assets, the value of any collateral, and the strength of guarantors—to determine if a loan should be charged off. Hanmi's stated policy required the Bank to fully or partially charge off a loan when those sources do not provide a "reasonable probability" that the principal can be collected in full. ¶31. The Bank does not require a loan to have "absolutely no recovery or salvage value" before charging it off. ¶30.

Hanmi treated the Troubled Loans as collateral dependent because repayment of the loans was expected to be provided solely by the underlying collateral. *Id*. The Interagency Statement requires banks to measure the impairment collateral-dependent loans using the fair value of collateral method. ¶72. GAAP requires banks to measure the fair value of collateral dependent loans by estimating the price that would be received to sell an asset in an orderly transaction between market participants as of the measurement date. ¶73. ASC 820-10-20. For impairment

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

analysis purposes, the fair value of collateral should reflect the current condition of the property, not the potential value of the collateral at some future date. ¶73.

Defendants violated ASC 310-10-35-41 by failing to charge off uncollectible portions of the Troubled Loans until the first quarter of 2020. ¶83. Defendants knew at the latest by the second quarter of 2019—and were deliberately reckless in not knowing earlier—that the fair value of the collateral securing the loans had eroded along with the liquidity and personal guarantee of the borrower. *Id*. The appraisals Hanmi received in the second quarter of 2019 and the fourth quarter of 2019 informed the Bank that at least a portion of the collateral-dependent impaired loans were uncollectible. ¶83. Further, Defendants violated ASC 820-10-20 by using "upon-completion" appraisals to measure to measure the fair value of the construction portion of the Troubled Loans. ¶84. ASC 820-10-20 defines fair value as the "price that would be received to sell an asset in an orderly transaction between market participants as of the measurement date." The "upon completion" valuation scenarios measure reflect the price as of a potential future date, inflating the fair value of the loan and Hanmi's earnings. ¶84.

### 2. Defendants Misled Investors By Downplaying Hanmi's Material Weaknesses and Losses

Defendants materially misled investors throughout the Class Period by minimizing the Troubled Loans and the Bank's accounting deficiencies.

First, Defendants repeatedly assured investors that Hanmi "continued to maintain conservative and disciplined underwriting standards" despite knowing that Hanmi's despite knowing that the Bank had an unremediated material weakness that left it incapable of effectively evaluating its loans. ¶¶100-101, 109,

Second, when Defendants first disclosed a potential adjustment to the Bank's ALLL on July 19, 2019, Defendants misled investors by downplaying the $40.7 million Troubled Loans as "a single credit relationship" and failing to disclose the Bank's material weakness. ¶¶89-90.

- 10 -

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Third, Defendants repeatedly assured investors the Troubled Loans would have a "positive resolution" despite knowing that at least portions of the Troubled Loans were uncollectible based on the appraisals. ¶¶101, 109.

## III.   ARGUMENT

Courts assess Rule 12(b)(6) motions by considering the complaint in its entirety, "accept[ing] all factual allegations . . . as true" and construing them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint should not be dismissed if it contains a "sufficient factual matter [that], accepted as true, 'state[s] a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must be mindful that "a district court ruling on a motion to dismiss is not sitting as a trier of fact" and "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Claims asserted under Section 10(b) of the Securities Exchange Act must plead six elements: a misrepresentation or omission of material fact, scienter, a connection with the purchase of sale of a security, reliance, economic loss, and loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Defendants challenge only falsity and scienter.

Plaintiffs do not oppose Defendants' request for judicial notice (Dkt. No. 33-1) to the extent that the Court takes notice of the fact that statements contained in those documents were made. To the extent that Defendants attempt to use these exhibits to defeat Plaintiffs' adequately pleaded claims, such practice is improper and highly discouraged by the Ninth Circuit. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (recognizing a "concerning pattern in securities cases" where defendants attempt to exploit judicial notice "procedures improperly to defeat what would otherwise constitute adequately stated claims at the pleading stage").

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## A. Defendants Made False and Misleading Statements

To plead falsity under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement [or omission] is misleading." 15 U.S.C. § 78u-4(b)(1)(B). The allegations must identify who made the allegedly misleading statements and what statements were misleading, state whereand when the statements were made, and explain why the statements were misleading. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)). The Complaint does exactly that.

