Laurence M. Rosen, Esq. (SBN 219683)
Daniel Tyre-Karp (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
Email: lrosen@rosenlegal.com
dtyrekarp@rosenlegal.com
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610

*Counsel for Lead Plaintiff and the Class*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KILLYOUNG OH, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HANMI FINANCIAL CORPORATION, C.G. KUM, BONITA I. LEE, and ROMOLO C. SANTAROSA,<br><br>Defendants. | Case No: 2:20-cv-02844-FLA-JC<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><u>CLASS ACTION</u><br><br>Judge: Hon. Fernando L. Aenlle-Rocha<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONENTS

I. NATURE OF THE ACTION ........ 1

II. JURISDICTION AND VENUE ........ 6

III. PARTIES ........ 6

IV. SUBSTANTIVE ALLEGATIONS ........ 8

A. Hanmi's Lending Business ........ 8

B. Hanmi's Troubled Loan Relationship With Michael Harrah ........ 10

*1. The Broadway Loan: Hanmi Loans $41.2 Million To Harrah's One Broadway Plaza ........ 12*

*2. The Caribou Loan: Hanmi Loans More Money to Harrah To Pay Off a Portion of the Broadway Loan ........ 15*

*3. Harrah's History Hiding Assets ........ 20*

C. Background of Class Period Disclosures and Investors' Losses 22

V. APPLICABLE ACCOUNTING STANDARDS ........ 27

A. GAAP and Hanmi's Own Accounting Standard Required Defendants to Disclose the Harrah Loans as Troubled Debt Restructurings And Impair Them ........ 28

B. GAAP and Hanmi's Internal Accounting Policies Required Defendants to Take a Specific Allowance and Promptly Charge Off $25 Million of Loan Losses From the Harrah Loans ........ 32

C. SEC Rules Requires Hanmi to Disclose Identifying Information About the Harrah Loans ........ 35

VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ........ 39

A. HANMI'S Q2 2018 FINANCIAL RESULTS ....................39
B. HANMI'S Q3 2018 FINANCIAL RESULTS ....................43
C. HANMI'S FISCAL YEAR 2018 FINANCIAL RESULTS ....................48
D. HANMI'S Q1 2019 FINANCIAL RESULTS ....................56
E. HANMI'S Q2 2019 FINANCIAL RESULTS ....................63
F. HANMI'S Q3 2019 FINANCIAL RESULTS ....................67
G. HANMI'S FISCAL YEAR 2019 FINANCIAL RESULTS ....................69

VII. ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER ....................73

A. THE HARRAH LOANS WERE CRITICAL TO HANMI'S CORE OPERATIONS ..73
B. THE ACCOUNTING PRINCIPLES AND POLICIES DEFENDANTS VIOLATED WERE SIMPLE, STRAIGHTFORWARD, AND ESSENTIAL TO HANMI'S OPERATIONS AS A BANK ....................76
C. THE HIGH VOLUME OF SUSPICIOUS PERSONNEL DECISIONS SUPPORTS A STRONG INFERENCE OF SCIENTER ....................79
D. DEFENDANTS' FINANCIAL MOTIVATION TO CONCEAL LOSSES FROM THE HARRAH LOANS SUPPORT A STRONG INFERENCE OF SCIENTER ....................81

VIII. PLAINTIFF'S CLASS ACTION ALLEGATIONS ....................83

IX. CAUSES OF ACTION ....................86

COUNT I ....................86

VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 AGAINST ALL DEFENDANTS ....................86

COUNT II ....................88

VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS ....................88

**X. PRAYER FOR RELIEF....................................................................89**

**XI. DEMAND FOR TRIAL BY JURY ......................................................90**

Plaintiff Killyoung Oh ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Hanmi Financial Corporation ("Hanmi" or the "Company")[1], analysts' reports and advisories about the Company, public dockets in California state courts; and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons who purchased the publicly traded Hanmi common stock between August 9, 2018 and April 30, 2020, both dates inclusive (the "Class Period").[2] Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

[1] Hanmi's subsidiaries are included in this definition.

[2] Excluded from the Class are all (i) Defendants; (ii) current and former officers, employees, consultants and directors of Hanmi; (iii) siblings, parents, children, spouses, and household members of any person excluded under (i) and (ii); and (iv) any entities affiliated with, controlled by, or more than 5% owned by, any person excluded under (i) through (iii); and (v) the legal representatives, heirs, successors or assigns of any person excluded under (i) through (iv).

2. Hanmi's financial statements throughout the Class Period materially overstated the Company's income by concealing over $40 million in nonperforming loans and over $25 million in loan losses that Defendants were required to disclose under generally applicable accounting principles ("GAAP") and Hanmi's own publicly-disclosed accounting policies. While concealing the nonperforming loans and related losses, Defendants falsely touted Hanmi's "excellent" asset quality and claimed that Hanmi's asset quality metrics were superior to those of peer banks. After bank examiners forced Defendants to disclose the nonperforming loans in August 2019, Defendants continued to understate Hanmi's losses on the loans and failed to provide investors with the basic information about the loans and the borrower that SEC rules required.

3. After the Class Period, Hanmi filed lawsuits in Los Angeles County Superior Court against the borrower, Orange County developer Michael Harrah, to recover $41.3 million Hanmi had lent him (the "Broadway Loan") to develop an office tower in Santa Ana ("One Broadway Plaza"). In the lawsuits, Hanmi admitted in pleadings that Harrah had defaulted on the Broadway Loan four times between March 2018 and January 2019 by failing to pay the outstanding loan principal when the loan matured. Each time, Hanmi restructured the nonperforming loan by granting a series of concessions to address the borrower's financial difficulties. These concessions included repeatedly extending the maturity of the original loan for a cumulative total of more than 1,000 days, issuing Harrah a second loan (the "Caribou Loan," and together with the Broadway Loan, the "Harrah Loans") to pay off a portion of the Broadway Loan, and reducing the interest rate on both loans in recognition of Harrah's inability to pay the higher interest rate.

4. Further, Hanmi admitted that one of the Company's top executive officers had personally negotiated the concessions with Harrah, leaving no doubt that Hanmi knew about the undisclosed troubled debt restructurings.

5. Hanmi lent Harrah $41.2 million in March 2016 to develop One Broadway Plaza, and the undeveloped land was used as collateral for the loan. Defendants knew by the start of the Class Period in August 2018 that the collateral for the Broadway Loan was worth less than the principal of the loan, which required Hanmi to impair the loan at the difference between the principal and the value of the collateral. By August 2018, Harrah still had (i) no permit to begin construction on the land beyond a partial foundation, (ii) no financing to build the tower, and (iii) no tenants to fill the proposed tower. Hanmi later admitted the undeveloped land was only worth around $15 million—a fraction of the $40.2 million outstanding principal at the start of the Class Period in August 2018.

6. Investors only learned of the massive $40 million in nonperforming loans in August 2019 because Hanmi's banking examiners forced Defendants to disclose them. Still, instead of immediately coming clean about the Company's losses, Hanmi continued to mislead investors about the nature of the loans and the extent of the losses for another eight months before the Company finally charged off the $25.2 million in losses in April 2020. Investors had no way of evaluating the risk of the Harrah Loans because, in violation of SEC rules, Hanmi failed to disclose any information about the borrower, the loan origination date, the purpose of the loan, or the collateral underlying the loan. Defendants concealed this basic information despite the fact that the SEC had previously warned Hanmi that its periodic disclosures must include this information when "a few large credit relationships make up a significant portion of your non-performing loans."

7. Throughout the Class Period, Hanmi attributed the Company's success to its "excellent asset quality" and often touted the excellence of its asset quality relative to its peer banks. Hanmi's asset quality metrics began to slip in its filings for the first quarter of 2019. Hanmi reported that its nonperforming loans had more than doubled—from $15.5 million at the end of 2018 to $40 million as of March 31,

2019—due to placing a $25 million commercial loan on nonaccrual status. During an investor call on April 23, 2019, Hanmi's then-CEO C.G. Kum ("Kum") assured investors that the significant degrading of Hanmi's asset quality metrics was "a one-off issue, and there are no other significant increases in the criticized or any other grade categories."

8. Unbeknownst to investors, Hanmi's "excellent" asset quality metrics and "[c]ommitment to conservative, disciplined underwriting" were a façade. Defendants were concealing from investors over $40 million in nonperforming loans to Harrah, with loan losses of $25.2 million (the "Harrah Loans").

9. By the quarter ended March 31, 2019, Harrah had defaulted on the Broadway Loan four times, and Hanmi had restructured the loan five times to accommodate Harrah's inability to repay the principal—including extending the maturity date of the loan by 1021 days. Worse, Hanmi recklessly rushed approval of the Caribou Loan on December 26, 2018, in a last ditch effort to avoid disclosing the nonperforming Broadway Loan in the Company's annual report. Yet Defendants continued to deliberately conceal the nonperforming loans and losses from investors.

10. On July 19, 2019, Hanmi disclosed that it was delaying the release of its earnings for the quarter ended June 30, 2019 "to evaluate potential adjustments to the allowance for loan and lease losses recently requested by its banking examiners related to a single credit relationship." On July 31, 2019, an analyst reported that the Company's call report indicated that second quarter earnings would be a "little light" and that Hanmi's stock price would be weighed down until the "ongoing uncertainty" of the allowance for loan and lease losses ("ALLL") review is clarified. In reaction, Hanmi's stock fell 4.1% on heavy trading volume to close at $20.60 per share.

11. On August 12, 2019, Hanmi filed a Form NT 10-Q stating that the Company was unable to timely file its Form 10-Q for the quarter ended June 30,

2019 "because the Company and its auditor are evaluating the classification of a single $40.7 million credit relationship (comprised of a $28.0 million construction loan and a $12.7 million business loan) . . . as well as a possible internal control deficiency primarily relating to construction lending, which may affect prior periods." This news stunned investors, and shares of Hanmi fell 6.4% on heavy trading volume to close at $18.59 per share on August 12, 2019, damaging investors.

12. On August 22, 2019, Hanmi announced that it had received a notice from Nasdaq that the Company was no longer in compliance with Nasdaq rules due to its untimely quarterly disclosure and was in danger of being delisted. Hanmi's stock dropped another 4.6% on heavy trading volume, to $17.33, in reaction.

13. On October 4, 2019, the Company finally filed its Form 10-Q for the second quarter of 2019, which disclosed that Hanmi had classified the entire $40.7 million loan relationship as a nonperforming asset, admitted that the Harrah Loans were troubled debt restructurings, and stated that the Company was taking a $15.7 million provision for loan and lease losses ("PLLL") for the loans. Further, the Company confirmed that it had identified a material weakness in internal control over financial reporting based on its inability to timely identify loans for impairment evaluations.

14. On January 28, 2020, the Company disclosed that it had taken an additional $6.9 million provision for the Harrah Loans, increasing the total to $22.6 million. CEO Bonita Lee assured investors that "the borrower had continued to make payments and we have incurred no charge-offs" and that the Bank would "continue to work closely with the borrower to achieve a positive resolution to this loan." On this news, shares of Hanmi fell $1.77 per share or 9.4% to close at $16.99 per share, damaging investors.

15. On April 30, 2020, Defendants finally came to clean to investors about the extent of Hanmi's losses on the Harrah Loans. Hanmi disclosed that it was taking

an additional $2.6 million provision for the Harrah Loans, raising the total to $25.2 million. Significantly, the Company announced that it had finally charged-off the entire $25.2 million—the first charge-off Hanmi had taken related to the Harrah Loans. On this news, shares of Hanmi tumbled 14.3% on heavy trading volume to close at $10.34 per share on May 1, 2020, damaging investors.

16. In sum, the price of Hanmi shares declined by about 60% during the Class Period, from $25.65 to $10.34, devastating investors.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

18. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

19. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as Hanmi is headquartered and conducts business in this District. The alleged misstatements entered and subsequent damages took place within this District.

20. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

21. Plaintiff, as set forth in the previously filed Certification, incorporated by reference herein, purchased the Hanmi's common stock at artificially inflated prices during the Class Period and was damaged upon the revelations of the alleged corrective disclosures.

22. Defendant Hanmi is a bank holding company whose subsidiary is Hanmi Bank (the "Bank"). Hanmi's primary operations are related to traditional banking activities, including the acceptance of deposits and the lending and investing of money through the operation of the Bank. Hanmi is a Delaware corporation with principal executive offices located at 3660 Wilshire Boulevard, Penthouse Suite A, Los Angeles, CA 90010. The Company's stock traded on the NASDAQ under the ticker symbol "HAFC."

23. Defendant C.G. Kum ("Kum") served as President and Chief Executive Officer of Hanmi and Hanmi Bank from June 2013 to May 2019. Kum previously served as President and Chief Executive Officer of First California Bank from 1999 to 2013.

24. Defendant Bonita I. Lee ("Lee") has served as President and Chief Executive Officer of Hanmi and Hanmi Bank since May 2019. Lee previously served as Chief Operating Officer of Hanmi Bank from August 2013 to May 2019.

25. Defendant Romolo C. Santarosa ("Santarosa") has served as the Company's Chief Financial Officer ("CFO") and Senior Executive Vice President since November 2015. Santarosa previously served as an Audit Senior Manager with Price Waterhouse.

26. Defendants Kum, Lee, and Santarosa are collectively referred to hereinafter as the "Individual Defendants."

27. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

28. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

29. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

30. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. <u>Hanmi's Lending Business</u>

31. The Bank originates loans and leases for its own portfolio and for sale in the secondary market. The Bank's lending activities include real estate loans (commercial property, construction and residential property), commercial and industrial loans (commercial term, commercial lines of credit and international), equipment lease financing, consumer loans and Small Business Administration loans.

32. The Bank claims to adhere to strict underwriting and appraisal policies to mitigate its risk. The review of each loan and lease application includes analysis of the applicant's business and experience, prior credit history, income level, cash flows, financial condition, tax returns, cash flow projections, and the value of any collateral to secure the loan, based upon reports of independent appraisers and/or audits of accounts receivable or inventory pledged as security. In the case of real estate loans over a specified threshold, the review of collateral value includes an appraisal report prepared by an independent Bank-approved appraiser. All appraisal reports on commercial real property secured loans are reviewed by an appraisal review officer. The review generally covers an examination of the appraiser's assumptions and methods that were used to derive a value for the property, as well as compliance with the USPAP.

33. The Bank claims that its construction loans typically have the following structure: maturities of two years or less; a floating rate of interest based on the Bank Prime Rate or the WSJ Prime Rate; minimum cash equity consistent with high volatility commercial real estate guidelines; a reserve of anticipated interest costs during construction or an advance of fees; a first lien position on the underlying real estate; loan-to-value ratios at time of origination that do not exceed 75 percent; and recourse against the borrower or a guarantor in the event of default.

34. Hanmi purports to have underwriting procedures designed to identify factors that it believes to maintain acceptable levels of risk in construction lending, including, among other procedures, engaging qualified and bonded third parties to provide progress reports and recommendations for construction loan disbursements.

35. Generally, the Bank takes collateral whenever possible. Collateral may include liens on inventory, accounts receivable, fixtures and equipment, leasehold improvements and real estate. Where real estate is the primary collateral, the Bank purports to obtain formal appraisals in accordance with applicable regulations to

support the value of the real estate collateral. Typically, the Bank requires all principals of a business to be co-obligors on all loan instruments and all significant stockholders of corporations to execute a specific debt guaranty. The Bank claims that all borrowers must demonstrate the ability to service and repay not only their obligations to the Bank, but also any and all outstanding business debt, without liquidating the collateral, based on historical earnings or reliable projections.

**B. Hanmi's Troubled Loan Relationship With Michael Harrah**

36. In 2016, Hanmi entered into a risky and ultimately disastrous $41.2 million loan relationship with Orange County real estate developer Michael Harrah.

37. Harrah initially built a sprawling development business in the 1980s in California and Arizona, including a theme attraction near Lake Havasu. According to the Los Angeles Times, Harrah filed for personal and business bankruptcy in 1990, claiming nearly $30 million in liabilities that included at least four years of unpaid federal income taxes.

38. After exiting bankruptcy protection, Harrah again began buying property to develop. Harrah focused his efforts in Santa Ana, amassing cheap land in the wake of Orange County's 1994 municipal bankruptcy.

39. Harrah's most ambitious project is a proposed 37-floor tower in downtown Santa Ana called One Broadway Plaza. Harrah first proposed the tower, which would be the tallest building in Orange County, in 1999.

40. For the past twenty years, Harrah routinely promised that One Broadway Plaza was financed, that tenants were lined up, and that construction would be starting soon. Despite Harrah's repeated assurances that construction would begin imminently, the imagined 37-floor tower is still just a hole in the ground. A lack of financing, the inability to attract tenants or buyers, litigation, referendums, and permitting issues have turned the project into a money pit.