## 1. Plaintiffs Plead Falsity With Particularity

Defendants' "charge of puzzle pleading is unfounded." *Nguyen v. Endologix, Inc.*, No. 17-00017-AB (PLAX), 2018 WL 10321880, at *4 (C.D. Cal. Sept. 6, 2018), *aff'd,* 962 F.3d 405 (9th Cir. 2020).[5] The Complaint quotes from the Defendants' public statements, with each quote followed by an explanation why it is false or misleading, *see* ¶¶85-90, 97-99, 100-107, 108-112, 113-117. *Id.* Defendants are well-aware of the specific material misstatements and omissions upon which the Complaint is based, as evidenced by their motion – where Defendants argue that certain false and misleading statements are inactionable. MTD at 20-21.[6]

_____

[5] *See also Murphy v. Precision Castparts Corp.*, No. 16 Civ. 521, 2017 WL 3084274, at *7 (D. Or. June 27, 2017), *report and recommendation adopted sub nom. Murphy v. Precision Castparts Corp.*, 2017 WL 3610523 (D. Or. Aug. 22, 2017) (rejecting defendant's puzzle pleading argument and finding complaint alleging misstatements and omissions in a specifically labeled section, organized by fiscal quarter or a particular event, along with the reasons each statement is false or misleading, to be sufficiently particularized).

[6] Defendants' recognition of the misleading statements defeats the claim that the Complaint is too vague. *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) (when Defendants easily parse out false and misleading statements in their motion, the complaint "fulfills the purpose of Rule 8 by putting Defendants on notice of the true substance of the claims against them.").

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defendants' attacks on the specific allegations in ¶¶85-87 related to the Q1 2019 Form 10-Q fail. As an initial matter, Defendants' SOX certifications (¶85) are alleged to be false and misleading because Hanmi had material weakness in internal control over financial reporting, as explained in ¶88. Further, Defendants' statements in ¶¶86-87, which attest to evaluation of loan and lease impairment in accordance with GAAP, the ratio of nonperforming loans and leases and allowance for collateral dependent loans, monitoring of quality of loan and lease portfolio, and the categorization of loans, are all alleged to be misleading because, *inter alia*, Hanmi failed to place the $40.7 million troubled loan relationship on nonaccrual, classify it as a Troubled Debt Restructuring, grade it as classified or a loss, or take a specific provision for it despite the fact that the loans' fair values were less than the recorded investments and partially uncollectible, also as explained in ¶88. These allegations are not fraud by hindsight. As explained in Section III.B, Defendants were aware (or at *minimum* recklessly disregarded) throughout the Class Period, that the troubled loan relationship required proper classification (but failed to do so), including at the time the Q1 2019 Form 10-Q was filed.

Additionally, the false statements and explanations alleged in ¶¶97-98, 100-107, 108-112, 113-117 are easily identifiable even though some of the statements come from block quotations. *Rihn v. Acadia Pharm. Inc.*, No. 15CV00575 BTM(DHB), 2016 WL 5076147, at *5 (S.D. Cal. Sept. 19, 2016) (finding no puzzle pleading despite the complaint's inclusion of multiple block quotes); *In re Acadia Pharm. Inc. Securities Litig.*, No. 18-CV-01647-AJB-BGS, 2020 WL 2838686, at *4 (S.D. Cal. June 1, 2020) (concluding no puzzle pleading although the statements in the section entitled "Materially False and Misleading Statements Issued During the Class Period." contained large block quotes). Not only are the statements identifiable, the explanation of why the statements are false is clear. ¶¶88, 90, 99, 107, 112, 117. In short, the Complaint does not employ puzzle pleading. *Endologix*, 2018 WL 10321880, at *4.

- 13 -

## 2. Defendants Violated Accounting Standards

Plaintiff alleges with particularity that Hanmi's financial statements throughout the Class Period violated GAAP, and it is black letter law that "[v]iolations of GAAP are presumed to be misleading," *Mulderrig v. Amyris, Inc.*, No. 19-CV-1765 YGR, 2020 WL 5903844, at *1 (N.D. Cal. Oct. 5, 2020) (citing SEC Regulation S-X, 17 C.F.R. § 210.4-01). *See* Section II.D.1.