41. In a November 2004 interview with the Orange County Register, Harrah claimed that he had lined up tenants for One Broadway Plaza and that the leases would probably be finalized by March 2005. Harrah stated: "We have three of them right now. Two of them can take the whole building. One of them can take half the building. We've literally got hundreds of calls from a lot of people that are interested in being tenants." Harrah also stated that he had sold four other buildings to finance construction of the tower because he was unable to secure a loan for preconstruction work.

42. In January 2008, Harrah told the Orange County Register that he was negotiating leases with "a couple of major tenants" and expects to begin construction in March or April. Still without tenants in 2010, Harrah convinced the Santa Ana City Council to rescind a restriction in the city's original approval of the project requiring Harrah to lease 50% of the building before beginning construction.

43. In January 2012, Jay Trevino—the executive director of Santa Ana's Planning & Building Agency—told the Orange County Register that "[n]o building permits have been issued for One Broadway Plaza" because Harrah had not lined up financing for the project and would have to pay about $14.1 million in fees and costs before construction could begin. Harrah's inability to obtain permits in 2011 required him to restart the permit approval process in 2012 to ensure the project complies with the latest building codes. Still, Harrah told the Register that "[w]e will be breaking ground in April." Harrah estimated the project would cost $300 million and take three years to build.

44. In February 2012, Harrah told the Voice of OC that financing is not an issue because a loan had enabled him to pay the approximately $14.1 million in various fees and costs required at the start of construction. Harrah declined to identify the source of the purported loan. Harrah stated he had an anchor tenant—a

major American corporation—that will fill up 75% of the building and that he would break ground by June or July.

45. In December 2012, Harrah told the Register that he had obtained financing "out of New York" that he expected to finalized by April or May and planned to break ground on One Broadway Plaza in the second quarter of 2013. Harrah claimed that he had "three major tenants in tow that will fill the whole building. We have all the permits. We have the plans. We have the approvals. And we have the money. We could literally start working today."

46. In January 2014, Harrah told the Register that he planned to start construction in the summer of 2014 and finish the project by 2017.

47. On March 10, 2016, Harrah told the Los Angeles Times that he had spent at least $80 million on the project and had still not broken ground. Harrah, once again, promised that construction would begin later that year.

1. <u>The Broadway Loan: Hanmi Loans $41.2 Million To Harrah's One Broadway Plaza</u>

48. The FDIC Manual of Examination Policies states that "[b]efore entering a construction loan agreement, it is appropriate for the institution to investigate the character, expertise, and financial standing of all related parties. Documentation files would then include background information concerning reputation, work and credit experience, and financial statements. Such documentation indicates that the developer, contractor, and subcontractors have demonstrated the capacity to successfully complete the type of project to be undertaken."[3]

49. Against this backdrop of red flags regarding Harrah and the One Broadway Plaza project, on March 15, 2016, Hanmi agreed to lend $41,166,673.68

[3] https://www.fdic.gov/regulations/safety/manual/section3-2.pdf

to One Broadway Plaza, LLC ("Broadway LLC"), an entity owned and controlled by Harrah (the "Broadway Loan"). Hanmi either failed to conduct even a cursory investigation into Harrah and his history with the One Broadway Plaza project or chose to make the Broadway Loan despite knowing the elevated risks.

50. As collateral, Broadway LLC granted Hanmi a security interest in (i) a deed to certain of the lots that were part of the proposed One Broadway Plaza project; and (ii) rents from the small businesses located on those lots. Hanmi also entered into guaranty agreements with Harrah and Harrah's trust.

51. The Broadway Loan's initial maturity date was March 15, 2017. The loan agreement granted Broadway the option to extend the maturity date by one year if Broadway satisfied a series of requirements, including (i) paying an extension fee of 0.25% of the outstanding principal; (ii) Santa Ana's continuing approval of entitlements for the project; and (iii) additional underwriting requirements, including an increased cash investment in the construction project to reduce Hanmi's loan-to-project value.

52. On March 13, 2017, Hanmi agreed to extend the maturity of the Broadway Loan to March 15, 2018 (the "First Broadway Restructuring"), despite the fact that Harrah still had not begun construction work for One Broadway Plaza. In August 2017, a spokeswoman for the city of Santa Ana stated that the only permitted work for One Broadway Plaza at that point was for a partial foundation.

53. In January 2018, still lacking both the financing and the tenants to begin construction on One Broadway Plaza. Harrah listed the One Broadway Plaza project for both sale and for lease with brokerage firm CBRE. Harrah told the Register that he was "looking for a joint-venture partner or an equity investor." The sales brochure stated that Harrah had already spend about $90 million to buy the land, design work, getting city approvals, and environmental studies.

54. The Broadway Loan matured on March 15, 2018, the balloon payment for the entire remaining principal became due, and Harrah defaulted by failing to make the balloon payment. Faced with Harrah's inability to repay the Broadway Loan due to his failure to make any progress on developing One Broadway Plaza, Hanmi attempted to make the best of a bad situation. On April 23, 2018, Hanmi again agreed to extend the maturity of the Broadway Loan from March 15, 2018 to September 15, 2018 (the "Second Broadway Restructuring"). Importantly, the Broadway Loan was delinquent at the time of the Second Broadway Restructuring. Hanmi's own accounting policies define delinquent loans as loans that are "30 to 89 days past due and still accruing."

55. On September 15, 2018, Harrah defaulted on the Broadway Loan for the second time by again failing to make the required balloon payment upon the loan's maturity. On October 3, 2018, Hanmi once again agreed to extend the maturity of the Broadway Loan from September 15, 2018 to November 2, 2018 (the "Third Broadway Restructuring"). The Third Restructuring gave Broadway just 30 days to come up with the entire remaining principle, an impossible task given that Harrah had still made no progress on developing One Broadway Plaza.

56. Harrah inevitably defaulted on the Broadway Loan for the third time on November 2, 2018, when the loan matured and he failed to make the required balloon payment. Defendants, desperate to avoid disclosing the Broadway Loan as delinquent and exposing Hanmi's losses on the Broadway Loan to investors, again granted concessions to Harrah. On December 24, 2018, Hanmi extended the maturity of the Broadway Loan from November 2, 2018 to January 31, 2019 (the "Fourth Broadway Restructuring").

2. The Caribou Loan: Hanmi Loans More Money to Harrah To Pay Off a Portion of the Broadway Loan

57. On December 26, 2018, just two days after the Fourth Broadway Restructuring, Hanmi agreed to make a business loan to Caribou Industries, Inc. ("Caribou") with a principal amount of $15,456,000 (the "Caribou Loan"). Harrah is the President and sole principal of Caribou, and both Harrah and the Harrah Trust executed guarantees backing the Caribou Loan.

58. Following Harrah's third default on the Broadway Loan in November 2018, and given the $25 million difference between the fair value of the undeveloped land serving as collateral and the outstanding loan balance, Defendants faced increasing pressure to finally come clean to investors. Instead, Defendants decided to continue concealing the losses on the Broadway Loan by diverting a portion of the outstanding principal into a second loan to Harrah. Immediately following the issuance of the Caribou Loan, the outstanding principal of the Broadway loan decreased by nearly $11 million—from $38,916,673.68 to $28,000,000.

59. Defendants' purported purpose of the Caribou Loan was to secure additional collateral, which was an acknowledgement that Defendants knew the fair value of the collateral for the Broadway Loan was insufficient and would require taking a provision. However, the rushed process by which Hanmi agreed to the Fourth Broadway Restructuring and the Caribou Loan in the week before the end of the 2018 fiscal year shows that Defendants were more concerned with the timing of the Caribou Loan than the sufficiency of the new collateral.

60. Harrah's personal collection of 13 cars served as collateral for the Caribou Loan. Hanmi accepted Harrah's car collection as collateral for the Caribou

Loan based on a one-page letter from Custom Auto Service, dated October 18, 2018, that placed a fair market value of the cars at $25,760,000.[4]

61. Critically, Custom Auto Service prepared the valuation for Harrah—not for Hanmi. Independence from both the loan production team and, especially, the borrower is a basic requirement for any reliable appraisal.

62. Robert Escalante owns Custom Auto Service and signed the valuation of Harrah's cars. According to the Orange County Business Journal, Escalante and Harrah have been friends since the early 1980s, and Harrah is a client of Escalante's Custom Auto Service. Escalante's letter stated that the $25,760,000 valuation was an update to a valuation Escalante provided Harrah in 2009. The letter does not list any of the cars, much less assign each an individual value. Rather, Escalante wrote: "TO WHOM IT MAY CONCERN: Mr. Harrah's unique collection of rare automobiles, are easily said to have an overall increase in TODAY'S FAIR MARKET VALUE (FMV) (of the entire collection) upwards of 15-20% placing an estimated overall value of approximately $25,760,000."

63. The FDIC Statement of Policy on Interagency Appraisal and Evaluation Guidelines provides that "[a]n institution's collateral valuation program should establish criteria to select, evaluate, and monitor the performance of appraisers and persons who perform evaluations. The criteria should ensure that: . . The person selected is capable of rendering an unbiased opinion. The person selected is independent and has no direct, indirect, or prospective interest, financial or otherwise, in the property or the transaction." Specifically, the FDIC policy statement requires that "An institution or its agent must directly select and engage appraisers. . . . ***An institution's use of a borrower-ordered or borrower-provided appraisal violates the Agencies' appraisal regulations***." (emphasis added).

---

[4] *See* Exhibit 2 at 8, 69.

64. Hanmi's publicly-disclosed internal policy also require an independent appraisal. For example, Hanmi's 2018 Form 10-K stated: "The Bank seeks to mitigate the risks inherent in its loan and lease portfolio by adhering to certain underwriting practices. The review of each loan and lease application includes analysis of . . . the value of any collateral to secure the loan, based upon reports of independent appraisers and/or audits of accounts receivable or inventory pledged as security."

65. In violation of applicable regulations, its own internal policies, and common sense best-practices, Hanmi did not make any effort to determine the quality, expertise, or independence of the Custom Auto Service valuation prior to extending the Caribou Loan. Instead, Hanmi relied on a facially-deficient, buyer-supplied one-page letter in deciding to issue a $15.5 million loan to a borrower who had defaulted on his other Hanmi loan three times in the past year. Fuhr stated in his declaration that Hanmi "relied on this statement of value for the Classic Cars found in this letter [] in extending the Loan to Caribou."

66. On January 7, 2019, Custom Auto Service sent Hanmi a two-page letter itemizing the valuation 12 of the 13 cars and comparing their purported "current net present value" to their appraised value from 2009.[5] The letter also attached a booklet describing the 13 cars. The booklet appears to be promotional materials Harrah uses for his car "museum." Neither the letter nor the booklet make effort to appraise the cars based on comparable sales. Curiously, the description of the first car in the booklet appears to have been copied and pasted from an advertisement for a

[5] The Declaration Of Matthew D. Fuhr In Support Of Ex Parte Application For Issuance Of A Temporary Restraining Order And Order To Show Cause Re Preliminary Injunction, filed November 24, 2020 in the Hanmi Bank v. Caribou Ind., et al action (Case No. 20STCV39491) in Los Angeles County Superior Court is annexed hereto as Exhibit 2 (at 8-9, 71-135).

miniature car model.[6] Seven of the twelve cars were assigned the exact same "net present value" as their 2009 appraisal value.

67. In January 2019, without the foundation built and without any secured tenants, engaged Lee & Associates to seek an investor to finance the construction of One Broadway Plaza for a percentage ownership of the development. That same month, the Register reported that the estimated price tag for the construction of One Broadway Plaza had increased to $450 million. These public statements by and on behalf of Harrah demonstrated that he had still not secured financing for One Broadway Plaza and was essentially restarting from scratch.

68. Harrah defaulted on the Broadway Loan for the fourth time on January 31, 2019, when the loan matured and he failed to make the required balloon payment of the $28 million remaining principal. On February 22, 2019, Hanmi once again agreed to extend the maturity of the Broadway Loan from January 31, 2019 to December 31, 2019 (the "Fifth Broadway Restructuring"). In addition to further extending the maturity date for the loan, Hanmi granted Broadway another significant concession by reducing the interest rate for the Broadway Loan from 7.0% to 5.5%. Hanmi's concession demonstrated its understanding of the borrower's financial difficulties—specifically, Harrah's inability to pay a higher interest rate.

69. On February 25, 2019, in a further demonstration of Hanmi's understanding of the borrower's financial difficulties and unlikelihood of repaying the loans' principal and interest, Hanmi agreed to restructure the Caribou Loan by reducing the interest rate from 6.0% to 5.5% (the "First Caribou Restructuring").

70. On May 29, 2019, Hanmi entered into another Change in Terms Agreement granting Caribou a series of material concessions (the "Second Caribou Restructuring"). First, Hanmi reduced the interest rate for the Caribou Loan from

---

[6] http://www.phillymint.com/FMShopCartae/XE83.htm

5.5% to 5%. Second, Hanmi changed Caribou's interest payments from monthly to quarterly. Third, Hanmi agreed to refund to borrower all interest paid in 2019 (among other concessions) if the Broadway Loan is repaid by September 30, 2019. Fourth, Hanmi agreed to only collect 60% of the appraisal value of any Harrah's cars that are sold if the Caribou Loan balance is reduced from $12,760,247.80 to $9.0 million.

71. In a declaration in the Caribou Action[7], Harrah states that Hanmi approached him in March 2019 to arrange for an updated appraisal of the collateral cars. Harrah's declaration attaches a handwritten letter dated April 15, 2019 from Bill Gilmore of Automotive Research Services to Robert Bartlett[8], attaching an appraisal of the 13 collateral cars and an invoice for his appraisal services. Harrah's declaration also attaches a document showing Gilmore's April 2019 appraisals that includes signatures from both Harrah and Bartlett dated June 5, 2019.

72. The document appraises the 13 collateral cars at an absurd $69,683,950. For example, the 1931 Rolls Royce valued at $27.5 million sold for $412,500 in a 2007 auction[9], 1930 Cadillac valued at $12,750,000 sold for $309,500 in a 2009

[7] The Declaration of Michael Harrah in Support of Defendant's Opposition to Plaintiff's Ex Parte Application, filed November 24, 2020 in the Hanmi Bank v. Caribou Ind., et al action (Case No. 20STCV39491) in Los Angeles County Superior Court is annexed hereto as Exhibit 3 (at 3, 64-93).

[8] Bartlett has served as Executive Vice President and Specialty Lending Officer with Hanmi since February 2017. Bartlett signed the Change in Terms Agreements on Hanmi's behalf for all five restructurings of the Broadway Loan, the original loan documents for the Caribou Loan, and both restructurings of the Caribou Loan.

[9]https://rmsothebys.com/en/auctions/aw07/the-al-wiseman-collection/lots/r140-1931-rolls-royce-phantom-ii-merlin/197124

auction[10], and the 1938 Packard valued at $1.3 million sold for around $200,000 in three separate auctions in 2006, 2007, and 2010.[11]

73. Hanmi inexplicably relied on this facially absurd appraisal in issuing the Second Caribou Restructuring.[12]

74. On December 31, 2019, the Broadway Loan and Caribou Loan both went into default when neither loan was repaid upon maturity. Neither Harrah, Caribou, nor Broadway paid any of the outstanding principal for the Broadway Loan ($28.0 million) and Caribou Loan ($12.76 million).

75. On February 26, 2020, Hanmi entered into a forbearance agreement with Harrah, Caribou, Broadway, and the Harrah Trust. Hanmi agreed to forbear from taking action against the borrowers if the loans were repaid in full by March 31, 2020. Alternatively, Hanmi agreed to extend the maturity of the Caribou Loan to December 31, 2022 if Caribou reduced the outstanding principal of the loan to $10 million by March 31, 2020. On April 21, 2020, without Harrah having repaid any of the outstanding principal, Hanmi agreed to amend the forbearance agreement by extending the expiration of forbearance to June 15, 2020.

76. On June 18, 2020, Fuhr sent letters to Harrah demanding the full repayment of the Broadway Loan and Caribou Loan by June 30, 2020. On October 14, 2020, Hanmi filed lawsuits in Los Angeles County Superior Court against Harrah and Caribou demanding full repayment of the outstanding loan balances, unpaid accrued interest, costs, and fees.

3. <u>Harrah's History of Hiding Assets</u>

---

[10] https://www.conceptcarz.com/profile/4195,15283/1938-packard-1607-twelve.aspx

[11] https://www.bonhams.com/auctions/17327/lot/229/

[12] *See* Ex. 2 at 43-45.

77. In addition to his history of bankruptcy, Harrah's practice of shifting assets between entities he controls to avoid liabilities should have served as a red flag to Hanmi as to the collectability of the Harrah Loans either directly from Harrah-controlled entities or from Harrah as a guarantor.