To plead misstatements based on GAAP violations, a plaintiff must "allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1017 (9th Cir. 2005). Plaintiff alleges that Defendants' GAAP violations were widespread an significant, as the $25 million in uncollectible principal that Defendants failed to disclose throughout the Class Period represented over 75% of Hanmi's $32.8 million of net income in 2019. ¶114.

Importantly, Defendants do not—and cannot—challenge the Complaint's allegations that Defendants violated GAAP because the allegations are based on Defendants' own admissions of material weaknesses. Further, Defendants may not challenge the accounting allegations on falsity grounds for the first time in their reply brief. *See, e.g., Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 812CV00717ABEX, 2014 WL 12564121, at *2 (C.D. Cal. Nov. 4, 2014) (Birotte Jr., J.) ("arguments raised for the first time in a reply brief are generally waived"). *Archibald v. Cty. of San Bernardino*, No. EDCV1601128ABSPX, 2018 WL 6017032, at *7 (C.D. Cal. Oct. 2, 2018) (Birotte Jr., J.) (holding that defendants waived an argument about the prong of a statute by failing to present an argument on the prong in their moving brief, and finding that "[r]eciting a general statement of the law is not equivalent to presenting argument on that law").[7]

---

[7] The Motion cites a string of cases for the principle that generalized allegations about inadequate reserves are not actionable. Motion at 20-21. These cases are all

- 14 -

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

### 3. Defendants Made Materially Misleading Statements

Defendants made several material misstatements in addition to their actionable accounting violations. First, Defendants repeatedly described Hanmi's underwriting standards as "conservative" and "disciplined." ¶¶100, 101, 109. These characterizations of Hanmi's underwriting were false and misleading because Defendants knew at the time they were made that Hanmi had an unremediated material weakness that rendered the Bank incapable of evaluating the impairment of its loans. *See, e.g.,. S.E.C. v. Mozilo*, No. CV09-3994HFWNABX, 2009 WL 3807124, at *11 (C.D. Cal. Nov. 3, 2009) (denying motion to dismiss and finding lender's statements touting its underwriting standards to be materially false and misleading); *In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (same).

Further, Defendants repeatedly assured investors the Troubled Loans would have a "positive resolution" despite knowing that at least portions of the Troubled Loans were uncollectible based on the appraisals. These statements were baseless when made, as demonstrated by the fact that they were repeated verbatim in different time periods. ¶¶101, 107, 109, 112.

Defendants do not contest the material falsity of these challenged statements.

### 4. Defendants' False SOX Certifications Are Actionable as Materially False and Misleading Statements

Defendants' SOX certifications are also actionable as false statements of fact. ¶¶85, 97, 104, 113. In an effort to protect investors from corporate wrongdoing, Sections 302 and 906 of SOX require companies filing financial reports with the SEC to have their principal executive and financial officer certify, among other things,

inapposite because they do not address the falsity of GAAP allegations. *See In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZX), 2009 WL 2767670, at *12 (C.D. Cal. Aug. 21, 2009) (only evaluating GAAP allegations for scienter); *Tripp v. Indymac Fin. Inc.*, No. CV07-1635GW, 2007 WL 4591930, at *5 (C.D. Cal. Nov. 29, 2007) (same)

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

that: (1) the signing officers have reviewed the report; (2) that the report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made not misleading; (3) that the report fairly presents the financial condition and operational results of the company; and (4) that the signing officers have established, maintained, and evaluated the company's internal controls and have presented their conclusions regarding the effectiveness of the company's internal controls. 15 U.S.C. §7241; 18 U.S.C. §1350. As this District has recognized, "[f]or these certifications to have any substance, signatories to the certifications must be held accountable for the statements." *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189–1190 (C.D. Cal. 2007).[8]

In accordance with this effort to protect investors, courts have held that false SOX certifications are actionable as misrepresentations under the securities laws when defendants are severely reckless in signing such certifications.