78. Harrah runs his development business through a plethora of entities that he beneficially owns and controls. One of Harrah's entities, OM Restaurant Management LLC ("OMRM") operated a restaurant in Santa Ana named Original Mike's. In 2014, an employee of the restaurant sued OMRM alleging a variety of employment claims. Just four days before the trial was set to begin in October 2015, OMRM filed for Chapter 11 bankruptcy. The plaintiff continued the lawsuit by voluntarily dismissing the bankrupt defendant and naming Harrah and two other Harrah-controlled entities as defendants: Original Mike Enterprises LLC and SAS Investments, L.P. The lawsuit alleged that all of the entities were alter egos of OMRM.

79. In the first phase of a bifurcated trial in March 2018, Orange County Superior Court Judge William D. Caster held that Harrah operated these entities as a single business enterprise, finding that the entities at issue in that case maintained separate bank accounts despite sharing the same business address and legal counsel. Judge Caster untangled the web of Harrah's related parties:

> OMRM is a limited liability company with one member, SAS, which is a limited partnership. Harrah is the non-member manager of OMRM. The general partner of SAS is Southwest Property Management, Inc. (SPI), and the limited partner is the Michael F. Harrah Trust. Harrah is SPI's president and sole shareholder. OME, which holds the liquor license used by the Restaurant, is also a limited liability company whose one member is SAS and whose non-member manager is Harrah.
>
> Several other entities controlled and owned by Harrah also are involved in the Restaurant. 100 South Main Street, LLC is the entity that owns the property where the Restaurant is located. Its manager and sole

member is Harrah. Cactus Financial, Inc. is described as a holding company whose president and sole shareholder is Harrah. Another entity, Caribou Industries, Inc., which built the Restaurant, also is controlled and beneficially owned by Harrah.

80. Judge Caster found that all of the Harrah entities share the same address, controller, and legal counsel.[13] At trial, Harrah testified that he operated the restaurant through various limited liability companies "for liability reasons." Judge Caster held that "Harrah was controlling his assets and liabilities among his various entities, deciding which debts to pay and when, ultimately for his personal benefit." After losing on the alter ego issue, Harrah settled the case for $5 million.

### C. Background of Class Period Disclosures and Investors' Losses

81. When Hanmi initially advanced the $41.2 million Broadway Loan to Harrah in the first quarter of 2016, the Company's construction loan portfolio was only $27 million. Curiously, Hanmi did not report the Broadway Loan in its construction loan portfolio in its 2016 Q1 Form 10-Q. Nor did Hanmi include the Broadway Loan in its construction portfolio in its 2016 Q2 Form 10-Q. Hanmi first included the Broadway Loan in its construction portfolio in its 2016 Q3 Form 10-Q, increasing the Bank's construction portfolio to $67 million from $26 million as of June 30, 2016.

82. By the start of the Class Period in August 2018, Hanmi reported in its that 100% of the Bank's construction loan portfolio was rated pass or pass-watch. Hanmi repeated these same false disclosures in the third and fourth quarters of 2018.

83. On March 1, 2019, when Hanmi filed its 2018 Form 10-K, it appeared to be in great shape. The Company reported $57.9 million in net income for the year

[13] The Statement of Decision Re: First Phase, filed March 27, 2018 in Beasley v. Original Mike's Enterprises, LLC, et al. (No. 30-2014-00725006) is annexed hereto as Exhibit 4.

ending December 31, 2018, which was a 5.9% increase over the previous year; loan and lease receivables increased 6.9% over the previous year; and the Company had declared $0.96 in cash dividends during 2018, a 20% increase over the previous year.

84. The Company's stability soon began to deteriorate. On April 3, 2019, the Company announced that Bonita Lee would replace C.G. Kum as Chief Executive Officer of the Company and the Bank on May 3, 2019 and would immediately assume a position on the Company's Board of Directors. Kum had served as CEO since June 2013. Lee had served as the Chief Operating Officer of the Company and the Bank since August 2013 and had been expected to take over as CEO upon Kum's retirement. Five days later, on April 8, 2019, Hanmi announced that the Chairman of its Board of Directors—Joseph K. Rho, who had served on Hanmi's Board since 1984 and as Chairman since 2007—was retiring.

85. On April 12, 2019, the Company filed a Proxy Statement urging investors to ratify the appointment of KPMG LLP ("KPMG") as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2019 because it "is in the best interests of the Company and its stockholders." KPMG had served as Hanmi's independent accounting firm since 2001. On May 22, 2019, investors overwhelmingly voted to ratify the appointment of KPMG by a margin of 27,743,487 for and only 731,601 against.

86. Just one month later, on June 26, 2019, Hanmi abruptly announced that it was dismissing KPMG as its independent auditor, and that the Company was replacing them with Crowe LLP ("Crowe"). Far from independent, Hanmi had engaged Crowe for several different consulting, tax, and auditing services from 2014 through 2018.

87. On July 19, 2019, Hanmi disclosed that it was delaying the release of its earnings for the quarter ended June 30, 2019 "to evaluate potential adjustments to the allowance for loan and lease losses recently requested by its banking

examiners related to a single credit relationship.” On July 31, 2019, an analyst reported that the Company’s call report indicated that second quarter earnings would be a “little light” and that Hanmi’s stock price would be weighed down until the “ongoing uncertainty” of the allowance for loan and lease losses (“ALLL”) review is clarified. In reaction, Hanmi’s stock fell 4.1% on heavy trading volume to close at $20.60 per share.

88. On August 12, 2019, Hanmi filed a Form NT 10-Q stating that the Company was unable to timely file its Form 10-Q for the quarter ended June 30, 2019 “because the Company and its auditor are evaluating the classification of a single $40.7 million credit relationship (comprised of a $28.0 million construction loan and a $12.7 million business loan) . . . as well as a possible internal control deficiency primarily relating to construction lending, which may affect prior periods.” This news stunned investors, and shares of Hanmi fell 6.4% on heavy trading volume to close at $18.59 per share on August 12, 2019, damaging investors.

89. On August 22, 2019, Hanmi announced that it had received a notice from Nasdaq that the Company was no longer in compliance with Nasdaq rules due to its untimely quarterly disclosure and was in danger of being delisted. Hanmi’s stock dropped another 4.6% on heavy trading volume, to $17.33, in reaction.

90. On October 4, 2019, the Company finally filed its Form 10-Q for the second quarter of 2019 (“Q2 2019 10-Q”), which disclosed that Hanmi had classified the entire $40.7 million loan relationship as a nonperforming asset, admitted that the Harrah Loans were troubled debt restructurings, and stated that the Company was taking a $15.7 million provision for loan and lease losses (“PLLL”) for the loans.

91. The Q2 2019 10-Q also admitted that the Company had a material weakness in internal controls over financial reporting and that the Company’s disclosure controls and procedures were not effective. The Company conceded that it was violating generally accepted accounting policies by failing to implement the

required policies for identifying loans to be individually measured for impairment. The Q2 2019 10-Q stated, in relevant part, that "as of the end of the period covered by this report, that the Company's disclosure controls and procedures were not effective. The material weakness in internal control over financial reporting resulted from the lack of operating effectiveness of a control that allowed for the inadequate review of the fair value of collateral dependent impaired loans. The material weakness was identified through evaluation of a non-real estate collateral dependent impaired loan. Specifically, our existing control for determining whether a fair value review of collateral dependent impaired loans should occur to facilitate the timely measurement of a specific allowance did not operate effectively."

92. The Company also stated that it had begun to remediate the material weakness over financial reporting, including "strengthening our policy documentation describing the criteria for when collateral dependent impaired loan fair value review is required, developing and implementing additional training on our collateral dependent impaired loan fair value review process, and reinforcing the required documentation when concluding a fair value review is not warranted." The remediation "enhancements" provide a detailed description of Hanmi's accounting violations: failing to properly document criteria for when individual loan reviews are required, failing to properly train employees on the impairment review process, and failing to document decisions not to conduct fair value reviews.

93. Notably, despite previously warning investors about "a possible internal control deficiency primarily relating to construction lending, which may affect prior periods," the Hanmi did not restate its financials for any prior period. Hanmi also did not mention construction lending in the description of its material weakness despite the obvious deterioration of its construction lending portfolio.

94. Piper Jaffray & Co. issued an analyst report on October 6, 2019 noting the problems in Hanmi's construction portfolio:

> The C&D portfolio is only $65M or 1.4% of total loans but 55% or $36M of the book is special mention ($7.7M) or classified ($27.9M). The $27.9M classified C&D amount is tied to one land loan and has a $14.7M specific allowance that equates to 53% of the related balance.

95. On January 28, 2020, the Company disclosed that it had taken an additional $6.9 million provision for the Harrah Loans, increasing the total to $22.6 million. CEO Bonita Lee assured investors that "the borrower had continued to make payments and we have incurred no charge-offs" and that the Bank would "continue to work closely with the borrower to achieve a positive resolution to this loan." On this news, shares of Hanmi fell $1.77 per share or 9.4% to close at $16.99 per share, damaging investors.

96. Analysts were disappointed by Hanmi's $6.9 million provision for a troubled loan relationship that should have already been properly accounted. Piper Jaffray stated "The $10.8M LLP was above consensus ($0.9M) on more specific LLRs (+$6.9M) for its previously identified problem loan relationship ($39.7M) that now has $22.6M or 57% set aside; LLRs increased 22 bps to 1.33% as a result."

97. On April 30, 2020, Defendants finally came to clean to investors about the extent of Hanmi's losses on the Harrah Loans. Hanmi disclosed that it was taking an additional $2.6 million provision for the Harrah Loans, raising the total to $25.2 million. Significantly, the Company announced that it had finally charged-off the entire $25.2 million—the first charge-off Hanmi had taken related to the Harrah Loans. Hanmi declared the full $25.2 million provision to be uncollectible without offering any explanation as to how the uncollectible portion of the loan had ballooned from $0 to $25.2 million in the course of a single quarter. On this news, shares of Hanmi tumbled 14.3% on heavy trading volume to close at $10.34 per share on May 1, 2020, damaging investors.

98. In sum, the price of Hanmi shares declined by about 60% during the Class Period, from $25.65 to $10.34, devastating investors:

## V. APPLICABLE ACCOUNTING STANDARDS

99. GAAP refers to the framework of guidelines for financial accounting used by accountants to prepare financial statements. The SEC has the statutory authority to set accounting standards and has delegated that authority to the Financial Standards Accounting Board ("FASB").

100. The FASB accounting standards codification ("ASC") and the SEC rules and interpretive releases are source of authoritative GAAP for SEC registrants. SEC Staff also issues Staff Accounting Bulletins ("SABs") which represent practices followed by the SEC staff in administering SEC disclosure requirements. ASC 105-10-05-1.

101. SEC and Nasdaq rules and regulations require that publicly traded companies such as Hanmi include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X ("Reg. S-X")

102. SEC Rule 4-01(a) of Reg. S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1)

103. According to the FASB Statement of Financial Accounting Concepts ("CON") No. 8, "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." CON 8 ¶ QC11 According to SAB 99, Evaluating materiality requires viewing the facts in the context of surrounding circumstances or as a "total mix." This means

considering not only the quantitative but also qualitative factors. SAB 99 recognizes that a 5% threshold in relation to individual line item amounts, subtotals or totals in the financial statements is often used as a "rule of thumb" in assessing materiality but cautions that such evaluation should be only the beginning of a materiality assessment and "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." Therefore, misstatements of financial statements which are less than 5% "could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material." *Id.* According to the SEC staff, qualitative considerations include "whether the misstatement masks a change in earnings or other trends, … whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise [and] whether the misstatement changes a loss into income or vice versa." *Id.*

104. The auditing standards established by the Public Company Accounting Oversight Board ("PCAOB"), a nonprofit corporation established by Congress to oversee the audits of public companies, provide that "[t]he financial statements are management's responsibility. . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements." PCAOB Auditing Standard ("AS") 1001.03. Further, an "entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility." *Id.*

### A. GAAP and Hanmi's Own Accounting Standard Required Defendants to Disclose the Harrah Loans as Troubled Debt Restructurings And Impair Them

105. GAAP requires companies to disclose troubled debt restructurings ("TDR") to investors. GAAP defines a loan restructuring or modification as a TDR if the creditor, for economic or legal reasons related to the debtor's financial difficulties, grants a concession to the debtor that it would not otherwise consider. ASC 310-40-15-5. Creditors grant concessions in an attempt to protect as much of their investments as possible (ASC 310-40-15-6) and to "make the best of a difficult situation" (ASC 310-40-15-7). One of the most common types of TDRs occurs when the creditor defers cash payments the debtor is required to make in the near future to help the debtor attempt to improve its financial condition and eventually be able to pay the creditor. ASC 310-40-15-6(a).

106. GAAP defines a "concession" as when, as a result of the restructuring, the bank does not expect to collect all amounts due, including interest accrued at the original contract rate. ASC 310-40-15-13. Further, GAAP defines a restructuring that results in a significant delay in payment as a TDR. ASC 310-40-15-17. GAAP also requires lenders to consider the cumulative effect of past restructurings to determine whether a delay in payment resulting from the most recent restructuring is significant. ASC 310-40-15-18.

107. GAAP provides several indicators to help banks determine when a borrower is experiencing financial difficulties, including: (i) it is probable that the debtor would be in payment default on any of its debt in the foreseeable future without the modification, even though the debtor is not currently in payment default; (ii) the debtor's entity-specific cash flows will be insufficient to service both the interest and principal in accordance with the existing contractual terms for the foreseeable future; or (iii) without modification the debtor would not be able to obtain funds from other sources at the current market interest rate for a nontroubled debtor. ASC 310-40-15-20.

108. Hanmi's stated accounting policies for TDRs match GAAP. For example, Hanmi's Form 10-Q for the quarter ended June 30, 2018 stated "[l]oans are considered to be TDRs if they were restructured through payment structure modifications such as reducing the amount of principal and interest due monthly and/or allowing for interest only monthly payments for three months or more. All TDRs are impaired and are individually evaluated for specific impairment[]."

109. Hanmi's 2018 Form 10-K stated that "[a] loan is identified as a troubled debt restructuring ('TDR') when a borrower is experiencing financial difficulties and, for economic or legal reasons related to these difficulties, the Bank grants a concession to the borrower in the restructuring that it would not otherwise consider. The Bank has granted a concession when, as a result of the restructuring, it does not expect to collect all amounts due, including principal and/or interest accrued at the original terms of the loan. The concessions may be granted in various forms, including a below-market change in the stated interest rate, a reduction in the loan balance or accrued interest, an extension of the maturity date, or a note split with principal forgiveness."

110. In each of its quarterly and annual filings during the Class Period, Hanmi identified the amounts of the Company's TDRs by the type of concession Hanmi provided for the restructuring: (i) deferral of principal; (ii) deferral of principal and interest; (iii) reduction of principal and interest; and (iv) extension of maturity.

111. From the start of the Class Period in August 2018, Harrah's inability to sell or obtain financing to build One Broadway Plaza left him unable to repay the outstanding principal of the Broadway Loan for the foreseeable future. Further, as Defendants eventually admitted, the undeveloped land collateralizing the Broadway Loan was worth less than half of the $41 million outstanding principle of the loan.

As a result of these financial difficulties, Harrah defaulted on the Broadway Loan four times before and during the Class Period.

112. Defendants made multiple concessions by extending the maturity date to give Harrah more time to repay the outstanding principal on the Broadway Loan. Each extension allowed Harrah to continue making interest-only payments on the loan while delaying the inevitable balloon payment for the entire principal. Hanmi restructured the Broadway loan five times between the first quarter of 2017 and the first quarter of 2019:

| RESTRUCTURINGS OF THE BROADWAY LOAN | | | | | |
|---|---|---|---|---|---|
| Restructuring | Date | Old Maturity | New Maturity | Length of Extension | Cumulative Extension |
| First[14] | 3/13/17 | 3/15/17 | 3/15/18 | 365 days | 365 days |
| Second[15] | 4/23/18 | 3/15/18 | 9/15/18 | 184 days | 549 days |
| Third[16] | 10/3/18 | 9/15/18 | 11/2/18 | 48 days | 597 days |
| Fourth[17] | 12/24/18 | 11/2/18 | 1/31/19 | 90 days | 687 days |
| Fifth[18] | 2/22/19 | 1/31/19 | 12/31/19 | 334 days | 1021 days |

113. In each restructuring, Hanmi allowed Harrah to further defer the balloon payment of principal the loan agreement required Harrah to pay when the

---

[14] The Declaration Of Matthew D. Fuhr In Support Of Plaintiff Hanmi Bank's Application For Right To Attach Orders And Orders For Issuance Of Writs Of Attachment Against Defendant Michael F. Harrah, An Individual, And Michael F. Harrah, As Trustee Of The Michael F. Harrah Trust, filed on November 3, 2020 in the Hanmi Bank v. Harrah, et. al. action (Case No. 20STCV39589) in Los Angeles County Superior Court is annexed hereto as Exhibit 1 (at 100-101).