Defendants represented that the Bank's internal controls over financial reporting were adequate and that the Bank's financial statements fairly presented, in

---

[8] *See also Zhengyu He v. China Zenix Auto Int'l Ltd.*, No. CV21815530KMJAD, 2020 WL 3169506, at *8 (D.N.J. June 12, 2020) (denying dismissal and finding SOX certification adequately alleged to be misleading and actionable because the complaint adequately the associate annual report contained misleading information); *In re Am. Serv. Grp., Inc.*, No. 3:06-0323, 2009 WL 1348163, at *42 (M.D. Tenn. Mar. 31, 2009) ("Plaintiffs' certification claims against [defendants] are actionable"); *Wieland v. Stone Energy Corp.*, No. CIV.A. 05-2088, 2007 WL 2903178, at *7 (W.D. La. Aug. 17, 2007) ("Plaintiffs have also sufficiently alleged that the Sarbanes-Oxley certifications that [defendants] signed in connection with [the company's] quarterly reports contained false and misleading information."); *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 745–46 (E.D. Mich. 2007) (holding that defendants' SOX certifications demonstrated the falsity of defendants' statements); *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 391 (S.D.N.Y. 2007) ("Because plaintiffs' allegation that the certifications at issue represent false statements is plausible, the motion to dismiss the Sarbanes-Oxley claim is denied."); *In re OCA, Inc. Sec. & Derivative Litig.*, No. 05-2165, 2006 WL 3747560, at *16 (E.D. La. Dec. 14, 2006) ("The Court therefore finds that plaintiff has adequately alleged that statement[s] in defendants' Sarbanes-Oxley certifications were false or misleading when made.").

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

all material respects, the financial condition and results of operations of the Company. ¶¶85, 97, 104, 113. Because Defendants falsely represented that the Bank's internal controls over financial reporting were adequate, and that they had disclosed all fraud, whether or not material, Defendants' SOX certifications are actionable as material misrepresentations. *Middlesex*, 527 F. Supp. 2d at 1189-1190).

### B. Plaintiff Adequately Alleges Scienter

Plaintiff alleges facts raising a strong inference of scienter, which not only includes knowledge, "but also deliberate recklessness." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). The "inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322– 23. A "strong inference" is raised when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference" of nonfraudulent intent. *Id.* at 310. The scienter inference "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required. *Id.* at 324–26. "'[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Capstone Turbine Corp. Sec. Litig.*, No. CV158914DMGRAOX, 2018 WL 836274, at *5 (C.D. Cal. Feb. 9, 2018) (citing *In re Daou Sys., Inc.*, 411 F.3d at 1015).

Crucially, Defendants fail to offer any competing non-fraudulent inference. Instead of identifying any plausible innocent explanation, Defendants improperly seek to "attack individual allegations in isolation," which "cannot overcome the overwhelming evidence drawn from a holistic view." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012).

### 1. Plaintiff Pleads Defendants' Significant Accounting Violations With Particularity

To plead scienter for accounting violations, a "plaintiff must show with

particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." *Daou*, 411 F.3d at 1018; *see also In re Obalon Therapeutics, Inc.*, No. 3:18-CV-0352-AJB-WVG, 2019 WL 4729461, at *9 (S.D. Cal. Sept. 25, 2019) ("when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves.").

Defendants argue that while Plaintiff's "allegations of Hanmi's alleged accounting violations are lengthy, they are nothing more than filler that the Ninth Circuit has rejected as a basis to plead scienter under the PSLRA." Motion at 25. Defendants' blanket dismissal of GAAP allegations as mere "filler" is based on a fundamental misunderstanding of the law. Defendants correctly note that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." Motion at 25 (*quoting In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994)). Defendants misunderstand this principle to mean that GAAP violations can *never* support a strong inference of scienter. As the court explained in *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272–73 (N.D. Cal. 2000), this principle "does not mean that detailed allegations of GAAP violations cannot support a strong inference of scienter," and "[c]ourts that have discounted allegations of GAAP violations as evidence of fraud have never held that GAAP violations are proper or cannot constitute fraud." Instead, courts must examine the particularity and magnitude of the GAAP allegations to determine whether they support a strong inference of scienter. "GAAP violations are minor or technical, there is less implication that senior management was aware of the misstatement. If the GAAP violations involve substantial clients or significant inflation of revenue, a strong inference arises that senior management intentionally misstated earnings." *Capstone Turbine*, 2018 WL 836274, at *8.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Here, Plaintiff pleads with particularity the specific GAAP provisions that Defendants violated, describes the amounts each of these violations affected the Bank's financial statements, and demonstrates that the misstatements significantly impacted the Bank's overall financial position.