[15] *See* Exhibit 1 at 102-103.

[16] *See* Exhibit 1 at 104.

[17] *See* Exhibit 1 at 105.

[18] *See* Exhibit 1 at 106.

loan expired. Hanmi made each of these concessions solely because Harrah's financial difficulties rendered him unable to pay the balloon payment for the foreseeable future. Indeed, Hanmi agreed to the Second, Third, Fourth, and Fifth Broadway Restructurings after Harrah had already defaulted on the loan by failing to make the balloon payment for the outstanding principal when the loan matured.

| DEFAULTS ON BROADWAY LOAN | | | | |
|---|---|---|---|---|
| **Restructuring** | **Date of Default** | **Date of Restructuring** | **Days in Default** | **Cumulative Days in Default** |
| Second | 3/15/18 | 4/23/18 | 39 days | 39 days |
| Third | 9/15/18 | 10/3/18 | 18 days | 57 days |
| Fourth | 11/2/18 | 12/24/18 | 52 days | 109 days |
| Fifth | 1/31/19 | 2/22/19 | 22 days | 131 days |

114. Accordingly, GAAP and the Hanmi's own accounting policies required Defendants to disclose the Broadway Loan as a TDR following the Second Broadway Restructuring during the quarter ended June 30, 2018.

115. Because they failed to disclose the Broadway Loan as a TDR following the Second Broadway Restructuring, and each subsequent Restructuring, the following quarterly and annual reports failed to comport with GAAP, the Company's own stated internal accounting polies, and thus were false when made: Q2 2018 10-Q; Q3 2018 10-Q; 2018 10-K; and Q1 2019 10-Q.

### B. GAAP and Hanmi's Internal Accounting Policies Required Defendants to Take a Specific Allowance and Promptly Charge Off $25 Million of Loan Losses From the Harrah Loans

116. GAAP states that a loan is impaired when it is probable a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement. ASC 310-10-35-16. GAAP requires banks to disclose the amount of and method of accounting for each class of impaired loans. ASC 310-10-50-14A.

According to GAAP, if a loan is impaired, the amount of loss must be measured, reported, and added to the ALLL.

117. ALLL is an estimate of probable losses that reduces the book value of loans and leases to the amount that is expected to be collected. ALLL is a materially important financial metric for banks whose principal assets are loans. ALLL represents the Bank's assessment of probable losses on its loans, and increases to ALLL reflect an assessed deterioration of its loan portfolio. Any increase in ALLL (a balance sheet item) is accompanied by the recording of a provision for loan losses ("PLLL," an income statement item), thereby impacting the Company's reported income or losses. ASC 310-10-35-24.

118. Hanmi's internal accounting policies state that "[a]ll TDRs are impaired and are individually evaluated for specific impairment." Accordingly, the Broadway Loan was impaired at the start of the Class Period, and the Caribou Loan was impaired as soon as it was issued in December 2018.

119. Hanmi concedes that both the Broadway Loan and Caribou Loan were collateral-dependent loans because repayment of the loans was expected to be provided solely by the underlying collateral. GAAP required Hanmi to examine the value of the collateral for both the Broadway and Caribou Loans at the time of each restructuring to determine the amount of loss.

120. GAAP requires loan impairment to be measured based on the present value of expected future cash flows, discounted at the loan's effective interest rate or, as a practical expedient, at the fair value of the collateral for a collateral-dependent loan. ASC 310-10-35-22 When loan repayment is dependent on the sale of the collateral, the value of the collateral should be reduced to consider estimated costs to sell. ASC 310-10-35-23

121. The Interagency Supervisory Guidance on Troubled Debt Restructurings[19] states that "for an impaired loan that is dependent solely on the sale of the collateral for repayment, any portion of the recorded investment in the loan exceeding the amount adequately secured by the fair value of the collateral less the estimated costs to sell is deemed to be uncollectible and, therefore, should be credit risk graded or classified loss and promptly charged off."

122. Hanmi's internal accounting policies for measuring the impairment of collateral-dependent loans matched GAAP:

> The allowance for collateral-dependent loans is determined by calculating the difference between the outstanding loan balance and the value of the collateral as determined by recent appraisals. The allowance for collateral-dependent loans varies from loan to loan based on the collateral coverage of the loan at the time of designation as nonperforming. We continue to monitor the collateral coverage, using recent appraisals, on these loans on a quarterly basis and adjust the allowance accordingly.

123. If appropriate, a loss shall be recognized immediately following origination of the loan. "If a faulty credit granting decision has been made or loan credit review procedures are inadequate or overly aggressive . . . the loss should be recognized at the date of loan origination." ASC 942-310-25-1

124. For individually impaired loans, the Interagency Statement requires the impairment of a collateral-dependent loan to be measured using the fair value of collateral method. Loans are collateral dependent if repayment of the loan is expected to be provided solely by the underlying collateral. In general, any portion of the recorded investment in a collateral-dependent loan (including any capitalized accrued interest, net deferred loan fees or costs, and unamortized premium or discount) in excess of the fair value of the collateral that can be identified as

[19] https://www.fdic.gov/news/financial-institution-letters/2013/fil13050.pdf

uncollectible, and is therefore deemed a confirmed loss, should be promptly charged off against the ALLL.

125. Hanmi's internal accounting policies state that "[a]ll TDRs are impaired and are individually evaluated for specific impairment."

126. Accordingly given that the Harrah Loans were TDRs throughout the Class Period, Hanmi was required from the start of the Class Period in August 2018 to take an allowance for the difference between the fair value of the outstanding principal of the loans and the fair value of the collateral. Additionally, Hanmi was required to promptly charge off the difference between the recorded investment and the fair value of the collateral less the estimated cost to sell the collateral.

127. Because they failed to take provisions for, and promptly charge off, the difference between the fair value of the collateral for the Harrah Loans and the recorded investment of those loans, the following periodic financial statements violated GAAP and Hanmi's own accounting policies, and were thus false when made: Q2 2018 10-Q; Q3 2018 10-Q; 2018 10-K; Q1 2019 10-Q; Q2 2019 10-Q; Q3 2019 10-Q; and 2019 10-K.

### C. SEC Rules Requires Hanmi to Disclose Identifying Information About the Harrah Loans

128. Regulation S-K Item 303(b) requires Management's discussion and analysis of financial condition and results of operations ("MD&A") sections of annual public filings to include any "information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operation." Bank holding companies, such as Hanmi, are directed to SEC Industry Guide 3, which directs that bank holding companies discuss the policy for placing loans on nonaccrual status (meaning the Bank would no longer accrue interest on the loan) and state the aggregate of loans in the following

categories: nonaccrual, accruing loans which are contractually past due 90 days or more, and other loans that are TDRs.

129. Regulation S-K Item 303(c) requires the MD&A sections of interim period financial statements to include information "so as to enable the reader to assess material changes in financial condition and results of operations between the periods." Interim statements must include discussion of material changes in topics listed in Item 303(b).

130. Crucially, Hanmi withheld virtually all details regarding the Broadway and Caribou Loans from investors, including any information about the borrower, the collateral securing the loans, the origination date of the loans, the dates and descriptions of recent appraisals, or any other information necessary for investors to understand Hanmi's accounting of the loans. Hanmi knew that the SEC required these disclosures because the SEC had informed Hanmi of these requirements in correspondence dated September 23, 2011.

131. On September 23, 2011, the SEC's Division of Corporation Finance issued a comment letter informing Hanmi that its 2010 Form 10-K lacked required disclosures regarding the Company's non-performing loans.[20] The SEC required that Hanmi provide, and revise future filings to include, "more transparent disclosure surrounding your non-performing loans."

132. The SEC required Hanmi to provide, and include in future filings, specific information about large credit relationships when those relationships make up a significant portion of the Company's non-performing loans. The SEC required Hanmi to disclose a detailed discussion of such relationships in future filings, including:

---

[20] The SEC's September 23, 2011 Comment Letter to Hanmi is available at: https://www.sec.gov/Archives/edgar/data/1109242/000000000011056739/filename1.pdf

- General information about the borrower;
- The type of collateral securing the loan;
- Loan origination date, amount and classification;
- Specific triggering events or specific circumstances (by date) which resulted in changes to loan classification, provision for loan losses and / or charge-off;
- The dates of recent appraisals associated with the credit relationship, if applicable, including a discussion of the findings associated with each appraisal or alternative fair value determination and how they were used in determining the loan loss provision amounts, partial and / or full charge-offs;
- Why management believes the allowance for loan losses associated with these particular credit relationships is appropriate to provide for losses that have been incurred; and
- Any other pertinent information deemed necessary to understand your review of and related accounting for these loans.

133. Hanmi filed correspondence responding to the SEC on December 23, 2011 promising that "[f]uture filings, beginning with our annual report on Form 10-K for the year ended December 31, 2011, will include expanded disclosure to provide more transparent information surrounding our non-performing loans and any associated net charge-offs and/ or specific allowance." Further, Hanmi provided the SEC with the disclosures the Bank would have made in its 2010 Form 10-K had the Bank incorporated the SEC's comments into that filing. As the SEC demanded, Hanmi provided detailed discussion of the two relationships that accounted for 20% of the Company's nonperforming loans, stating in relevant part:

> At December 31, 2010, our non-performing loans consisted of two large credit relationships, which accounted for 20% of our total non-performing loans, and several small credit relationships.
>
> A commercial real estate loan secured by land was classified as non-performing with a carrying amount of $25.73 million as of December 31, 2010. ***The loan was originated in March 2006 to finance construction of a real estate project in San Jose, California. Due to the slow-down of the economy, the planned development was***

> ***delayed, and the value of the collateral deteriorated. The loan was impaired in March 2009 without a specific allowance as the appraised value of the collateral was sufficient to cover the contractual amount due. Subsequently, $2.67 million was charged off in the fourth quarter of 2010 based on the most recent appraisal value of the collateral at $25.65 million.*** As of December 31, 2010, the Bank has a specific allowance of $ 75 thousand for this impaired loan.
>
> ***A construction loan secured by an apartment building was classified as non-performing with a carrying value of $7.18 million as of December 31, 2010. The loan was originated in April 29, 2005 to finance the construction of low income senior housing units in the city of Los Angeles. At maturity of the original loan agreement, the project was 55% complete. Eventually, the equity investor halted its funding of the project. Since then, the project was in litigation with the former general contractor and forced into involuntary bankruptcy.*** The loan was classified as impaired in September 2007 and a specific reserve of $4.86 million was established based upon a current appraisal. Subsequently, $4.86 million was charged off in November 2008 and $4.55 million was charged off in December 2009 based on the current appraisal value of $7.65 million. As of December 31, 2010, the Bank does not have a specific allowance for this impaired loan as the most recent appraisal value of the collateral is $21.6 million.

(emphasis added)

134. Despite its 2011 promise to the SEC and its knowledge that investors required such detailed information, Hanmi purposely withheld from investors all details of the Broadway and Caribou Loans, the borrower, and the relevant appraisals. Hanmi deprived investors of the ability to evaluate its accounting of the loans or the likelihood of repayment.

135. The MD&A sections of Hanmi's Q2 2018 10-Q, Q3 2018 10-Q, 2018 10-K, Q1 2019 10-Q, Q2 2019 10-Q, Q3 2019 10-Q, and 2019 Form 10-K each omitted any information about the borrower, the collateral securing the loans, the origination date of the loans, the dates and descriptions of recent appraisals, or any

other information necessary for investors to understand Hanmi's accounting of the loans

# VI. DEFENDANTS' FALSE AND MISLEADING STATEMENTS

## A. Hanmi's Q2 2018 Financial Results

136. The Class Period begins on August 9, 2018, when the Company filed a quarterly report for the quarter ended June 30, 2018 on a Form 10-Q with the SEC ("Q2 2018 10-Q"). The Q2 2018 Form 10-Q was signed by Defendants Kum and Santarosa. The Q2 2018 Form 10-Q was signed by Defendants Kum and Santarosa. Defendants Kum and Santarosa signed certifications, attached to the Q2 2018 Form 10-Q, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

137. The Q2 2018 10-Q stated that Hanmi had $16.1 million in nonperforming assets ("NPAs") and $14.3 million in TDRs. The Q2 2018 10-Q also stated that Hanmi's NPL Ratio was 0.35% and its NPA Ratio was 0.30%.

138. These reported amounts and ratios were materially false and misleading because they did not include the $38.9 million Broadway Loan, which was a nonperforming TDR as of June 30, 2018.

139. Hanmi's reported $14.3 million in TDRs was false and misleading because, by the end of June 2018, Defendants knew or were deliberately reckless in not knowing that Hanmi had restructured the Broadway Loan by granting concessions to Harrah to address Harrah's financial difficulties. Accordingly, the Broadway Loan was a TDR under both GAAP and Hanmi's own accounting policies.

140. Under the terms of the original Broadway Loan, Harrah was obligated to make a balloon payment for the entire $41.2 million principal when the loan

matured on March 15, 2017. Pursuant to Section 8.1(a) of the Broadway Loan agreement, Harrah's failure to pay the entire principal when due on March 15, 2017 would constitute an Event of Default of the loan agreement. On March 13, 2017—just two days before the Broadway Loan was set to mature—Hanmi agreed to the First Broadway Restructuring, which extended the maturity of the loan by 365 days from March 15, 2017 to March 15, 2018.

141. On March 15, 2018, the Broadway Loan matured and Harrah defaulted by failing to make the required balloon payment. On April 23, 2018, more than 30 days after Harrah's default— Hanmi granted Harrah another concession due to Harrah's financial difficulties by entering into the Second Broadway Restructuring. The Second Broadway Restructuring extended the maturity of the loan another 184 days, from March 15, 2018 to September 15, 2018. Accordingly, as of June 30, 2018, Hanmi had already extended the maturity of the Broadway Loan by a cumulative total of 549 days due to Harrah's financial difficulties.

142. Hanmi's reported $16.1 million in NPAs was materially false and misleading because, by the end of June 2018, Defendants knew or were deliberately reckless in not knowing that the full timely collection of the principal or interest of the Broadway Loan was in doubt. Accordingly, the Broadway Loan was a nonperforming asset under Hanmi's own accounting policies.

143. The Broadway Loan was a bridge loan that would only be repaid if Harrah obtained financing to build One Broadway Plaza. As of June 30, 2018, more than two years after the loan was initiated, Harrah had made no progress towards this goal. He had not secured any tenants, he had not arranged any construction financing, and he had not obtained any permits to build anything beyond the partial foundation that he already had a permit to build at the time of the loan. Further, Harrah had already defaulted once on the loan despite Hanmi granting him a one year extension of the maturity and was just 75 days away from defaulting again once

the loan was scheduled to mature on September 15, 2018. Further, the still-undeveloped land collateralizing the loan was worth significantly less than the outstanding principal.

144. The Q2 2018 10-Q stated that Hanmi had $26.9 million in impaired loans and $31.8 million in ALLL.

145. The reported $26.9 million amount of impaired loans was materially false and misleading because it did not include the $38.9 million Broadway Loan, which was impaired as of June 30, 2018.

146. For the reasons described in paragraphs 137-141, the June 30, 2018 financial statements were materially false and misleading because the Broadway Loan was a TDR as of June 30, 2018. Under Hanmi's own accounting policies, all TDRs are impaired.

147. The Q2 2018 10-Q's reported $31.8 million amount of ALLL was materially false and misleading because it did not include any allowance for the impaired Broadway Loan. GAAP and Hanmi's own accounting policies required Hanmi to measure all TDRs for specific allowances. The allowance for collateral-dependent loans is calculated as the difference between the principal of the loan and the fair value of the collateral less the estimated cost to sell it.

148. As Defendants eventually admitted when they charged off all but $13.2 million of the Broadway Loan, the fair value of the undeveloped land serving as collateral for the Broadway Loan was just $13.2 million. Accordingly, GAAP and Hanmi's own accounting policies required Hanmi to charge off or take a specific allowance for the $25.7 million difference between the $38.9 million outstanding principal and $13.2 million fair value of the collateral.

149. The Q2 2018 10-Q stated that Hanmi had $0.1 million in PLLL and $21.4 million in income before income tax expense ("Pre-Tax Income").

150. The reported amount of $0.1 million in PLLL was false and misleading because it did not include any provision for the impaired Broadway Loan. GAAP and Hanmi's own accounting policies required that the $25.7 million specific allowance for the Broadway Loan that Defendants were required to take be accompanied by a corresponding recording of a $25.7 million PLLL on Hanmi's income statement. ASC 310-10-35-24.