Defendants admit that Hanmi had a material weakness that rendered Hanmi incapable of determining whether loans should be measured for impairment and that Defendants only disclosed this material weakness after Hanmi's bank examiner forced them to evaluate the Troubled Loans during the second quarter of 2019. ¶¶51-52. Hanmi's inability to timely determine that the Troubled Loans should be evaluating for impairment despite their numerous red flags violated ASC 310-10-35-14 and prevented the Company from classifying the entire $40 million loan relationship as non-performing and taking a specific provision for the already-impaired loans in the first quarter of 2019.

Further, Defendants violated ASC 310-10-35-41 by failing to charge off the $25.2 million in uncollectible principal prior to the first quarter of 2020. Significantly, Defendants violated the Interagency Statement's requirement that Hanmi maintain documentation of its impairment review policies and documentation of each of its loan classification decisions. ¶¶79-82.

Finally, Defendants violated ASC 820-10-20 by using "upon completion" appraisals to measure the fair value of the impaired construction portion of the Troubled Loans. GAAP required Hanmi to measure fair value as the price that would be received by selling the collateral as of the measurement date, not as of some future date after the construction has been completed. ¶¶83-84; *see In the Matter of Trinity Capital Corp., Respondent.*, Release No. 3706, 2015 WL 5692553, at *5 (Sept. 28, 2015) ("For purposes of measuring the impairment on a collateral dependent loan, the Bank was required to consider the current condition of the property, which can be accomplished by using an 'as-is' appraisal value. However, in at least two instances, certain former members of the Bank's management directed the use of the

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

higher 'as stabilized' or 'as completed' values in measuring impairment losses when an as-is appraisal should have been used.") (citing ASC 820-10-20).

Defendants' accounting violations had a significant impact on Hanmi's overall finances. The $25.2 million charge off that Hanmi falsely delayed for a year represented over 75% of Hanmi's operating profit for 2019.

### 2.   Knowledge Can Be Imputed to Defendants

Courts can infer scienter from allegations of facts that "were prominent enough that it would be absurd to suggest that top management was without knowledge of the matter." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008). Here, Plaintiff alleges facts showing that Lee and Santarosa were aware of Hanmi's GAAP obligations to maintain an effective system for determining which loans should be evaluated for impairment, spoke at length and in detail about the Troubled Loans (¶¶101, 103, 109, 110), and attested to Hanmi's material weaknesses. Given these well-pleaded facts, it is absurd to suggest that Lee and Santarosa were anything less than knowledgeable or deliberately reckless.

Further, the accounting violations significantly affected Hanmi's ALLL, the measurement of which the Company considers to be "an integral part of the quarterly credit review process." ¶34. The Interagency Statement assigns management with the responsibility for maintaining the ALLL at an appropriate level, documenting its analysis, and evaluating the ALLL reported on the balance sheet as of the end of each quarter,. An institution's failure to analyze the collectibility of the loan portfolio and maintain and support an appropriate ALLL in accordance with GAAP and supervisory guidance is generally an unsafe and unsound practice. ¶35. Lee served as the Chairperson of Hanmi's Risk, Compliance, and Planning Committee (the "RCP Committee") throughout the Class Period. ¶37. The RCP Committee undertakes a quarterly risk assessment and assists the Board in fulfilling its oversight responsibility with respect to regulatory, compliance, operational risk and enterprise risk management issues that affect the Company. ¶37.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Finally, the magnitude of the Troubled Loans all but assure that Lee and Santarosa were aware of their fraudulent accounting. The Troubled Loans accounted for more than 60% of Hanmi's construction lending portfolio, and the belated $25.2 million charge off represented more than 75% of Hanmi's net income for the entire 2019 fiscal year. ¶¶53-54. Together, these allegations show the absurdity of the idea that Lee and Santarosa were merely negligent rather than deliberately reckless. *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1042 (N.D. Cal. 2016) ("Accounting errors that prove to have a significant impact on core business operations-*i.e*. cash, revenue, profits, liquidity...sometimes give rise to a compelling inference of scienter."); *In re Northpoint Commc'ns Grp., Inc., Sec. Litig.*, 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002) (CFO's scienter inferred because of CFO's position and because fraud involved significant financial aspect of the business).