151. The reported amount of $21.4 million in Pre-Tax Income was materially false and misleading because it did not include the $25.7 million PLLL for the impaired Broadway Loan.

152. The following table illustrates how materially Hanmi misstated these amounts and ratios by not including the $38.9 million Broadway Loan and the related $25.7 million specific allowance:

| Metric | Falsely Reported Amount | Required Adjustment for Broadway Loan | Amount with Broadway Loan Correctly Included[21] |
|---|---|---|---|
| NPAs | $16.1 million | $38.9 million | $55.0 million |
| NPA Ratio | 0.30% | | 1.02% |
| TDRs | $14.3 million | $38.9 million | $53.2 million |
| Impaired | $26.9 million | $38.9 million | $65.8 million |
| ALLL | $31.8 million | $25.7 million | $56.2 million |
| ALLL Ratio | 0.70% | | 1.24% |
| PLLL | $0.1 million | $25.7 million | $25.8 million |
| Pre-Tax Income | $21.4 million | ($25.7 million) | ($4.3 million) |

153. On September 5, 2018, Kum delivered a presentation on behalf of Hanmi at the 2018 U.S. Bank Conference hosted by Raymond James.

[21] The amounts and ratios calculated in this column—and the corresponding column of each chart for subsequent reporting periods—include subtracting the amount Hanmi should have reported in NPAs from Hanmi's total assets and the amount Hanmi should have reported in NPLs from Hanmi's total loans and leases.

154. Kum's presentation stated, in relevant part, that Hanmi had "[e]xcellent [a]sset [q]uality" due its "NPA-to-assets of 30 bps vs. median of 50 bps for $3 to $10 billion U.S. bank" as of the end of the second quarter of 2018.

155. The stated 0.30% NPA Ratio in Kum's presentation was materially false and misleading because, for the reasons described in paragraphs 142-143 and 152, Hanmi's NPA Ratio as of the quarter ended June 30, 2018 was 1.02%.

156. Accordingly, Kum's assertion that Hanmi had excellent asset quality was also false and misleading because Hanmi's NPA Ratio was more than twice as high as the median NPA Ratio of its peers rather than 40% below the median of its peers as Kum stated in his presentation.

157. For the reasons described in paragraphs 105-115 and 139-141, the June 30, 2018 financial statements were materially false and misleading because the Broadway Loan should have been disclosed as a TDR and impaired as of June 30, 2018 under GAAP and Hanmi's own accounting policies.

**B. Hanmi's Q3 2018 Financial Results**

158. On October 23, 2018, Hanmi filed a Form 8-K with the SEC attaching a press release announcing the Company's financial results for the quarter ended September 30, 2018. Kum signed the Form 8-K.

159. Among the "2018 Third Quarter Highlights," the press release listed "Excellent asset quality; Nonperforming assets at 0.35% of total assets and net charge-offs of 0.03%."

160. The 0.35% NPA Ratio stated in the press release was materially false and misleading because, for the reasons described in paragraphs 168-169 and 178, Hanmi's NPA Ratio as of the quarter ended September 30, 2018 was 1.06%. Accordingly, the press release's assertion that Hanmi had excellent asset quality was also false and misleading.

161. On November 9, 2018, the Company filed its quarterly report for the quarter ended September 30, 2018 on a Form 10-Q with the SEC ("Q3 2018 Form 10-Q"). The Q3 2018 Form 10-Q was signed by Defendants Kum and Santarosa. Defendants Kum and Santarosa signed certifications, attached to the Q3 2018 Form 10-Q, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

162. The Q3 2018 10-Q stated that Hanmi had $19.2 million in NPAs and $13.4 million in TDRs. The Q3 2018 10-Q also stated that Hanmi's NPA Ratio was 0.35%.

163. These reported amounts and ratios were materially false and misleading because they did not include the $38.9 million Broadway Loan, which was a nonperforming TDR as of September 30, 2018.

164. Hanmi's reported $13.4 million in TDRs was false and misleading because, by the end of September 2018, Defendants knew or were deliberately reckless in not knowing that Hanmi had restructured the Broadway Loan by granting concessions to Harrah to address Harrah's financial difficulties. Accordingly, the Broadway Loan was a TDR under both GAAP and Hanmi's own accounting policies.

165. Under the terms of the original Broadway Loan, Harrah was obligated to make a balloon payment for the entire $41.2 million principal when the loan matured on March 15, 2017. Pursuant to Section 8.1(a) of the Broadway Loan agreement, Harrah's failure to pay the entire principal when due on March 15, 2017 would constitute an Event of Default of the loan agreement. On March 13, 2017—just two days before the Broadway Loan was set to mature—Hanmi agreed to the First Broadway Restructuring, which extended the maturity of the loan by 365 days from March 15, 2017 to March 15, 2018.

166. On March 15, 2018, the Broadway Loan matured and Harrah defaulted by failing to make the required balloon payment. On April 23, 2018, more than 30 days after Harrah's default— Hanmi granted Harrah another concession due to Harrah's financial difficulties by entering into the Second Broadway Restructuring. The Second Broadway Restructuring extended the maturity of the loan another 184 days, from March 15, 2018 to September 15, 2018.

167. On September 15, 2018, the Broadway Loan matured and Harrah defaulted a second time by again failing to make the required balloon payment. Accordingly, as of September 30, 2018, Harrah was in default on the Broadway Loan because he was unable to pay the outstanding $38.9 million principal despite the fact that Hanmi had granted him concessions by extending the maturity of the loan by a cumulative total of 549 days due to his financial difficulties.

168. Hanmi's reported $19.2 million in NPAs and 0.35% NPA Ratio were materially false and misleading because, by September 30, 2018, Defendants knew or were deliberately reckless in not knowing that the full timely collection of the principal or interest of the Broadway Loan was in doubt. Accordingly, the Broadway Loan was a nonperforming asset under Hanmi's own accounting policies.

169. The Broadway Loan was a bridge loan that would only be repaid if Harrah obtained financing to build One Broadway Plaza. As of September 30, 2018, nearly two and a half after the loan was initiated, Harrah had made no progress towards this goal. He had not secured any tenants, he had not arranged any construction financing, and he had not obtained any permits to build anything beyond the partial foundation that he already had a permit to build at the time of the loan. Further, Harrah had already defaulted twice on the loan despite Hanmi granting him 549 days of extended maturity. Further, the still-undeveloped land collateralizing the loan was worth significantly less than the outstanding principal.

170. The Q3 2018 10-Q stated that Hanmi had $30.3 million in impaired loans and $31.7 million in ALLL.

171. The reported $30.3 million amount of impaired loans was materially false and misleading because it did not include the $38.9 million Broadway Loan, which was impaired as of September 30, 2018.

172. For the reasons described in paragraphs 105-115 and 137-141 the September 30, 2018 financial statements were materially false and misleading because the Broadway Loan was a TDR as of September 30, 2018. Under Hanmi's own accounting policies, all TDRs are impaired.

173. The Q3 2018 10-Q's reported $31.7 million amount of ALLL was materially false and misleading because it did not include any allowance for the impaired Broadway Loan. GAAP and Hanmi's own accounting policies required Hanmi to measure all TDRs for specific allowances. The allowance for collateral-dependent loans is calculated as the difference between the principal of the loan and the fair value of the collateral less the estimated cost to sell it.

174. As Defendants eventually admitted when they charged off all but $13.2 million of the Broadway Loan, the fair value of the undeveloped land serving as collateral for the Broadway Loan was just $13.2 million. Accordingly, GAAP and Hanmi's own accounting policies required Hanmi to charge off or take a specific allowance for the $25.7 million difference between the $38.9 million outstanding principal and $13.2 million fair value of the collateral.

175. The Q2 2018 10-Q stated that Hanmi had $0.2 million in PLLL and $21.4 million in income before income tax expense ("Pre-Tax Income").

176. The reported amount of $0.2 million in PLLL was false and misleading because it did not include any provision for the impaired Broadway Loan. GAAP and Hanmi's own accounting policies required that the $25.7 million specific allowance for the Broadway Loan that Defendants were required to take be

accompanied by a corresponding recording of a $25.7 million PLLL on Hanmi's income statement. ASC 310-10-35-24.

177. The reported amount of $22.3 million in Pre-Tax Income was materially false and misleading because it did not include the $25.7 million PLLL for the impaired Broadway Loan.

178. The following table illustrates how materially Hanmi misstated these amounts and ratios by not including the $38.9 million Broadway Loan and the related $25.7 million specific allowance:

| Metric | Falsely Reported Amount | Required Adjustment for Broadway Loan | Amount with Broadway Loan Correctly Included |
|---|---|---|---|
| NPAs | $19.2 million | $38.9 million | $58.1 million |
| NPA Ratio | 0.35% | | 1.06% |
| TDRs | $13.4 million | $38.9 million | $52.3 million |
| Impaired | $30.3 million | $38.9 million | $69.2 million |
| ALLL | $31.7 million | $25.7 million | $57.4 million |
| ALLL Ratio | 0.69% | | 1.25% |
| PLLL | $0.2 million | $25.7 million | $25.9 million |
| Pre-Tax Income | $22.3 million | ($25.7 million) | ($3.4 million) |

179. The Q3 2019 10-Q stated that "[m]anagement has evaluated subsequent events through the date of issuance of the financial data included herein. Other than as disclosed above, there have been no subsequent events that occurred during such period that would require disclosure in this Quarterly Report on Form 10-Q for the period ended September 30, 2018, or would be required to be recognized in the Consolidated Financial Statements (Unaudited) as of September 30, 2018."

180. The statement that management was not aware of any other subsequent events that would require disclosure was false and misleading because it excluded the Third Broadway Restructuring.

181. On October 3, 2018, after the end of the quarter ending September 30, 2018 but before Hanmi issued the Q3 2018 10-Q, Hanmi entered into the Third

Broadway Restructuring, which granted Harrah further concessions due to his inability to pay off the Broadway Loan. The Third Broadway Restructuring was highly unusual because it extended the maturity of the loan by just 48 days from September 15, 2018 to November 2, 2018. When the restructuring was entered into on October 3, it was highly doubtful that Harrah would be able to make the balloon payment of $38.9 million just 30 days later on November 2, 2018, as required under the restructuring. Accordingly, the Broadway Loan was impaired as of October 3, 2018, and Defendants were required to disclose such as a subsequent event. ASC 855-10-50.

182. On November 14, 2018, Kum delivered a presentation on behalf of Hanmi at a conference hosted by Keefe, Bruyette & Woods.

183. Kum's presentation stated, in relevant part, that Hanmi had "[e]xcellent [a]sset [q]uality" due its "NPA-to-assets of 35 bps vs. median of 59 bps for $3 to $10 billion U.S. bank" as of the end of the third quarter of 2018.

184. The stated 0.30% NPA Ratio in Kum's presentation was materially false and misleading because, for the reasons described in paragraphs 168-169, Hanmi's NPA Ratio as of the quarter ended September 30, 2018 was 1.06%.

185. Accordingly, Kum's assertion that Hanmi had excellent asset quality was also false and misleading because Hanmi's NPA Ratio was much higher than the median NPA Ratio of its peers rather than 40% below the median of its peers as Kum stated in his presentation.

**C. Hanmi's Fiscal Year 2018 Financial Results**

186. On January 15, 2019, Hanmi filed a Form 8-K with the SEC attaching a press release announcing the Company's financial results for the quarter and fiscal year ended December 31, 2018. Kum signed the Form 8-K.

187. Among the "2018 Fourth Quarter and Full Year Highlights," the press release listed "Excellent asset quality; nonperforming assets at 0.29% of total assets and net charge-offs of 0.07% for the year; allowance to loans and leases at 0.70%."

188. The 0.29% NPA Ratio stated in the press release was materially false and misleading because, for the reasons described in paragraphs 194-195 and 211, Hanmi's NPA Ratio as of the quarter ended December 31, 2018 was 1.03%. Accordingly, the press release's assertion that Hanmi had excellent asset quality was also false and misleading.

189. Hanmi hosted an investor call on January 15, 2019. Kum, Santarosa, and Lee all participated in the call. On the call, Kum stated that "[i]mportantly, we continued to maintain our normal conservative underwriting standards and our overall asset quality remains excellent. During the quarter, criticized loans declined 17.6% from $71.3 million to $58.7 million. Nonperforming loans were $15.5 million or 34 basis points of loans at quarter end, representing sequential improvement of 15.3% from third quarter non-performing loans of $18.3 million or 40 basis points of loans. We recorded a $3 million loan loss provision in the quarter and our allowance for loan losses held steady at 70 basis points of loans and leases at year-end." Kum also stated that "[o]verall, our asset quality metrics have remained excellent."

190. These statements were false and misleading because Hanmi's asset quality metrics only appeared to be "excellent" because Hanmi misstated its ALLL Ratio by excluding the nonperforming $40.3 million Harrah Loans and their related specific allowances.

191. Kum also stated on the January 15, 2019 investor call that Hanmi's "asset quality metrics" were "about as strong as you can get."

192. This statement was false and misleading because Hanmi's asset quality metrics only appeared to be "as strong as you can get" because Hanmi misstated its

asset quality metrics by excluding the nonperforming $40.3 million Harrah Loans and their related specific allowances.

193. On March 1, 2019, the Company filed its annual report for the year ended December 31, 2018 on a Form 10-K with the SEC ("2018 10-K"). The 2018 Form 10-K was signed by Defendants Kum and Santarosa. Defendants Kum and Santarosa signed certifications, attached to the 2018 10-K, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

194. The 2018 10-K stated that Hanmi had $16.2 million in NPAs and $10.3 million in TDRs. The 2018 10-K also stated that Hanmi's NPA Ratio was 0.29%.

195. These reported amounts and ratios were materially false and misleading because they did not include the $28.0 million Broadway Loan or the $12.3 million Caribou Loan[22], both of which were nonperforming TDRs as of December 31, 2018.

196. Hanmi's reported $10.3 million in TDRs was false and misleading because, by the end of December 2018, Defendants knew or were deliberately reckless in not knowing that Hanmi had restructured the Broadway Loan by granting concessions to Harrah to address Harrah's financial difficulties, including by issuing the Caribou Loan. Accordingly, the Broadway Loan and Caribou Loan were TDRs under both GAAP and Hanmi's own accounting policies.

197. The quarter ended December 31, 2018 began with Harrah in default on the Broadway Loan despite Hanmi having twice granted him concessions due to his inability to pay off the outstanding principal. On October 3, 2018, Hanmi entered into the Third Broadway Restructuring, which granted Harrah further concessions

[22] The transaction history of the Caribou Loan (Ex. 2 at 66) shows that Hanmi advanced $12.3 million to Harrah on December 31, 2018.

due to his inability to pay off the Broadway Loan. The Third Broadway Restructuring was highly unusual because it extended the maturity of the loan by just 48 days from September 15, 2018 to November 2, 2018.

198. The Broadway Loan matured for a third time on November 2, 2018, and Harrah defaulted on the loan for a third time by again failing to comply with his contractual obligation to repay the entire outstanding principal. On December 24, 2018—more than 50 days after the Broadway Loan matured and weeks after repayment of the principal became delinquent—Hanmi entered into the Fourth Broadway Restructuring that extended the maturity of the Broadway Loan from November 2, 2018 to January 31, 2019.

199. As part of the Fourth Broadway Restructuring, Hanmi added Caribou as an additional debtor by lending Caribou money to pay off a portion of the impaired Broadway Loan. GAAP requires companies to disclose restructurings that result in an additional debtor that is controlled by the original debtor. ASC 310-40-25-2. Harrah controlled both One Broadway Plaza LLC and Caribou at all relevant times, and Harrah used the vast majority of the Caribou Loan to pay down a portion of the outstanding principal of the Broadway Loan.

200. Hanmi's reported $16.2 million in NPAs and 0.29% NPA Ratio were materially false and misleading because, by the end of December 2018, Defendants knew or were deliberately reckless in not knowing that the full timely collection of the principal or interest of the Broadway Loan was in doubt. Accordingly, the Broadway Loan was a nonperforming asset under Hanmi's own accounting policies.

201. The Broadway Loan was a bridge loan that would only be repaid if Harrah obtained financing to build One Broadway Plaza. As of December 31, 2018, More than 30 months after the loan was initiated, Harrah had made no progress towards this goal. He had not secured any tenants, he had not arranged any construction financing, and he had not obtained any permits to build anything

beyond the partial foundation that he already had a permit to build at the time of the loan. Further, Harrah had already defaulted three times on the loan despite Hanmi granting him 687 days of extended maturity. Further, the still-undeveloped land collateralizing the loan was worth significantly less than the outstanding principal.