### 3. Suspicious Firings and Departures Support an Inference of Scienter

The high number of suspicious personnel changes during the first six months of Defendant Lee's tenure as CEO support a strong inference of scienter. First, the Bank dismissed KPMG as its auditor on June 26, 2019. ¶¶4, 43-44, 123-124. The Bank abruptly dismissed KPMG just two months after recommending that shareholders ratify KPMG's appointment for another year and just one month after over 97% of voting shareholders voted to ratify KPMG's appointment. *Id*; s*ee Turner Ins. Agency, Inc. v. Farmland Partners Inc.*, No. 18-CV-02104-DME-NYW, 2019 WL 2521834, at *6 (D. Colo. June 18, 2019) (denying motion to dismiss and finding that scienter can be inferred from resignation of certain directors and change in auditors); *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 709 (S.D. Tex. 2006) (denying dismissal and finding strong inference of scienter, in part, based on suspicious dismissal of auditor).

Additionally, numerous courts have held that the departure of a key company executive can bolster a strong inference of scienter. *See, e.g.*, *Bielousov v. GoPro,*

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Inc.*, No. 16-CV-06654-CW, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (holding that resignation of the company's president bolstered the strong inference of scienter alleged); *Middlesex*, 527 F. Supp. 2d at 1187–1188 (holding that because defendant's resignation was "highly suspicious," it leaned "heavily towards a finding of scienter").

On November 18, 2019—just weeks after the Hanmi revealed its material weakness and took a $15.7 million specific allowance, Hanmi announced the departure of Chief Risk Officer, Jean Lim, was leaving Hanmi. ¶¶4, 55, 126, Lim had served as the Bank's Chief Risk Officer since August 2008 and as Executive Vice President since August 2013. Lim was one of just five Named Executive Officers at the Company. Id. The Board's Risk, Compliance, and Planning Committee received regular reports from Lim related to information technology and information security to fulfill its role of assisting management in identifying, assessing, measuring and managing certain risks facing the Company. *Id*. Lim reported directly to Defendant Lee. ¶55. The suspicious timing of the resignation of Lim and the termination of KPMG strongly imply either that new management was trying to cover up the fraud or that the Bank had been recklessly misstating its revenues since at least the start of the Class Period. *See In re Mercator Software, Inc. Sec. Litig.*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001) (denying dismissal and finding scienter, in part, because "one could deduce that the company had been having financial difficulties for some time" from departure of key officers at the same time company restated financials). Further, both KPMG and Lim left the Bank before replacements had been named. *See, e.g., In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("[f]urther reinforcing the case for scienter is the allegation that Dick resigned in the wake of the restatement, before a replacement CFO was selected").

Finally, the fact that Santarosa took over Lim's information technology authority—despite Santarosa having no experience in information technology—just one week after the Hanmi dismissed KPMG adds to the suspicious nature of the

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

personnel changes following Lee's ascension as CEO. ¶4, Moreover, the same quarter that Lim left her role as CRO Hanmi disclosed yet another material weakness related to ineffective information technology general controls in the area of user access and segregation of duties over certain information technology systems that support the Company's recording of transactions and financial reporting processes—the area over which Defendant Santarosa had recently assumed Lim's oversight. ¶60, 124-126.

Defendants' citation to *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009), further reinforces the inference of scienter. Motion at 26-27. In *Zucco*, the Ninth Circuit held that allegations of suspicious personnel changes are not compelling unless accompanied by "allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns." *Id.* Here, Plaintiff alleges that KPMG was abruptly fired after serving as Hanmi's external auditor for over 18 years, and Lim was forced out after serving as the Company's Chief Risk Officer for over 11 years. *See Ross v. Career Educ. Corp.*, No. 12 C 276, 2012 WL 5363431, at *10 (N.D. Ill. Oct. 30, 2012) (observing that "the timing of [a corporate officer's] resignation lends weight to a finding of scienter"). Accordingly, Plaintiff's allegations meet the *Zucco* "uncharacteristic" standard.