202. The 2018 10-K stated that Hanmi had $25.1 million in impaired loans and $32.0 million in allowance for loan and lease losses.

203. The reported $25.1 million amount of impaired loans was materially false and misleading because it did not include the $28 million Broadway Loan or the $12.3 million Caribou Loan, both of which were impaired as of December 31, 2018. Because Hanmi split the debt from the Broadway Loan into multiple loans to the same borrower, GAAP required Hanmi to continue to base its measure of the loans' impairment on the contractual terms specified in the Broadway Loan rather than evaluating each loan individually. ASC 310-40-50-5.

204. For the reasons described in paragraphs 195-201, the 2018 10-K financial statements were materially false and misleading because the Broadway Loan and Caribou Loans were TDRs as of December 31, 2018. Under Hanmi's own accounting policies, all TDRs are impaired.

205. The 2018 10-K's reported $32.0 million amount of ALLL was materially false and misleading because it did not include any allowance for the impaired Broadway Loan. GAAP and Hanmi's own accounting policies required Hanmi to measure all TDRs for specific allowances. The allowance for collateral-dependent loans is calculated as the difference between the principal of the loan and the fair value of the collateral less the estimated cost to sell it.

206. As Defendants eventually admitted when they charged off all but $13.2 million of the Broadway Loan, the fair value of the undeveloped land serving as collateral for the Broadway Loan was just $13.2 million. Accordingly, GAAP and Hanmi's own accounting policies required Hanmi to charge off or take a specific

allowance for the $14.8 million difference between the $28.0 million outstanding principal and $13.2 million fair value of the collateral.

207. Additionally, as Defendants eventually admitted when they charged off all but $1.1 million of the Caribou Loan, the fair value (minus the costs to sell) of the car collection serving as collateral for the Caribou Loan was just $1.1 million. Accordingly, GAAP and Hanmi's own accounting policies required Hanmi to charge off or take a specific allowance for the $11.2 million difference between the $12.3 million outstanding principal and $1.1 million fair value of the collateral.

208. The 2018 10-K stated that Hanmi had $4.0 million in PLLL and $84 million in income before income tax expense ("Pre-Tax Income").

209. The reported amount of $4.0 million in PLLL was false and misleading because it did not include any provision for the impaired Broadway Loan or Caribou Loan. GAAP and Hanmi's own accounting policies required that the $26.0 million specific allowance for the Harrah Loans that Defendants were required to take be accompanied by a corresponding recording of a $26.0 million PLLL on Hanmi's income statement. ASC 310-10-35-24.

210. The reported amount of $84 million in Pre-Tax Income was materially false and misleading because it did not include the $26.0 million PLLL for the impaired Harrah Loans.

211. The following table illustrates how materially Hanmi misstated these amounts and ratios by not including the $40.3 million Harrah Loans and the related $26 million specific allowance:

| Metric | Falsely Reported Amount | Required Adjustment for Broadway Loan | Amount with Broadway Loan Correctly Included[23] |
|---|---|---|---|

[23] The amounts and ratios calculated in this column—and the corresponding column of each chart for subsequent reporting periods—include subtracting the amount

| | | | |
|---|---|---|---|
| NPAs | $16.2 million | $40.3 million | $56.5 million |
| NPA Ratio | 0.29% | | 1.03% |
| TDRs | $10.3 million | $40.3 million | $50.6 million |
| Impaired | $25.1 million | $40.3 million | $65.4 million |
| ALLL | $32.0 million | $26.0 million | $58.0 million |
| ALLL Ratio | 0.70% | | 1.26% |
| PLLL | $4.0 million | $26.0 million | $30.0 million |
| Pre-Tax Income | $84.0 million | ($26.0 million) | ($58.0 million) |

212. The "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of the 2018 Form 10-K stated that, other than the loans designated as nonperforming, "management is not aware of any loans and leases as of December 31, 2018 for which known credit problems of the borrower would cause serious doubts as to the ability of such borrowers to comply with their present loan or lease repayment terms, or any known events that would result in the loan or lease being designated as nonperforming at some future date."

213. This statement was false and misleading because, by December 31, 2018, Defendants knew or were reckless in not knowing that (i) Harrah had already defaulted on the Broadway Loan three times; (ii) Hanmi had restructured the Broadway Loan four times due to Harrah's ongoing credit problems; and, accordingly, (iii) serious doubt existed about Harrah's ability to comply with the then-present terms of the Broadway Loan by repaying the entire remaining principal when the loan was due to mature in just one month on January 31, 2019.

214. The MD&A statement was also false and misleading because, by December 31, 2018, Defendants knew or were reckless in not knowing that (i) Hanmi had just issued a new collateral-dependent loan to Harrah—the Caribou Loan—on December 26, 2018 despite the fact that Harrah had defaulted three times

---

Hanmi should have reported in NPAs from Hanmi's total assets and the amount Hanmi should have reported in NPLs from Hanmi's total loans and leases.

on the Broadway Loan; (ii) Hanmi repeatedly made concessions to Harrah in restructuring the Broadway Loan due to Harrah's inability to comply with the terms on the loan by repaying the principal upon the agreed maturity date; (iii) Hanmi allowed Harrah to use his car collection as collateral for the Caribou Loan despite Hanmi never receiving a credible appraisal or valuation of the collateral; and, accordingly, (iv) serious doubt existed about Harrah's ability to repay and make monthly 6% interest payments on the collateral-dependent Caribou Loan according to the then-present terms.

215. Hanmi accepted the car collection as collateral for the $15,456,000 based on a one page letter from Custom Auto Service from October 18, 2018 valuing the fair market value of the cars at $25,760,000. Critically, Custom Auto Service prepared the valuation for Harrah—not for Hanmi.

216. Robert Escalante owns Custom Auto Service and signed the valuation of Harrah's cars. According to the Orange County Business Journal, Escalante and Harrah have been friends since the early 1980s, and Harrah is a client of Escalante's Custom Auto Service. Escalante's letter stated that the $25,760,000 valuation was an update to a valuation Escalante provided Harrah in 2009. The letter does not list any of the cars, much less assign each an individual value. Rather, Escalante wrote: "TO WHOM IT MAY CONCERN: Mr. Harrah's unique collection of rare automobiles, are easily said to have an overall increase in TODAY'S FAIR MARKET VALUE (FMV) (of the entire collection) upwards of 15-20% placing an estimated overall value of approximately $25,760,000."

217. In violation of applicable regulations and its own internal policies, Hanmi did not make any effort to determine the quality, expertise, or independence of the Custom Auto Service valuation prior to extending the Caribou Loan. Fuhr stated in his Declaration (Ex. 2 at 8) that Hanmi "relied on this statement of value for the Classic Cars found in this letter [] in extending the Loan to Caribou."

218. On March 5, 2019, Kum delivered a presentation on behalf of Hanmi at the 2019 West Coast Financial Services Conference hosted by Sandler O'Neill.

219. Kum's presentation stated, in relevant part, that Hanmi had "[e]xcellent [a]sset [q]uality" due its "NPA-to-assets of 29 bps vs. median of 55 bps for $3 to $10 billion U.S. bank" as of the end of the fourth quarter of 2018.

220. The stated 0.29% NPA Ratio in Kum's presentation was materially false and misleading because, for the reasons described in paragraph 211, Hanmi's NPA Ratio as of December 31, 2018 was 1.03%.

221. Accordingly, Kum's assertion that Hanmi had excellent asset quality was also false and misleading because Hanmi's NPA Ratio was far higher than the median NPA Ratio of its peers rather than 47% below the median of its peers as Kum stated in his presentation.

**D. Hanmi's Q1 2019 Financial Results**

222. On April 23, 2019, Hanmi filed a Form 8-K with the SEC attaching a press release announcing the Company's financial results for the quarter ended March 31, 2019. The press release stated that Hanmi's NPA had increased to "$40.7 million at the end of the first quarter of 2019, or 0.73% of assets, compared to $16.2 million, or 0.29% of assets, at the end of the prior quarter."

223. Hanmi hosted an investor call on April 23, 2019. Kum, Santarosa, and Lee all participated in the call. On the call, Kum stated Kum stated that the increase in nonperforming loans was "due to a $25 million commercial loan relationship" that "experienced a labor issue that has caused a business interruption." When an analyst asked about the "broader trend in criticized/classified assets this quarter," Kum assured investors that the increase in nonperforming loans was a "one-off issue" and that "there are no other significant increases in the criticized or any other grade categories."

224. Kum's statement that the $25 million increase in nonperforming loans was a one-off issue, and that there are no other significant increases in the criticized or any other grade categories, was materially false and misleading because Kum knew at the time, or was reckless in not knowing, that the $40.7 million Harrah Loans were nonperforming and impaired.

225. On May 10, 2019, the Company filed its quarterly report for the quarter ended March 31, 2019 on a Form 10-Q with the SEC ("Q1 2019 10-Q"). The Q1 2019 10-Q was signed by Defendants Lee and Santarosa. Defendants Lee and Santarosa signed certifications, attached to the Q1 2019 10-Q, pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

226. The Q1 2019 10-Q stated that Hanmi had $40.7 million in NPAs and $10.0 million in TDRs. Q1 2019 10-Q also stated that Hanmi's NPA Ratio was 0.73%.

227. These reported amounts and ratios were materially false and misleading because they did not include the $28.0 million Broadway Loan or the $12.8 million Caribou Loan, both of which were nonperforming TDRs as of March 31, 2019.

228. Hanmi's reported $10.0 million in TDRs was false and misleading because, by the end of March 2019, Defendants knew or were deliberately reckless in not knowing that (i) Hanmi had restructured the Broadway Loan by granting concessions to Harrah to address Harrah's financial difficulties, including by issuing the Caribou Loan; and (ii) Hanmi had restructured the Caribou Loan by granting concessions to Harrah to address Harrah's financial difficulties. Accordingly, the Broadway Loan and Caribou Loan were TDRs under both GAAP and Hanmi's own accounting policies.

229. Harrah defaulted on the Broadway Loan for the fourth time when the loan matured on January 31, 2019, and Harrah again failed to meet his contractual obligation to repay the outstanding principal of the loan. Defendants made further concessions to Harrah during the first quarter of 2019. On February 22, 2019, in continuation of the long-running pattern, Hanmi once again agreed to extend the maturity of the Broadway Loan from January 31, 2019 to December 31, 2019 as part of the Fifth Broadway Restructuring. In addition to further extending the maturity date for the loan, Hanmi granted Broadway another significant concession by reducing the interest rate for the Broadway Loan from 7.0% to 5.5%.

230. On February 25, 2019, in a further demonstration of Hanmi's understanding of the borrower's financial difficulties and unlikelihood of repaying the loan's principal and interest, Hanmi agreed to the First Caribou Restructuring, which reduced the interest rate of the Caribou Loan from 6.0% to 5.5%. Hanmi's concessions demonstrated an understanding of Harrah's ongoing financial difficulties and his inability to pay higher interest rates.

231. Hanmi's reported $40.7 million in NPAs and 0.73% NPA Ratio were materially false and misleading because, by the end of March 2019, Defendants knew or were deliberately reckless in not knowing that the full timely collection of the principal or interest of the Broadway Loan and Harrah Loan were in doubt. Accordingly, the Broadway Loan and Caribou Loan were nonperforming assets under Hanmi's own accounting policies.

232. The Broadway Loan was a bridge loan that would only be repaid if Harrah obtained financing to build One Broadway Plaza. As of March 31, 2019, more than three years after the loan was initiated, Harrah had made no progress towards this goal. He had not secured any tenants, he had not arranged any construction financing, and he had not obtained any permits to build anything beyond the partial foundation that he already had a permit to build at the time of the

loan. Further, Harrah had already defaulted four times on the loan despite Hanmi granting him over 1,000 days of extended maturity. Further, the still-undeveloped land collateralizing the loan was worth significantly less than the outstanding principal.

233. The Caribou Loan was another collateral-dependent loan based on collateral that was worth less than the principal of the loan. In violation of applicable regulations and its own internal policies, Hanmi made no effort to commission or otherwise receive a credible appraisal of Harrah's car collection prior to or after the Company issued the Caribou Loan. Nor did Hanmi make any effort to determine the quality, expertise, or independence of the Custom Auto Service valuation prior to or after extending the Caribou Loan.

234. On January 7, 2019, after Hanmi had already issued the Caribou Loan, Custom Auto Service sent Hanmi a two-page letter purporting to provide a valuation of 12 of the collection's 13 cars. The letter also purported to compare the "current net present value" of each car to Escalante's 2009 valuation of the same cars. The letter also attached a booklet describing the 13 cars. The bulk of the booklet appears to be promotional materials Harrah uses for his car "museum." Neither the letter nor the booklet make effort to appraise the cars based on comparable sales. Curiously, the description of the first car in the booklet appears to have been copied and pasted from an advertisement for a miniature car model.[24] Seven of the 12 cars were assigned the exact same net present value as their 2009 appraisal value.

235. Q1 2019 10-Q stated that Hanmi had $43.3 million in impaired loans and $32.9 million in allowance for loan and lease losses.

236. The reported $25.1 million amount of impaired loans was materially false and misleading because it did not include the $28 million Broadway Loan or

[24] http://www.phillymint.com/FMShopCartae/XE83.htm

the $12.8 million Caribou Loan, both of which were impaired as of December 31, 2018. Because Hanmi split the debt from the Broadway Loan into multiple loans to the same borrower, GAAP required Hanmi to continue to base its measure of the loans' impairment on the contractual terms specified in the Broadway Loan rather than evaluating each loan individually. ASC 310-40-50-5.

237. For the reasons described in paragraphs 105-115 and 227-230, the Q1 2019 financial statements were materially false and misleading because the Broadway Loan was a TDR as of March 31, 2019. Under Hanmi's own accounting policies, all TDRs are impaired.

238. The Q1 2019 10-Q's reported $32.9 million amount of ALLL was materially false and misleading because it did not include any allowance for the impaired Broadway Loan and Caribou Loan. GAAP and Hanmi's own accounting policies required Hanmi to measure all TDRs for specific allowances. The allowance for collateral-dependent loans is calculated as the difference between the principal of the loan and the fair value of the collateral less the estimated cost to sell it.

239. As Defendants eventually admitted when they charged off all but $13.2 million of the Broadway Loan, the fair value of the undeveloped land serving as collateral for the Broadway Loan was just $13.2 million. Accordingly, GAAP and Hanmi's own accounting policies required Hanmi to charge off or take a specific allowance for the $14.8 million difference between the $28.0 million outstanding principal and $13.2 million fair value of the collateral.

240. Additionally, as Defendants eventually admitted when they charged off all but $1.1 million of the Caribou Loan, the fair value (minus the costs to sell) of the car collection serving as collateral for the Caribou Loan was just $1.1 million. Accordingly, GAAP and Hanmi's own accounting policies required Hanmi to charge off or take a specific allowance for the $11.7 million difference between the $12.8 million outstanding principal and $1.1 million fair value of the collateral.

241. The Q2 2018 10-Q stated that that Hanmi had $1.1 million in PLLL and $21.0 million in Pre-Tax Income.

242. The reported amount of $1.1 million in PLLL was false and misleading because it did not include any provision for the impaired Harrah Loans. GAAP and Hanmi's own accounting policies required that the $26.5 million specific allowance for the Harrah Loans that Defendants were required to take be accompanied by a corresponding recording of a $26.5 million PLLL on Hanmi's income statement. ASC 310-10-35-24.

243. The reported amount of $21.0 million in Pre-Tax Income was materially false and misleading because it did not include the $26.5 million PLLL for the impaired Broadway Loan.

244. The following table illustrates how materially Hanmi misstated these amounts and ratios by not including the $40.8 million Harrah Loans and the related $26.5 million specific allowance:

| Metric | Falsely Reported Amount | Required Adjustment for Broadway Loan | Amount with Broadway Loan Correctly Included |
|---|---|---|---|
| NPAs | $40.7 million | $40.8 million | $81.5 million |
| NPA Ratio | 0.73% | | 1.47% |
| TDRs | $10 million | $40.8 million | $50.8 million |
| Impaired | $43.3 million | $40.8 million | $84.1 million |
| ALLL | $32.9 million | $26.5 million | $59.4 million |
| ALLL Ratio | 0.70% | | 1.24% |
| PLLL | $1.1 million | $26.5 million | $27.6 million |
| Pre-Tax Income | $21.0 million | ($26.5 million) | ($5.5 million) |

245. The "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of the 1Q 2019 10-Q stated that, other than the loans designated as nonperforming, "management is not aware of any loans and leases as of March 31, 2019, for which known credit problems of the borrower would

cause serious doubts as to the ability of such borrowers to comply with their present loan or lease repayment terms, or any known events that would result in the loan or lease being designated as nonperforming at some future date."