### 4. The Inference of Scienter Is At Least As Compelling as Defendants' Suggested Inference

Plaintiff pleads several inferences of scienter: (i) particularized allegations of significant accounting violations, (ii) imputed knowledge of the Bank's core operations, (iii) and suspiciously-timed and uncharacteristic departures of key accounting personnel. While each of these allegations are sufficient, standing alone, to plead a strong inference of scienter than is at least as cogent and compelling as any competing inference, "looking at the totality of the circumstances under the *Tellabs* analysis makes the inference irresistible." *Reese v. Malone*, 747 F.3d 557,

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

577 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

Defendants contest scienter by attacking each scienter allegation in isolation. Motion at 23 ("the existence of internal control deficiencies does not amount to scienter"); Motion at 25 & n.2 ("GAAP violations are insufficient to plead securities fraud"); Motion at 26 ("'suspicious' changes in a corporate defendant's personnel are [not] sufficient to plead scienter"). The Supreme Court has explicitly rejected this type of argument, holding that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 326. "Viewed in isolation, any one allegation may not compel an inference of scienter. However, when we consider the allegations holistically, the inference that [defendants] were deliberately reckless as to the truth of their financial reports and related public statements is at least as compelling as any opposing inference." *VeriFone*, 704 F.3d at 698–99 (overturning district court's dismissal and finding scienter).

Defendants do not, and cannot, suggest any non-fraudulent inference to compete with the strong inference of fraud pleaded by Plaintiff. Finally, Plaintiff adequately alleges scienter against Hanmi because "[t]he scienter of a corporation can be imputed from that of its officers." *S.E.C. v. Platforms Wireless Int'l Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008).

**C. Plaintiff Adequately Alleges Control Person Liability**

Plaintiffs have adequately pleaded control person liability under Section 20(a) by alleging primary violations and that Defendants were in positions of control. ¶¶21-23; *see In re BofI Holding, Inc. Sec. Litig.*, No. 3:15-CV-02324, 2017 WL 2257980, at *21 (S.D. Cal. May 23, 2017). Defendants argue that Plaintiff's Section

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

20(a)[9] claims fail because the Complaint has not adequately alleged scienter against the Individual Defendants. Motion at 27-28. These arguments are misplaced; it is black letter law that "Section 20(a) does not require scienter and/or fraud as prerequisites for finding a control person's liability." *Chiteishvili v. Vertifx LLC*, No. CV 17-8711-JFW(RAOX), 2018 WL 6219983, at *8 (C.D. Cal. Oct. 9, 2018).

## IV.   CONCLUSION

Defendants' motion to dismiss should be denied in its entirety. Alternatively, if the Court grants any portion of the motion, Plaintiff respectfully requests leave to amend. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (holding that leave to amend should be freely granted unless "the pleading could not possibly be cured by the allegation of other facts.").[10]

---

[9] Where the Motion refers to Section 20(b) claims (Motion at 9, 17, 27), which the Complaint does not plead, Plaintiff interprets these arguments to be related to the Complaint's Section 20(a) claims.

[10] The Motion makes several erroneous arguments as to why, if the Court grants the Motion, leave to amend should be denied. First, Defendants argue that the Complaint "grossly mischaracterizes" Hanmi's August 12, 2019 disclosure "in an attempt to show that it 'concealed' problems with the Loan from investors." Motion at 29. This argument is perplexing given that the Complaint alleges the August 12, 2019 disclosure was a partially corrective disclosure, not a misstatement. ¶¶48, 93-94. Second, Defendants nonsensically argue that the August 12, 2019 disclosure that Hanmi "anticipated" (Motion at 12) taking a provision for the Troubled Loans was actually a disclosure than the Bank had already taken such a provision in June 2019. Third, Defendants baselessly assert that generic pre-Class Period disclosures about the general risks of lending insulate Defendants from liability for deliberately reckless accounting violations. Motion at 30-31. None of these arguments merit the dismissal of the Complaint, much less demonstrate that amendment would be futile.

- 25 -

Dated: December 17, 2020

**THE ROSEN LAW FIRM, P.A.**

By: Laurence M. Rosen, Esq.
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff*

**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke (SBN 241521)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kwolke@glancylaw.com

*Additional Counsel for Lead Plaintiff*

- 26 -

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on December 17, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 17, 2020                    /s/ Laurence M. Rosen
                                            Laurence M. Rosen