246. This statement was false and misleading because, by March 31, 2019, Defendants knew or were recklessly in not knowing that (i) Harrah had already defaulted on the Broadway Loan four times; (ii) Hanmi had restructured the Broadway Loan five times due to Harrah's ongoing credit problems; and, accordingly, (iii) Hanmi had reduced the interest rate of the Broadway Loan due to Harrah's inability to continue making higher payments; and (iv) serious doubt existed about Harrah's ability to comply with the then-present terms of the Broadway Loan by repaying the entire remaining principal when the loan was due to mature in just one month on December 31, 2019.

247. The MD&A statement was also false and misleading because, by December 31, 2018, Defendants knew or were reckless in not knowing that (i) Hanmi allowed Harrah to use his car collection as collateral for the Caribou Loan despite Hanmi never receiving a credible appraisal or valuation of the collateral; and, accordingly, (ii) Hanmi had reduced the interest rate of the Caribou Loan due to Harrah's inability to continue making higher payments; and, accordingly, (iii) serious doubt existed about Harrah's ability to repay and make monthly interest payments on the collateral-dependent Caribou Loan according to the then-present terms.

248. Hanmi accepted the car collection as collateral for the $15,456,000 based on a one page letter from Custom Auto Service from October 18, 2018 valuing the fair market value of the cars at $25,760,000. Critically, Custom Auto Service prepared the valuation for Harrah—not for Hanmi.

249. Robert Escalante owns Custom Auto Service and signed the valuation of Harrah's cars. According to the Orange County Business Journal, Escalante and

Harrah have been friends since the early 1980s, and Harrah is a client of Escalante's Custom Auto Service. Escalante's letter stated that the $25,760,000 valuation was an update to a valuation Escalante provided Harrah in 2009. The letter does not list any of the cars, much less assign each an individual value. Rather, Escalante wrote: "TO WHOM IT MAY CONCERN: Mr. Harrah's unique collection of rare automobiles, are easily said to have an overall increase in TODAY'S FAIR MARKET VALUE (FMV) (of the entire collection) upwards of 15-20% placing an estimated overall value of approximately $25,760,000."

250. In violation of applicable regulations and its own internal policies, Hanmi did not make any effort to determine the quality, expertise, or independence of the Custom Auto Service valuation prior to extending the Caribou Loan. Fuhr stated in his Declaration (Ex. 2 at 8) that Hanmi "relied on this statement of value for the Classic Cars found in this letter [] in extending the Loan to Caribou."

**E. Hanmi's Q2 2019 Financial Results**

251. On October 4, 2019, the Company belatedly filed its quarterly report for the quarter ended June 30, 2019 on a Form 10-Q with the SEC ("Q2 2019 10-Q"). The Q2 2019 10-Q was signed by Defendants Lee and Santarosa. Defendants Lee and Santarosa signed certifications, attached to the Q2 2019 10-Q, pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

252. The Q2 2019 10-Q admitted that the Broadway Loan and Caribou Loan were both nonaccrual TDRs and that both loans were nonperforming assets. The Q2 2019 10-Q also disclosed that Hanmi had taken a $14.7 million specific allowance for the Broadway Loan and a $1.0 million specific allowance for the Caribou Loan.

253. The Q2 2019 10-Q stated that Hanmi's total charge-offs for the quarter ended June 30, 2019 were $1.5 million, none of which were related to the Harrah Loans.

254. This statement was materially false and misleading because Defendants knew or were reckless in not knowing that a significant portion of the Broadway Loan was uncollectible. Accordingly, both GAAP and Hanmi's own accounting policies required Hanmi to promptly charge off the uncollectible portion of the Broadway Loan.

255. Under GAAP and Hanmi's own accounting policies, Defendants determined the $14.7 million specific allowance for the Broadway Loan by calculating the difference between the outstanding loan balance and the value of the collateral as determined by recent appraisals. Accordingly, Hanmi finally admitted that the undeveloped land that served as collateral was only worth about $13.2 million—the difference between the outstanding loan balance of $27.9 million and the specific allowance of $14.7 million.

256. Once Hanmi admitted that the undeveloped land was only worth a fraction of the principal of the loan, Defendants should have promptly charged off the remainder of the loan as uncollectible. The only way Hanmi would collect the full outstanding balance would be if Harrah finally obtained financing to build One Broadway Plaza. But, as of June 30, 2019, Harrah still had (i) no permit to begin construction on the land beyond a partial foundation, (ii) no financing to build the tower, and (iii) no tenants to fill the proposed tower. Harrah had already listed the property for sale, and the sale of the undeveloped land would not allow full repayment of the loan because the undeveloped land was only worth about $13.2 million.

257. The Q2 2019 10-Q's reported $49.4 million amount of ALLL was materially false and misleading because it only included $1.0 million for the Caribou

Loan. GAAP and Hanmi's own accounting policies required Hanmi to measure all TDRs for specific allowances. The allowance for collateral-dependent loans is calculated as the difference between the principal of the loan and the fair value of the collateral less the estimated cost to sell it.

258. Additionally, as Defendants eventually admitted when they charged off all but $1.1 million of the Caribou Loan, the fair value (minus the costs to sell) of the car collection serving as collateral for the Caribou Loan was just $1.1 million. Accordingly, GAAP and Hanmi's own accounting policies required Hanmi to charge off or take a specific allowance for the $11.7 million difference between the $12.8 million outstanding principal and $1.1 million fair value of the collateral—or $10.7 million more than Hanmi reported.

259. The Q2 2019 10-Q stated that that Hanmi had $16.7 million in PLLL and $3.9 million in Pre-Tax Income.

260. The reported amount of $16.7 million in PLLL was false and misleading because it only included $1.0 million for the Caribou Loan. GAAP and Hanmi's own accounting policies required that the $10.7 million additional specific allowance for the Caribou Loan that Defendants were required to take be accompanied by a corresponding recording of a $10.7 million PLLL on Hanmi's income statement. ASC 310-10-35-24.

261. The reported amount of $3.9 million in Pre-Tax Income was materially false and misleading because it did not include the $10.7 million additional PLLL for the impaired Caribou Loan.

262. The MD&A section of the 2Q 2019 10-Q contained a brief discussion of the Harrah Loans. The section stated that Hanmi took "a $15.7 million specific allowance relating to a $40.7 million loan relationship comprised of a $27.9 million land loan and a $12.8 million business loan." The section further stated that Hanmi, "as part of its credit administration practices, evaluated the project status of the land

loan, considered the approaching December 2019 contractual maturities of both loans and the timeliness of certain liquidity events for the guarantor of both loans during the 2019 second quarter. As a result, although both loans were current, the Bank placed the entire loan relationship on nonaccrual status." Finally, Hanmi stated that "[a]fter evaluating the recent appraisals for the real and personal property securing the loans, the liquidity and personal guarantee of the borrower, and the appropriate accounting and regulatory guidance, the Bank established an aggregate specific allowance of $15.7 million."

263. The statement that Hanmi evaluated the loan "as part of its credit administration practices" was materially misleading because it gave investors the false impression that the evaluation of the loan occurred as part of Hanmi's normal loan review process. In fact, Hanmi's bank examiners forced Hanmi to review the loan for impairment just days before Hanmi was scheduled to issue its financial results for the quarter ended June 30, 2019.

264. The statement that determined Hanmi determined the Broadway Loan was impaired, in part, due to the "approaching December 2019 contractual maturit[y]" was materially misleading because it gave investors the false impression that the Broadway Loan had not yet approached its contractual maturity. In fact, the Broadway Loan had matured and defaulted four separate times between March 2018 and January 2019, and each time Hanmi granted concessions to Harrah by retroactively extending the maturity of the loan to accommodate Harrah's inability to pay off the principal.

265. Similarly, the statement that "both loans were current" was materially misleading because it gave investors the false impression that Broadway Loan had always been current. In fact, the Broadway Loan had matured and defaulted four separate times between March 2018 and January 2019, and each time Hanmi granted

concessions to Harrah by retroactively extending the maturity of the loan to accommodate Harrah's inability to pay off the principal.

266. Finally, the MD&A section's entire discussion of the Harrah Loans was materially false and misleading because it omitted basic facts about the loan relationship that Item 303 required Defendants to disclose. Specifically, and despite the SEC's prior admonishment of Hanmi for failing to disclose such details about significant nonperforming loan relationships, Hanmi omitted all information about the borrower, the loan origination date and amount, the specific triggering events that resulted in the change of classification, and the dates of recent appraisals and a discussion of their findings as they relate to fair value. The SEC had specifically informed Hanmi of its duty to disclose this information, Hanmi had assured the SEC that the Company would include this information in future filings, yet Defendants still chose to conceal these material facts from investors.

**F. Hanmi's Q3 2019 Financial Results**

267. On November 12, 2019, the Company filed its quarterly report for the quarter ended September 30, 2019 on a Form 10-Q with the SEC ("Q3 2019 10-Q"). The Q3 2019 10-Q was signed by Defendants Lee and Santarosa. Defendants Lee and Santarosa signed certifications, attached to the Q3 2019 10-Q, pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

268. The Q3 2019 10-Q stated that Hanmi's total charge-offs for the quarter ended September 30, 2019 were $916,000, none of which were related to the Harrah Loans.

269. This statement was materially false and misleading because Defendants knew or were reckless in not knowing that a significant portion of the Broadway Loan was uncollectible. Accordingly, both GAAP and Hanmi's own accounting

policies required Hanmi to promptly charge off the uncollectible portion of the Broadway Loan.

270. Under GAAP and Hanmi's own accounting policies, Defendants determined the $14.7 million specific allowance for the Broadway Loan by calculating the difference between the outstanding loan balance and the value of the collateral as determined by recent appraisals. Accordingly, Hanmi finally admitted that the undeveloped land that served as collateral was only worth about $13.2 million—the difference between the outstanding loan balance of $27.9 million and the specific allowance of $14.7 million.

271. Once Hanmi admitted that the undeveloped land was only worth a fraction of the principal of the loan, Defendants should have promptly charged off the remainder of the loan as uncollectible. The only way Hanmi would collect the full outstanding balance would be if Harrah finally obtained financing to build One Broadway Plaza. But, as of September 30, 2019, Harrah still had (i) no permit to begin construction on the land beyond a partial foundation, (ii) no financing to build the tower, and (iii) no tenants to fill the proposed tower. Harrah had already listed the property for sale, and the sale of the undeveloped land would not allow full repayment of the loan because the undeveloped land was only worth about $13.2 million.

272. The Q3 2019 10-Q's reported $50.7 million amount of ALLL was materially false and misleading because it only included $1.0 million for the Caribou Loan. GAAP and Hanmi's own accounting policies required Hanmi to measure all TDRs for specific allowances. The allowance for collateral-dependent loans is calculated as the difference between the principal of the loan and the fair value of the collateral less the estimated cost to sell it.

273. Additionally, as Defendants eventually admitted when they charged off all but $1.1 million of the Caribou Loan, the fair value (minus the costs to sell) of

the car collection serving as collateral for the Caribou Loan was just $1.1 million. Accordingly, GAAP and Hanmi's own accounting policies required Hanmi to charge off or take a specific allowance for the $11.7 million difference between the $12.8 million outstanding principal and $1.1 million fair value of the collateral—or $10.7 million more than Hanmi reported.

274. The Q3 2019 10-Q stated that that Hanmi had $1.6 million in PLLL and $16.7 million in Pre-Tax Income.

275. The reported amount of $1.6 million in PLLL was false and misleading because it did not include the Caribou Loan. GAAP and Hanmi's own accounting policies required that the $10.7 million specific allowance for the Caribou Loan that Defendants were required to take be accompanied by a corresponding recording of a $10.7 million PLLL on Hanmi's income statement. ASC 310-10-35-24.

276. The reported amount of $16.7 million in Pre-Tax Income was materially false and misleading because it did not include the $10.7 million additional PLLL for the impaired Caribou Loan.

**G. Hanmi's Fiscal Year 2019 Financial Results**

277. On January 28, 2020, Hanmi filed a Form 8-K with the SEC attaching a press release reporting Hanmi's financial results for the quarter and year ended December 31, 2019. Lee signed the Form 8-K.

278. The press release disclosed that Hanmi took an additional $6.9 million specific allowance for the Harrah Loans, raising the total specific allowance for the Harrah Loans to $22.6 million. The press release quoted Lee stating "[w]ith the loans comprising this relationship maturing on December 31, 2019, we received current appraisals on the personal property securing the relationship and have provided for a specific allowance at the lower range of the appraised values. Notwithstanding this particular relationship, Hanmi's overall credit quality metrics remain strong."

279. On January 28, 2020, Hanmi hosted a conference call with analysts to discuss the Company's Q4 2019 earnings. Defendants Lee and Santarosa participated on the call. During the question-and-answer portion of the Q4 2019 Call, analyst Gary Tenner of D.A. Davidson & Company asked when the most recent appraisal—prior to the one conducted in the fourth quarter of 2019—of the collateral underlying the troubled loan had been performed:

> **<u>Gary Tenner</u>**: I had a couple of questions on credit. In terms of the large credit, the increase in the specific reserve and the current valuation, which I think is $22.5 million, when was the most prior appraisal to the updated one that is mentioned in the press release?
>
> **<u>Defendant Lee</u>**: So we obtained the most recent one within the last month or so. The prior one was within the last -- second half of the last year (inaudible) second half of the last year.
>
> **<u>Defendant Santarosa</u>**: So the real estate side of life that was a year-ago second quarter. On the personal property, we had one of course at inception. We had one in the second quarter, which gave rise to the question about how we should view it, et cetera. So we commissioned another one here at -- as we got into the fourth quarter.

280. Santarosa's statement that "[o]n the personal property, we had [an appraisal] of course at inception" misled investors by creating a false impression that Hanmi had commissioned a professional appraisal of personal property serving as collateral for the Caribou Loan. In fact, at the time the Caribou Loan was initiated in December 2018, Hanmi had neither commissioned nor received an actual appraisal of Harrah's car collection. Hanmi's only valuation of the car collection at the time of inception consisted of a one-page letter from an acquaintance of Harrah conclusorily stating the total value of the cars without any description or individual valuation of the cars.

281. On January 7, 2019, after Hanmi had already issued the Caribou Loan, Custom Auto Service sent Hanmi a two-page letter itemizing the valuation 12 of the

13 cars and comparing their purported current net present value to their appraised value from 2009. The letter also attached a booklet describing the 13 cars. The booklet appears to be promotional materials Harrah uses for his car "museum." Neither the letter nor the booklet make effort to appraise the cars based on comparable sales. Curiously, the description of the first car in the booklet appears to have been copied and pasted from an advertisement for a miniature car model.[25] Seven of the 12 cars were assigned the exact same net present value as their 2009 appraisal value.

282. Santarosa's statement that "[w]e had one in the second quarter, which gave rise to the question about how we should view it" misled investors by giving them the false impression that Hanmi commissioned a reputable appraisal of the personal property collateral in the second quarter of 2019. In fact, the April 2019 valuation placed facially absurd values on Harrah's car collection.

283. In a declaration Harrah filed in the lawsuit Hanmi filed against Caribou, Harrah stated that Hanmi approached him in March 2019 to arrange for an updated appraisal of the collateral cars. Harrah's declaration attaches a handwritten letter dated April 15, 2019 from Bill Gilmore of Automotive Research Services to Robert Bartlett[26], attaching an appraisal of the 13 collateral cars and an invoice for his appraisal services. Harrah's declaration also attaches a document showing Gilmore's April 2019 appraisals that includes signatures from both Harrah and Bartlett dated June 5, 2019. The document appraises the 13 collateral cars at an absurd $69,683,950. For example, the 1931 Rolls Royce valued at $27.5 million sold for

---

[25] http://www.phillymint.com/FMShopCartae/XE83.htm

[26] Bartlett has served as Executive Vice President and Specialty Lending Officer with Hanmi since February 2017. Bartlett signed the Change in Terms Agreements on Hanmi's behalf for all five restructurings of the Broadway Loan, the original loan documents for the Caribou Loan, and both restructurings of the Caribou Loan.

$412,500 in a 2007 auction[27], 1930 Cadillac valued at $12,750,000 sold for $309,500 in a 2009 auction[28], and the 1938 Packard valued at $1.3 million sold for around $200,000 in three separate auctions in 2006, 2007, and 2010.[29]

284. Further, Santarosa's statement that Hanmi's appraisal "gave rise to the question of how we should view it" misled investors by giving them the false impression that Hanmi's receipt of the appraisal had triggered the loan review process that led to Hanmi impairing the Caribou Loan as of June 30, 2019. In fact, Hanmi only reviewed the Caribou Loan for impairment because Hanmi's bank examiners forced Hanmi to do so.

285. On March 2, 2020, Hanmi filed its annual report for the year ended December 31, 2019 on a Form 10-K with the SEC (the "2019 10-K"). The 2019 10-K was signed by Lee and Santarosa. Attached to the 2019 10-K were certifications pursuant to SOX signed by Lee and Santarosa attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

286. The 2019 10-K disclosed that the additional $6.9 million specific allowance Hanmi took in the quarter ended December 31, 2019 was related to the Caribou Loan, raising the total specific allowance for the Caribou Loan to $7.9 million.

287. The 2019 10-K stated that Hanmi's total charge-offs for the quarter ended December 31, 2019 were $1.0 million, none of which were related to the Harrah Loans.

---

[27]https://rmsothebys.com/en/auctions/aw07/the-al-wiseman-collection/lots/r140-1931-rolls-royce-phantom-ii-merlin/197124

[28]https://www.conceptcarz.com/profile/4195,15283/1938-packard-1607-twelve.aspx

[29] https://www.bonhams.com/auctions/17327/lot/229/

288. This statement was materially false and misleading because Defendants knew or were reckless in not knowing that a significant portion of the Broadway Loan was uncollectible. Accordingly, both GAAP and Hanmi's own accounting policies required Hanmi to promptly charge off the uncollectible portion of the Broadway Loan.

289. Under GAAP and Hanmi's own accounting policies, Defendants determined the $14.7 million specific allowance for the Broadway Loan by calculating the difference between the outstanding loan balance and the value of the collateral as determined by recent appraisals. Accordingly, Hanmi finally admitted that the undeveloped land that served as collateral was only worth about $13.2 million—the difference between the outstanding loan balance of $27.9 million and the specific allowance of $14.7 million.

290. Once Hanmi admitted that the undeveloped land was only worth a fraction of the principal of the loan, Defendants should have promptly charged off the remainder of the loan as uncollectible. The only way Hanmi would collect the full outstanding balance would be if Harrah finally obtained financing to build One Broadway Plaza. But, as of September 30, 2019, Harrah still had (i) no permit to begin construction on the land beyond a partial foundation, (ii) no financing to build the tower, and (iii) no tenants to fill the proposed tower. Harrah had already listed the property for sale, and the sale of the undeveloped land would not allow full repayment of the loan because the undeveloped land was only worth about $13.2 million.

## VII. ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

### A. The Harrah Loans Were Critical to Hanmi's Core Operations

291. Defendants concealment of the Harrah Loans massively affected every aspect of Hanmi's operations and financial disclosures. The amounts of the nonperforming Harrah Loans were larger than all of the rest of Hanmi's

nonperforming loans, combined, the losses on the Harrah Loans nearly equaled Hanmi's ALLL for all of its other loans, the Harrah Loans represented more than half of the Company's construction portfolio, and the eventual $25.2 million charge off of the loan losses dwarfed all of Hanmi's previous charge offs.

292. The magnitude of the troubled loan relationship and the outsized portion of Hanmi's construction portfolio that it represented are additional inferences of scienter. An August 13, 2019 analyst report from Janney Montgomery Scott LLC noted that the relationship was one of the top 25 to 30 relationships at the Bank and was not a joint venture with another bank. Further, Janney noted that the construction piece of the relationship was equivalent to 34% of Hanmi's construction book as of the first quarter of 2019.

293. The magnitude of the losses Hanmi suffered was enormous in relation the Company's historical levels of classified loans and charge offs. Hanmi's $25.2 million charge off for the Harrah loans in the first quarter of 2020 dwarfed the Company's average of $1.5 million in charge-offs over the previous 12 quarters. In fact, the $25.2 million charge-off was more than Hanmi's gross charge-offs in the previous 12 quarters, combined.




294. Hanmi had access to information throughout the Class Period that should have set off red flags regarding Harrah's ability to timely repay the loans. In addition to experts Hanmi should have deployed Hanmi also had access to a plethora of public information, including information regarding Harrah's financial difficulties, the One Broadway Plaza project's stagnation, Harrah's repeated false promises about the project, Harrah's pattern of using entities he controls to shield himself from liability, and Harrah's relationship with the author of the initial valuation of Harrah's cars. Hanmi prevented investors from using this publicly available information by withholding all identifying information about the borrower and project.

295. Fuhr's personal handling of the Caribou Loan and restructuring demonstrates that the highest levels of Hanmi's management were focused on the loans to Harrah. In his declaration, Harrah stated that Kum also went to view the cars

being held as collateral, which suggests Kum was also personally involved in the Caribou Loan. As Chief Credit Administration Officer, Fuhr has full authority over individual lending. Fuhr is one of Hanmi's five Named Executive Officers along with the CEO, COO, CFO, and CRO. As a named executive officer, Fuhr's knowledge can imputed to Hanmi.

### B. The Accounting Principles and Policies Defendants Violated Were Simple, Straightforward, and Essential to Hanmi's Operations as a Bank

296. Hanmi represented to investors that it evaluated loan impairment and measured losses in accordance with GAAP and the Interagency Statement, but Defendants and Crowe both concede that Defendants were violating these applicable accounting standards during the Class Period. Hanmi's reckless failure to design and implement an effective loan review system left the Company incapable of timely identifying or evaluating impaired loans.

297. As the Interagency Statement describes, the foundation for any loan review system is accurate and timely loan classification or credit grading, which involves an assessment of credit quality and leads to the identification of problem loans. The Interagency Statement required Hanmi to, at a minimum, have policies and procedures that ensure it has an effective loan review system and controls (including an effective loan classification or credit grading system) that identify, monitor, and address asset quality problems in an accurate and timely manner.

298. Hanmi stated in a July 19, 2019 press release that the Company only became aware that one of the its largest loan relationships was impaired when its banking examiner informed them the Company was required to adjust the ALLL to account for the impairment. Given the severity of the omission, Defendants were forced to admit a material weakness in internal control over financial reporting from

the lack of operating effectiveness of a control that allowed for the inadequate review of the fair value of collateral dependent impaired loans.

299. Several accounting violations caused Defendants' failure to even identify the troubled loan relationship for an impairment evaluation. First, Defendants concede that the Company did not have the required policy documentation describing the criteria for when collateral dependent impaired loan fair value review is required. This failure violated the Interagency Statement's directive that an effective credit risk review system starts with a written credit risk review policy. In order for an institution's ALLL methodology to be effective, the institution's written policies and procedures should describe the methodology for determining and measuring impairment and the methods used to identify loans to be analyzed individually.

300. ASC 310 describes the criterion that are useful in identifying loans for evaluation and demonstrates that a compliant identification protocol would have ensured that Hanmi flagged the troubled loan relationship for impairment review. ASC 310-10-35-14. As Hanmi and Crowe later admitted, the troubled loan relationship had several attributes that, independently, should have flagged the loan to management for evaluation: the Harrah loans were one of Hanmi's largest relationships and at one point represented the majority of Hanmi's construction loan portfolio; Hanmi understood that construction loans are inherently uncertain and require constant examination of progress and valuation, and Hanmi knew that the type of bridge financing Hanmi provided Harrah was even riskier than a typical construction loan; Harrah had a long public history of liquidity problems; Harrah had failed to secure financing or permits to build One Broadway Plaza for over 15 years at the time of the initial Broadway Loan; the classic cars used as collateral were unique in nature, had a limited resale market, and variability in the estimated

fair value; and Hanmi issued the Caribou Loan based on a borrower-provided valuation of the cars that was facially inadequate and unreliable.

301. Second, Defendants' failure to adequately train its credit risk review personnel on the collateral dependent impaired loan fair value review process violated the Interagency Statement's basic requirements that personnel be knowledgeable in both sound lending practices and the institution's lending guidelines for the types of loans offered by the institution and knowledge of relevant laws, regulations, and supervisory guidance.

302. Third, Defendants' admitted failure to "require[] documentation when concluding a fair value review is not warranted" precluded the Company from improving its ineffective credit review function. Hanmi's bank examiners require written supporting documentation for all decisions regarding the loan grading system or process. The Interagency Statement requires Hanmi's loan review function to prepare a list of all loans reviewed (including the date of the review) and documentation (including a summary analysis) that substantiate the grades or classifications assigned to the loans reviewed. A report that summarizes the results of the loan review should be submitted to the board of directors at least quarterly. Hanmi's failure to document basic evaluation decisions also precluded the Company's independent auditor from evaluating the reasonableness of accounting estimates made by management, including their estimates of loan impairments and the associated allowance for loan losses.

303. Hanmi's accounting violations affected the Company's most essential reporting metrics, including income and ALLL. Allowance for loan and lease losses ("ALLL") is an estimate of probable losses that reduces the book value of loans and leases to the amount that is expected to be collected. ALLL is a materially important financial metric for banks whose principal assets are loans. ALLL represents the Bank's assessment of probable losses on its loans, and increases to ALLL reflect an

assessed deterioration of its loan portfolio. Any increase in ALLL (a balance sheet item) is accompanied by the recording of a provision for loan losses (an income statement item), thereby impacting the Company's reported income or losses.

304. Both banking regulators and the SEC have emphasized the importance of ALLL to bank financial disclosure. For example, on December 13, 2006, the Board of Governors of the Federal Reserve System, the FDIC, the Office of the Comptroller of the Currency, the Office of Thrift Supervision, and the National Credit Union Administration issued the *Interagency Policy Statement on the Allowance for Loan and Lease Losses* (the "Interagency Statement"), in which they stated that ALLL "represents one of the most significant estimates in an institution's financial statements and regulatory reports." In the wake of the financial crisis, in August 2009, the Commission's Division of Corporation Finance sent an illustrative letter to the CFOs of certain public companies, a sample of which it posted on the Commission's website, stating that "[c]lear and transparent disclosure about how you account for your provision and allowance for loan losses has always been critically important to an investor's understanding of your financial statements."

305. Hanmi lists its ALLL calculation as a "critical accounting policy," which the Company defines as "those policies that are most important to the determination of our financial condition and results of operations." The Bank considers the ALLL calculation to be "an integral part of the quarterly credit review process."

**C. The High Volume of Suspicious Personnel Decisions Supports a Strong Inference of Scienter**

306. The high number of suspicious personnel decisions during the first six months of Defendant Lee's tenure as CEO provide additional inferences of scienter. On April 12, 2019, the Company filed a Proxy Statement urging investors to ratify the appointment of KPMG LLP ("KPMG") as the Company's independent

registered public accounting firm for the fiscal year ending December 31, 2019 because it "is in the best interests of the Company and its stockholders." KPMG had served as Hanmi's independent accounting firm since 2001. On May 23, 2019, investors overwhelmingly voted to ratify the appointment of KPMG by a margin of 27,743,487 for and only 731,601 against.

307. Just one month later, on June 26, 2019, Hanmi abruptly announced that it was dismissing KPMG as its independent auditor, and that the Company was replacing them with Crowe LLP ("Crowe"). Far from independent, Hanmi had engaged Crowe for several different consulting, tax, and auditing services from 2014 through 2018.

308. Lee and Santarosa pushed out the CRO to take over the information technology control, leading to a material weakness. On July 10, 2019, Hanmi disclosed that it had expanded Defendant Santarosa's duties to include "information technology, deposit operations, legal and facilities." The Bank's 2020 Proxy statement later revealed that "Santarosa received a grant of 17,914 restricted shares in July 2019 in recognition of his expanded responsibilities, which includes additional oversight over other areas including information technology, deposit operations, legal and facilities." Defendant Santarosa's base salary also increased from $325,000 to $400,000.

309. Fewer than six months after Defendant Santarosa expanded his duties to include information technology, Hanmi identified a material weakness in its internal control related to ineffective information technology general controls. Defendant Santarosa had no previous experience in information technology, and the Company blamed the material weakness in internal control over financial reporting and ineffective information technology general controls on insufficient training of personnel around changes in our IT environment.

310. On November 18, 2019, Hanmi announced that its Chief Risk Officer, Jean Lim, was leaving the company. Lim had been Hanmi's CRO since August 2008.

### D. Defendants' Financial Motivation to Conceal Losses From the Harrah Loans Support a Strong Inference of Scienter

311. Hanmi's executives were highly motivated to hide the troubled loans from investors because their bonuses were directly tied to Hanmi's ability to avoid nonperforming loans.

312. According to Hanmi's 2020 Proxy Statement, 35% of Fuhr's bonus, 25% of Lee's bonus, and 25% of Santarosa's bonus were directly tied to Hanmi's NPA Ratio, which provided a powerful motivation for each executive to conceal the nonperforming Harrah Loans.

313. According to Hanmi's 2019 Proxy Statement, Kum's bonus was also directly tied to Hanmi's NPA Ratio.

### E. Defendants' Attempts to Conceal Basic Information About the Harrah Loans Demonstrates Their Intent To Hide The Loans From Investors

314. First, Hanmi inexplicably failed to disclose the Broadway Loan as part of the Company's construction loan portfolio until the third quarter of 2016 despite first extending the loan in the first quarter of 2016.

315. Second, Hanmi intentionally omitted all details of the loans from investors, even after disclosing that the loans were impaired, despite explicit directions from the SEC to provide such information. Hanmi withheld basic information, including: the identity of the borrower, a description of the project, the location of the project, the origination date of the loans, the fact that a second loan was issued to pay off a portion of the first loan, the fact that the collateral for the Caribou Loan was a car collection, a description of the appraisals, and an explanation

of why the Bank's fair value estimate of the collateral differed from the appraisals the Company received.

316. Third, restructuring the Broadway Loan five times due to Harrah's inability to repay the principle—including four times after Harrah had defaulted on the loan—and restructuring the Caribou Loan twice, Defendants still had no intention of disclosing the Harrah Loans as TDRs, designating them as nonperforming, or taking provisions for their losses. The terms of Second Caribou Restructuring on May 29, 2019 were especially egregious in terms of concessions to the borrower, including reducing interest rates, interest payments, and principal payments. Yet Defendants were still planning on concealing the Harrah Loans from investors and not disclosing them as impaired TDRs until the Company's bank examiner forced them to do so.

### F. Hanmi's Attempt to Use Price-Inflated Shares as Merger Currency Creates an Inference of Scienter

317. On May 21, 2018, Hanmi announced it had entered into an agreement to acquire SWNB Bancorp, Inc. ("SWNB"), a privately-held bank holding company for Southwestern National Bank. Under the terms of the agreement, SWNB shareholders would elect to receive either 0.1961 shares of Hanmi common stock or $5.74 in cash, subject to the overall requirement that 80% of SWNB shares of common stock receive the stock consideration and the remainder receive cash. The aggregate consideration of the transaction was $76.7 million, which was based on Hanmi's closing stock price of $28.65 per share as of May 18, 2018.

318. Defendants were highly motivated to keep Hanmi's stock price at or near the $28.65 price in order to secure consummation of the deal at the scheduled SWNB shareholder vote on August 16, 2018.

319. Despite Defendants' attempt to inflate Hanmi's stock price by excluding the nonperforming Harrah Loans from its financial statements for the

quarter ending June 30, 2018, Hanmi's share price dipped to $25.65 by August 8, 2018. Hanmi made a new offer based on 70% Hanmi stock and 30% cash. SWNB shareholders eventually rejected the merger after Hanmi's stock failed to return to the $28.65 standard.

## VIII. PLAINTIFF'S CLASS ACTION ALLEGATIONS

320. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Hanmi during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

321. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Hanmi securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

322. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

323. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and

securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

324. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of Hanmi securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

325. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

326. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Hanmi securities are traded in efficient markets;
- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NASDAQ, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased and/or sold Hanmi securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

327. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

328. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX. CAUSES OF ACTION

### COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5

### Against All Defendants

329. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

330. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

331. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

332. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Hanmi securities during the Class Period.

333. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such

statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

334. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

335. As a result of the foregoing, the market price of Hanmi securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Hanmi securities during the Class Period in purchasing Hanmi securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

336. Had Plaintiff and the other members of the Class been aware that the market price of Hanmi securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants

did not disclose, they would not have purchased Hanmi securities at the artificially inflated prices that they did, or at all.

337. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

338. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of Hanmi securities during the Class Period.

**COUNT II**

**Violation of Section 20(a) of The Exchange Act**

**Against The Individual Defendants**

339. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

340. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

341. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

342. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the

marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Hanmi securities.

343. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

344. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XI. DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 6, 2021

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
By: /s/ Laurence M. Rosen
Laurence M. Rosen, Esq. (SBN 219683)
Daniel Tyre-Karp (*pro hac vice*)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

-and-

GLANCY PRONGAY & MURRAY LLP
Kara M. Wolke (SBN 241521)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kwolke@glancylaw.com

*Additional Counsel for Plaintiff*