Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
Email: lrosen@rosenlegal.com
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610

*Counsel for Lead Plaintiff and the Class*

[Additional Counsel on Signature Page]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KILLYOUNG OH, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>HANMI FINANCIAL CORPORATION, C.G. KUM, BONITA I. LEE, and ROMOLO C. SANTAROSA,<br><br>Defendants. | Case No: 2:20-cv-02844-FLA-JC<br><br><u>CLASS ACTION</u><br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>JUDGE:  Hon. Fernando L. Aenlle-Rocha<br>DATE:   August 6, 2021<br>TIME:   1:30 p.m.<br>CTRM:   6B |

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................. 1

II.   FACTUAL BACKGROUND ........................................................................... 3

      A.    Hanmi's Lending Business ................................................................. 3

      B.    Hanmi's Risky Loans to Michael Harrah ......................................... 4

            1.    The Broadway Loan ................................................................ 5

            2.    The Caribou Loan .................................................................. 6

      C.    Bank Examiner Forces Hanmi to Disclose Harrah Loans ............. 7

      D.    Relevant Accounting Policies ............................................................ 8

III.  ARGUMENT .................................................................................................. 9

      A.    The SAC Adequately Pleads That Defendants Made
            Misrepresentations And/Or Omissions of Material Facts ............. 9

            1.    Defendants Repeatedly Violated GAAP and Hanmi's
                  Own Publicly-Disclosed Accounting Policies ..................... 10

            2.    Defendants Misled Investors About Hanmi's Asset
                  Quality Metrics .................................................................... 14

            3.    Defendants Misled Investors About the Harrah Loans ...... 15

      B.    Plaintiff Adequately Alleges Scienter ............................................. 16

            1.    Defendants' Significant Accounting Violations
                  Contribute to a Strong Inference of Scienter ..................... 17

            2.    Knowledge Can Be Imputed to Defendants ......................... 18

            3.    Suspicious Firings and Departures Support an
                  Inference of Scienter ........................................................... 20

            4.    Defendants Had Motive and Opportunity to Commit
                  Fraud .................................................................................... 21

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**a.      Defendants Attempted to Use Price-Inflated Shares As Merger Currency**..........................................**21**

**b.      Compensation Directly Tied To Area Of Fraud** .......**22**

**5.      The Inference of Scienter Is At Least As Compelling as Defendants' Suggested Inference** ...........................................**23**

**IV.      CONCLUSION**.........................................................................................**25**

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................ 9

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ............................................................................ 19

*Bielousov v. GoPro, Inc.*,
   2017 WL 3168522 (N.D. Cal. July 26, 2017) .................................................. 20

*Cohen v. Koenig*,
   25 F.3d 1168 (2d Cir. 1994) ............................................................................. 10

*Crafton v. Powerwave Techs., Inc.*,
   2008 WL 11338622 (C.D. Cal. Apr. 17, 2008) ................................................ 22

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005) ............................................................................................ 9

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ............................................................................ 22

*In re Alphabet, Inc. Sec. Litig.*,
   No. 20-15638, 2021 WL 2448223 (9th Cir. June 16, 2021) ............................. 23

*In re Baan Co. Sec. Litig.*,
   103 F. Supp. 2d 1 (D.D.C. 2000) ...................................................................... 18

*In re BofI Holding, Inc. Sec. Litig.*,
   2017 WL 2257980 (S.D. Cal. May 23, 2017) ................................................... 25

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   692 F. Supp. 2d 1181 (N.D. Cal. 2010) ............................................................ 19

*In re Capstone Turbine Corp. Sec. Litig.*,
   2018 WL 8362*5 (C.D. Cal. Feb. 9, 2018) ....................................................... 17

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005) ............................................................ 10, 12, 17, 21

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ........................................................................... 9

*In re Medicis Pharm. Corp. Sec. Litig.*,
2010 WL 3154863 (D. Ariz. Aug. 9, 2010) ...................................................... 22

*In re Mercator Software, Inc. Sec. Litig.*,
161 F. Supp. 2d 143 (D. Conn. 2001) ............................................................... 21

*In re Obalon Therapeutics, Inc.*,
2019 WL 4729461 (S.D. Cal. Sept. 25, 2019) .............................................. 12, 17

*In re Scot. Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ............................................................... 18

*In re Seitel, Inc. Sec. Litig.*,
447 F. Supp. 2d 693 (S.D. Tex. 2006) ............................................................... 20

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ...................................................................... 17, 25

*In re: Bofi Holding, Inc. Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016) .................................................. 14

*Levin v. Res. Cap. Corp.*,
2016 WL 5867451 (S.D.N.Y. Oct. 5, 2016) ...................................................... 16

*Lloyd v. CVB Fin. Corp.*,
2013 WL 12120506 (C.D. Cal. May 9, 2013) .............................................. 13, 24

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ...................................................................... 3, 14

*Longo v. OSI Sys., Inc.*,
2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) ................................................... 22

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ......................................................................... 25

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ............................................................... 22

*May v. KushCo Holdings, Inc.*,
2020 WL 6587533 (C.D. Cal. Sept. 25, 2020) ..................................... 18

*Middlesex Ret. Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................... 20

*Mulderrig v. Amyris, Inc.*,
2020 WL 5903844 (N.D. Cal. Oct. 5, 2020) .................................. 10, 12

*New Mexico State Inv. Council v. Ernst & Young LLP*,
641 F.3d 1089 (9th Cir. 2011) ............................................................. 23

*Osher v. JNI Corp.*,
183 F. App'x 604 (9th Cir. 2006) ......................................................... 25

*Provenz v. Miller*,
102 F.3d 1478 (9th Cir. 1996) ............................................................. 18

*Resh v. China Agritech, Inc.*,
2019 WL 1055240 (C.D. Cal. Jan. 8, 2019) ........................................ 23

*Richard v. Nw. Pipe Co.*,
2011 WL 3813073 (W.D. Wash. Aug. 26, 2011) ................................. 23

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ........................................ 21

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ............................................................... 23

*S.E.C. v. Mozilo*,
2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) ....................................... 15

*S.E.C. v. Platforms Wireless Int'l Corp.*,
559 F. Supp. 2d 1091 (S.D. Cal. 2008) ............................................... 19

*Sanders v. Realreal, Inc.*,
2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) ..................................... 14

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ................................................................................. 16

*Strathclyde Pension Fund v. Bank OZK*,
  2020 WL 1650834 (E.D. Ark. Apr. 3, 2020) ......................................................... 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................... 9, 16, 24

*Turner Ins. Agency, Inc. v. Farmland Partners Inc.*,
  2019 WL 2521834 (D. Colo. June 18, 2019) ......................................................... 20

*Turtle Island Restoration Network v. U.S. Dep't of Com.*,
  672 F.3d 1160 (9th Cir. 2012) ............................................................................... 12

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ................................................................................. 9

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ................................................................................. 21

**Statutes**

15 U.S.C. § 78u-4(b)(1)(B) ........................................................................................ 9

**Regulations**

17 C.F.R. § 210.4-01 ................................................................................................ 10

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# I.      INTRODUCTION

Defendants materially overstated Hanmi's income during the Class Period[1] by concealing over $40 million in nonperforming loans and over $25 million in loan losses that Defendants were required to disclose under Generally Accepted Accounting Principles ("GAAP") and Hanmi's own publicly-disclosed accounting policies. While concealing the nonperforming loans and related losses, Defendants falsely touted Hanmi's "excellent" asset quality and claimed that Hanmi's asset quality metrics were superior to those of peer banks. After bank examiners forced Defendants to disclose the nonperforming loans in August 2019, Defendants continued to understate Hanmi's losses on the loans and failed to provide investors with the basic information about the loans and the borrower that SEC rules required.

After the Class Period, and after Plaintiff filed the amended complaint in this action, Hanmi filed lawsuits in Los Angeles County Superior Court against the borrower, Orange County developer Michael Harrah, to recover $41.3 million Hanmi had lent him (the "Broadway Loan") in March 2016 to develop an office tower in Santa Ana ("One Broadway Plaza"). In the lawsuits, Hanmi admitted in pleadings that Harrah had defaulted on the Broadway Loan four times between March 2018 and January 2019 by failing to pay the outstanding loan principal when the loan matured. Each time, Hanmi restructured the nonperforming loan by granting a series of concessions to address Harrah's inability to repay the principal. These concessions included (i) repeatedly extending the maturity of the loan, adding a cumulative total of over 1,000 days extra days of interest only payments; (ii) issuing Harrah a second loan (the "Caribou Loan," and together with the Broadway Loan, the "Harrah Loans") to pay off a portion of the Broadway Loan; and (iii) reducing the interest rate on both loans. Further, Hanmi admitted that one of its top executive officers had personally

---

[1] The Class Period is August 9, 2018 through April 30, 2020, both dates inclusive.

negotiated these troubled debt restructurings ("TDR"s) with Harrah, leaving no doubt that Defendants knew the truth about the restructurings.

The Broadway Loan was a bridge loan that would only be repaid if Harrah obtained financing to build One Broadway Plaza. Defendants knew by the start of the Class Period in August 2018 that the collateral for the Broadway Loan—the undeveloped land—was worth less than the principal of the loan, which required Hanmi to impair the loan at the difference between the principal and the value of the collateral. By August 2018, Harrah still had (i) no permit to begin construction on the land beyond a partial foundation, (ii) no financing to build the tower, and (iii) no tenants to fill the proposed tower. Hanmi later admitted the undeveloped land was only worth around $15 million—a fraction of the $40.2 million outstanding principal at the start of the Class Period.

Despite clear GAAP rules and internal accounting policies requiring Hanmi to disclose the TDRs and impaired loans to investors, Defendants hid the Harrah Loans from investors. Investors only learned of the massive $40 million in nonperforming loans in August 2019 because Hanmi's banking examiners forced Defendants to disclose them. Still, instead of immediately coming clean about the Company's losses, Hanmi continued to mislead investors about the nature of the loans and the extent of the losses for another eight months before the Company finally charged off the $25.2 million in losses in April 2020. By the end of the Class Period, the price of Hanmi's shares had declined by about 60%, from $25.65 to $10.34, devastating investors.

Investors could not evaluate the risk of the Harrah Loans because, in violation of SEC rules, Hanmi failed to disclose any information about the borrower, the loan origination date, the purpose of the loan, or the collateral underlying the loan. Defendants concealed this information despite the fact that the SEC had previously warned Hanmi that its periodic disclosures must include this information when "a

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

few large credit relationships make up a significant portion of your non-performing loans."

Plaintiff pleads a strong inference of scienter based on: (i) particularized allegations of significant accounting violations, including publicly stated company polices; (ii) Defendants' knowledge of Harrah Loans; (iii) Defendants' deliberately reckless misstatements about Hanmi's core business; (iv) Defendants' attempts to cover up the troubled Harrah Loans after regulators took action; (v) Defendants' motivation to increase Hanmi's stock price to consummate a merger and to maximize Defendants' compensation incentives; and (vi) the numerous uncharacteristic and suspiciously timed personnel changes at key moments of the fraud.

Defendants' motion to dismiss (the "Motion") does not—and cannot—dispute that Defendants knew that (i) Hanmi repeatedly restructured the Harrah Loans by granting concessions due to Harrah's inability to timely make the required balloon payment; (ii) GAAP and Hanmi's own accounting policies required Hanmi to disclose the Harrah Loans as TDRs; or (iii) the $40 million Harrah Loans were material to Hanmi's financial statements. Accordingly, the Motion effectively concedes that Defendants made actionable misstatements with scienter. Rather than addressing Plaintiff's well-pleaded allegations, the Motion relies on the Ninth Circuit's partial affirmance of the dismissal in *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016). This reliance is misplaced, and the allegations here are far stronger than those previously addressed by the Ninth Circuit.

Armed with the underlying loan documents and details about the borrower that Hanmi had previously concealed, the SAC addresses the Court's concerns about the prior iteration of the complaint. The Court should deny Defendants' Motion.

## II.    FACTUAL BACKGROUND

### A.    Hanmi's Lending Business

- 3 -

Hanmi is a bank holding company whose subsidiary is Hanmi Bank. ¶22.[2] Defendant C.G. Kum served as President and CEO of Hanmi and Hanmi Bank from June 2013 to May 2019. ¶23. Defendant Bonita I. Lee served as COO of Hanmi Bank from August 2013 to May 2019, when she took over as Hanmi's CEO. ¶24. Defendant Romolo C. Santarosa has served as the Company's CFO since November 2015, and he previously served as an Audit Senior Manager with PwC. ¶25.

Hanmi purports to engage qualified and bonded third parties to provide progress reports and recommendations for construction loan disbursements. ¶34. The Bank purports to obtain formal appraisals in accordance with applicable regulations to support the value of real estate collateral. ¶35. The Bank claims that all borrowers must demonstrate the ability to service and repay not only their obligations to the Bank, but also any and all outstanding business debt, without liquidating the collateral, based on historical earnings or reliable projections. *Id*. The Bank claims it reviews each loan application by analyzing the applicant's business and experience, prior credit history, income level, cash flows, financial condition, tax returns, cash flow projections, and the value of any collateral to secure the loan, based upon reports of independent appraisers and/or audits of accounts receivable or inventory pledged as security. ¶64. All appraisal reports on commercial real property secured loans are reviewed by an appraisal review officer, which covers an examination of the appraiser's assumptions, as well as compliance with the Uniform Standards of Professional Appraisal Practice. ¶32.

**B.    Hanmi's Risky Loans to Michael Harrah**

Michael Harrah's sprawling development business came to abrupt halt in 1990, when he filed for personal and business bankruptcy—claiming nearly $30 million in

---

[2]    Unless otherwise stated, all paragraph ("¶") references are to Plaintiff's Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("SAC"). Unless otherwise indicated, all emphasis is added and all internal citations and quotations are omitted.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

liabilities, including at least four years of unpaid federal income taxes. ¶37. After exiting bankruptcy protection, Harrah began buying property in Orange County to develop. ¶38. In 1999, Harrah proposed his most ambitious project: a 37-floor tower in downtown Santa Ana called One Broadway Plaza, which would be the tallest building in Orange County. ¶39. For the next twenty years, Harrah repeatedly boasted to local media the start of construction was imminent. ¶¶40-47. These assertions always proved false. *Id*. Meanwhile, Harrah's estimate of the cost of the building ballooned from $300 million in 2012 to $450 million by 2019. ¶¶43, 67.

### 1.  The Broadway Loan

Despite these red flags, on March 15, 2016, Hanmi agreed to lend $41.2 million to One Broadway Plaza, LLC, an entity owned and controlled by Harrah (the "Broadway Loan"). ¶49. As collateral, Broadway granted Hanmi a security interest in the still-undeveloped Broadway land. ¶50.

The Broadway Loan had a one year maturity, and Harrah had the option to extend the maturity date by one year if he satisfied a series of requirements. ¶51. On March 13, 2017, Hanmi agreed to extend the maturity of the Broadway Loan to March 15, 2018 (the "First Broadway Restructuring"), despite the fact that Harrah still had no permit to begin construction work. ¶52. The Broadway Loan matured on March 15, 2018, the balloon payment for the entire remaining principal became due, and Harrah defaulted. ¶54. On April 23, 2018, despite the loan being delinquent under Hanmi's own publicly-disclosed policy because it was more than 30-days past due, Hanmi agreed to extend the maturity to September 15, 2018 (the "Second Broadway Restructuring"). *Id*.

On September 15, 2018, Harrah defaulted on the Broadway Loan for the second time by again failing to make the required balloon payment upon the loan's maturity. ¶55. On October 3, 2018, Hanmi once again agreed to extend the maturity of the Broadway Loan from September 15, 2018 to November 2, 2018 (the "Third Broadway Restructuring"). *Id*. This highly unusual restructuring allowed Harrah just

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

30 days to come up with the entire remaining principle, an impossible task given that Harrah had still made no progress on the project. *Id.* Harrah inevitably defaulted on the Broadway Loan for the third time on November 2, 2018. On December 24, 2018, desperate to avoid disclosing the Broadway Loan as delinquent and exposing Hanmi's losses to investors in its Form 10-K, Hanmi again granted concessions to Harrah by extending the maturity to January 31, 2019 (the "Fourth Broadway Restructuring"). ¶56.

Harrah's fourth default came on 0January 31, 2019. ¶68. On February 22, 2019, Hanmi once again agreed to extend the maturity to December 31, 2019 (the "Fifth Broadway Restructuring"). *Id*. In addition to further extending the maturity date for the loan, Hanmi granted Broadway another significant concession by reducing the interest rate for the Broadway Loan from 7.0% to 5.5%. *Id.*

| RESTRUCTURINGS OF THE BROADWAY LOAN[3] | | | | | |
|---|---|---|---|---|---|
| Restructuring | Date | Old Maturity | New Maturity | Length of Extension | Cumulative Extension |
| First | 3/13/17 | 3/15/17 | 3/15/18 | 365 days | 365 days |
| Second | 4/23/18 | 3/15/18 | 9/15/18 | 184 days | 549 days |
| Third | 10/3/18 | 9/15/18 | 11/2/18 | 48 days | 597 days |
| Fourth | 12/24/18 | 11/2/18 | 1/31/19 | 90 days | 687 days |
| Fifth | 2/22/19 | 1/31/19 | 12/31/19 | 334 days | 1021 days |

### 2.  The Caribou Loan

Just two days after the Fourth Broadway Restructuring, Hanmi lent Harrah an additional $15.5 million (the "Caribou Loan") to allow Harrah to reduce the outstanding principal of the Broadway Loan to $28,000,000. ¶¶57-58. Defendants' purported purpose of the Caribou Loan was to secure Harrah's personal car collection as additional collateral, but the rushed process in the week before the end of the 2018 fiscal year shows that Defendants were more concerned with the timing than the

---

[3] ¶112; *see* Exhibit 1 to the SAC, at 100-106.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

sufficiency of the new collateral. ¶59. In flagrant disregard of its own stated policies, Hanmi accepted Harrah's car collection as collateral for the Caribou Loan based on a one-page valuation letter from one of Harrah's friends. ¶¶60-65. The letter did not even list any of the cars, much less assign each an individual value. *Id*. Instead, it simply asserted that the "fair market value" of Harrah's cars had increased by 15%-20% since a 2009 valuation. ¶62. Critically, the friend prepared the valuation for Harrah—not for Hanmi. ¶¶62-63. Matthew Fuhr, Hanmi's chief credit officer, stated in his declaration that Hanmi "relied on this statement of value for the Classic Cars found in this letter [] in extending the Loan to Caribou." ¶65.

On February 25, 2019, Hanmi agreed to restructure the Caribou Loan by reducing the interest rate from 6.0% to 5.5% (the "First Caribou Restructuring"). ¶69. On May 29, 2019, Hanmi granted Caribou a series of further material concessions (the "Second Caribou Restructuring"), including reducing the rate and frequency of the interest, in reliance on a facially absurd $69.7 million appraisal of Harrah's cars. ¶¶70-73.[4]

On December 31, 2019, the Broadway Loan and Caribou Loan both went into default. ¶74. Hanmi entered into forbearance agreements with Harrah for the loans on February 26, 2020 for repayment in full by March 31, 2020, and Harrah again defaulted. ¶75. Hanmi extended the forbearance to June 15, 2020, which Harrah also defaulted. *Id*. On June 18, 2020, Fuhr sent letters to Harrah demanding the full repayment of the Harrah Loans by June 30, 2020. ¶76. On October 14, 2020, Hanmi filed lawsuits against Harrah and Caribou demanding full repayment of the outstanding loan balances, unpaid accrued interest, costs, and fees. *Id*.

**C.    Bank Examiner Forces Hanmi to Disclose Harrah Loans**

---

[4] For example: a 1931 Rolls Royce valued at $27.5 million sold for $412,500 in a 2007 auction. ¶72.

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

On August 12, 2019, Hanmi filed a Form NT 10-Q stating it was unable to timely file its Form 10-Q for the quarter ended June 30, 2019 because Hanmi's bank examiner forced the Company to review "the classification of a single $40.7 million credit relationship (comprised of a $28.0 million construction loan and a $12.7 million business loan)." ¶88. On October 4, 2019, the Company finally filed its Form 10-Q for the second quarter of 2019, which disclosed that Hanmi had classified the entire $40.7 million loan relationship as a nonperforming asset, admitted that both Harrah Loans were TDRs, and stated that the Company was taking a $15.7 million provision for the loans. ¶90. Hanmi also admitted that it had identified a material weakness in internal control over financial reporting based on its inability to timely identify loans for impairment evaluations. ¶91.

Hanmi announced another $6.9 million provision for the Harrah Loans on January 28, 2020. ¶95. Finally, on April 30, 2020, Hanmi took an additional $2.6 million provision and charged-off the entire $25.2 million total provision. ¶97.

### D.    Relevant Accounting Policies

GAAP requires companies to disclose TDRs to investors. ¶105. GAAP defines a loan restructuring or modification as a TDR if the creditor, for economic or legal reasons related to the debtor's financial difficulties, grants a concession to the debtor that it would not otherwise consider. *Id.*; ASC 310-40-15-5. One of the most common types of TDRs is the deferral of required cash payments to help the debtor attempt to improve its financial condition and eventually be able to pay the creditor. *Id.*; ASC 310-40-15-6(a). Restructurings that result in a significant delay in payment are TDRs, and lenders must consider the cumulative effect of past restructurings in determining whether a delay is significant. ¶¶105-6. Hanmi's publicly-disclosed accounting policies for TDRs matched GAAP. ¶¶108-9.

Hanmi's internal accounting policies state that "[a]ll TDRs are impaired and are individually evaluated for specific impairment." ¶118. GAAP and Hanmi's own policies required the Company to take an allowance for the difference between the

amount of outstanding principal of the loans and the fair value of the collateral. ¶¶120-122.

## III.   ARGUMENT

Courts assess Rule 12(b)(6) motions by considering the complaint in its entirety, "accept[ing] all factual allegations . . . as true" and construing them in the light most favorable to plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint should not be dismissed if it contains a "sufficient factual matter [that], accepted as true, 'state[s] a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts must be mindful that "a district court ruling on a motion to dismiss is not sitting as a trier of fact" and "[a] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008).

Claims asserted under Section 10(b) of the Securities Exchange Act must plead six elements: a misrepresentation or omission of material fact, scienter, a connection with the purchase of sale of a security, reliance, economic loss, and loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Defendants challenge only falsity and scienter.

### A. The SAC Adequately Pleads That Defendants Made Misrepresentations And/Or Omissions of Material Facts

To plead falsity under the PSLRA, a plaintiff must "specify each statement [or omission] alleged to have been misleading [and] the reason or reasons why the statement [or omission] is misleading." 15 U.S.C. § 78u-4(b)(1)(B). The allegations must identify who made the allegedly misleading statements and what statements were misleading, state where and when the statements were made, and explain why the statements were misleading. *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The SAC meets these criteria and adequately pleads falsity.

**1. Defendants Repeatedly Violated GAAP and Hanmi's Own Publicly-Disclosed Accounting Policies**

Plaintiff alleges with particularity that Hanmi's Class Period financial statements violated GAAP, and it is black letter law that "[v]iolations of GAAP are presumed to be misleading," *Mulderrig v. Amyris, Inc.*, 2020 WL 5903844, at *1 (N.D. Cal. Oct. 5, 2020) (citing SEC Regulation S-X, 17 C.F.R. § 210.4-01). In the Ninth Circuit, a plaintiff states a claim based on GAAP violations by pleading facts "sufficient to support a conclusion that [d]efendant prepared the fraudulent financial statements and that the alleged financial fraud was material." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016-17 (9th Cir. 2005) (plaintiff "must allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue").

The SAC plausibly alleges that Defendants violated GAAP by describing the relevant accounting policies, explaining how Hanmi violated these policies (¶¶99-127), identifying the specific transactions that were improperly accounted for (*id*.), and detailing the material effect each of these accounting violations had on Hanmi's financial statements (¶¶136-290).[5] The SAC demonstrates the falsity of each statement by detailing the loan quality metrics, ALLL, and income Hanmi reported and compares these amounts to the amounts GAAP required Hanmi to report. *Id*; *see, e.g. Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994) (fraud pled by setting out representations made, what financial figures were given, and what the alleged true financial figures were).

---

[5] *Cf. In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) ("When pleading irregularities in revenue recognition, plaintiffs should allege "(1) 'such basic details as the approximate amount by which revenues and earnings were overstated'; (2) 'the products involved in the contingent transaction'; (3) 'the dates of any of the transactions'; or (4) 'the identities of any of the customers or [company] employees involved in the transactions'").

- 10 -

The SAC adequately alleges that Hanmi's Q2 2018 10-Q; Q3 2018 10-Q; 2018 10-K; and Q1 2019 10-Q were all false and misleading because they failed to classify the Harrah Loans as TDRs and failed to account for them as impaired loans and nonperforming assets. ¶¶105-115. The Harrah Loans were TDRs during the Class Period because Hanmi repeatedly restructured the loans to allow Harrah to make interest only payments instead of the contractually-required balloon payment of the entire outstanding principal and by reducing the interest rates on the loans. ¶¶3, 68-70, 229-30, 246-7, 316. These concessions are hallmarks of TDRs under both GAAP and Hanmi's own publicly-disclosed accounting policies. ¶¶105-109.

The SAC also alleges that Hanmi's Q2 2018 10-Q; Q3 2018 10-Q; 2018 10-K; Q1 2019 10-Q; Q2 2019 10-Q; Q3 2019 10-Q; and 2019 10-K were false and misleading because they failed to take provisions for, and promptly charge off, the difference between the fair value of the collateral for the Harrah Loans and the recorded investment of those loans. ¶¶116-127. Hanmi conceded the value of the undeveloped land was worth less than the principal of the Broadway Loan when they sought additional collateral in the Caribou Loan in December 2018. ¶59.

The Broadway Loan was a bridge loan that would only be repaid if Harrah obtained financing to build One Broadway Plaza. ¶143. As of the start of the Class Period on August 9, 2018—more than two years after the loan was initiated—Hanmi knew that Harrah had not secured any tenants, arranged any construction financing, or even obtained any permits to build anything beyond the partial foundation that he already had a permit to build at the time of the loan. *Id*. Further, Harrah had already defaulted once on the loan despite Hanmi granting him a one year extension of the maturity and was just 75 days away from defaulting again. *Id*. Between March 2017 and February 2019, Hanmi extended the maturity of the Broadway Loan five times, significantly delaying the required principal payment and allowing Harrah to make interest-only payments for a total of 1021 days. ¶112. Hanmi agreed to four of these

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

restructurings after the Broadway Loan had already matured, and Hanmi reduced the interest rate on the loans. *Id*.

The Motion does not—and cannot—dispute that (i) Hanmi repeatedly restructured the Harrah Loans by granting concessions to Harrah due to his inability to timely make the required balloon payment; (ii) GAAP and Hanmi's own accounting policies required Hanmi to disclose the Harrah Loans as TDRs; or (iii) the $40 million Harrah Loans were material to Hanmi's financial statements.[6] Accordingly, the Motion effectively concedes Defendants made actionable misstatements. *See Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1005 (N.D. Cal. 2020) (denying dismissal of claims based on GAAP violations where "[p]laintiffs have alleged facts sufficient to show that defendants' alleged GAAP violations here were significant and material"). The fact that Hanmi first designated the Broadway Loan as a TDR in its 2Q 2018 10-Q (¶90), despite the fact that the loan was last restructured during 1Q 2018 (¶112), further proves its prior filings were false.

Instead of addressing the pleaded facts in the SAC and the relevant GAAP, the Motion incorrectly argues the SAC's GAAP allegations are non-actionable as a matter of law. First, the Motion argues that "courts in this Circuit have consistently ruled that GAAP violations [] are not actionable as false statements." Motion at 12. The Motion misstates the law; it is black letter law in the Ninth Circuit that properly pled GAAP violations are actionable as false statements. *See In re Daou*, 411 F.3d, at 1016 (reversing dismissal and holding that complaint adequately pled actionable GAAP violations); *In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *8 (S.D. Cal. Sept. 25, 2019) (denying dismissal of claims based on GAAP violations).

---

[6] After failing to argue in the Motion that the restructurings were something other than concessions, Defendants may not do so in their reply. *See, e.g., Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1166 & n.8 (9th Cir. 2012) ("arguments raised for the first time in a reply brief are waived") (citation omitted).

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Second, the Motion argues that Defendants' GAAP violations are not actionable because vaguely similar allegations were dismissed in *Lloyd v. CVB Fin. Corp.*, 2013 WL 12120506, at *22 (C.D. Cal. May 9, 2013), *aff'd in part, rev'd in part and remanded,* 811 F.3d 1200 (9th Cir. 2016). Motion at 12-13. The Motion's reliance on *Lloyd* is misplaced. The court in *Lloyd* did not hold that GAAP violations are inactionable; rather, the court held that the complaint failed to allege that the defendants made a "concession" as part of the loan restructuring, such as "a substantial reduction in interest rates." *Id*. The allegations in *Lloyd* did not include significant extensions of maturity, reduction in interest rates, or interest-only payments. *Id*. Here, the SAC alleges (and Hanmi's own loan documents confirm) that "Hanmi granted Broadway another significant concession by reducing the interest rate for the Broadway Loan from 7.0% to 5.5%." ¶¶68, 229; *see also* ¶¶3, 69. The SAC also pleads a myriad of other concessions Hanmi granted Harrah due to his inability to make the contractually required balloon payment, including extending the maturity of the Broadway Loan for over 1,000 days of interest-only payments. ¶112.

The recent holding in *Strathclyde Pension Fund v. Bank OZK*, 2020 WL 1650834, at *4 (E.D. Ark. Apr. 3, 2020) is particularly instructive. There, the court denied dismissal of claims based on the alleged GAAP violations and related misstatements nearly identical to those alleged here. *Id*., at 2. As here, the loans had repeatedly gone into default before being repeatedly extended, while the defendants failed to disclose the loans as nonperforming or as TDRs. *Id*. Eventually, the defendant re-appraised the collateral for the loan, downgraded the loan, and finally disclosed a likely loss. The court held that "accepting [plaintiff's] particularized allegations as true, which the Court must do at this early point in the case, [plaintiff] has adequately pleaded that these extensions were not routine: They were concessions to buy time for an impaired loan the Bank knew the borrower probably could not repay when due." *Id*., at *4. The same result should hold here: the SAC adequately pleads that the Harrah Loans were TDRs, and thus impaired, throughout the Class

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Period, and Defendants made material misstatements by failing to disclose these material facts to investors.

### 2. Defendants Misled Investors About Hanmi's Asset Quality Metrics

Throughout the Class Period, Hanmi touted its "excellent asset quality," especially relative to its peers. *See, e.g.*, ¶¶2, 7-8, 154-56, 183-85, 218-220. Hanmi's "excellent" asset quality metrics and "normal conservative underwriting standards" (¶189) were a façade. Defendants were concealing from investors over $40 million in nonperforming loans to Harrah, with loan losses of $25.2 million.

Defendants argue these alleged statements are inactionable puffery. Motion at 15-16 (citing *Lloyd*, 811 F.3d at 1206–07). Once again, *Lloyd* is inapposite. The statements at issue in *Lloyd* were "vague" and "optimistic," while the statements here were specific and verifiable. *See Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *9 (N.D. Cal. Mar. 31, 2021). ("[a] simple heuristic to distinguish between an actionable misstatement and corporate puffery is that the latter is incapable of objective verification"). For example, Defendants did not just generalize that its "credit metrics are superior to those of its peers," Kum stated that Hanmi had "NPA-to-assets of 30 bps vs. median of 50 bps for $3 to $10 billion U.S. bank" as of the end of the second quarter of 2018. ¶154. Kum's statement was verifiably false because Hanmi's NPA Ratio (the percentage of Hanmi's assets that were nonperforming) as of the end of the second quarter was 102 bps—more than twice as high as the median of Hanmi's peers—once the Broadway Loan was properly included among Hanmi's non-performing assets. ¶¶152-156; *see also* ¶¶183-85, 218-220.

Further, Kum's statement that "[i]mportantly, we continued to maintain our normal conservative underwriting standards" (¶189) was misleading because it came just weeks after Hanmi issued the Caribou Loan in reliance on facially deficient one-page letter prepared for Harrah—not Hanmi—valuing Harrah's cars at over $25 million. ¶¶60-65. Relying on that letter plainly violated Hanmi's publicly-disclosed policies and best practices for underwriting. *Id*; *see In re: Bofi Holding, Inc. Sec.*

*Litig.*, 2016 WL 5390533, at \*9 (S.D. Cal. Sept. 27, 2016) (denying dismissal, distinguishing *Lloyd*, and rejecting defendant's argument that statements professing its "conservative credit guidelines" were immaterial puffery because "underwriting practices would be among the most important information looked to by investors"); *see also S.E.C. v. Mozilo*, 2009 WL 3807124, at \*11 (C.D. Cal. Nov. 3, 2009) (denying dismissal and finding lender's statements touting its underwriting standards to be materially false and misleading).

### 3.   Defendants Misled Investors About the Harrah Loans

On an April 23, 2019 investor call, an analyst asked Kum whether Hanmi's $25 million increase in non-performing loans in the first quarter of 2019 was part of a "broader trend in criticized/classified assets this quarter," Kum assured investors that the increase in nonperforming loans was a "one-off issue" and that "there are no other significant increases in the criticized or any other grade categories." ¶223. Kum's statement was materially false and misleading because Kum knew at the time, or was reckless in not knowing, that the $40.7 million Harrah Loans were nonperforming and impaired. ¶224. The Motion does not address this statement.

Hanmi's 2Q 2019 10-Q stated that Hanmi decided to put the Harrah Loans on nonaccrual status following a review "as part of its credit administration practices." ¶262. This statement was materially misleading because it gave investors the false impression that the evaluation of the loan occurred as part of Hanmi's normal loan review process when, in fact, Hanmi's bank examiners forced Hanmi to review the loan for impairment just days before Hanmi was scheduled to issue its financial results for the quarter ended June 30, 2019. ¶263. The same 10-Q's statement that determined the Broadway Loan was impaired, in part, due to the "approaching December 2019 contractual maturit[y]" was materially misleading because it gave investors the false impression that the Broadway Loan had not yet approached its contractual maturity. ¶262. In fact, the Broadway Loan had matured and defaulted four separate times between March 2018 and January 2019, and each time Hanmi

granted concessions to Harrah by retroactively extending the maturity of the loan to accommodate Harrah's inability to pay off the principal. ¶264. Finally, the statement in the 10-Q that "both loans were current" was materially misleading because it gave investors the false impression that the Harrah Loans had always been current. ¶262, 265. The holding in *Levin v. Res. Cap. Corp.*, 2016 WL 5867451, at *1 (S.D.N.Y. Oct. 5, 2016) is particularly instructive. In *Levin*, the court denied dismissal and found that defendant's description of a loan as "current" was false and misleading because the loan was only "current" under the modified terms of its TDR. *Id.* ("[t]o describe the Mezzanine Loan as 'performing' or 'current' without stating the qualification that it was a non-interest-paying troubled debt of a borrower in financial difficulty was, in the words of SEC Rule 10b-5 '. . . to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading'") (ellipses in original).

Accordingly, Plaintiff pleads actionable misstatements.

## B. Plaintiff Adequately Alleges Scienter

Plaintiff alleges facts raising a strong inference of scienter, which not only includes knowledge, "but also deliberate recklessness." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016). The "inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs,* 551 U.S. at 322– 23. A "strong inference" is raised when "a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference" of nonfraudulent intent. *Id.* at 310. The scienter inference "need not be irrefutable . . . or even the most plausible," and no "smoking-gun" is required. *Id.* at 324–26. "'[F]alsity and scienter in private securities fraud cases are generally strongly inferred from the same set of facts,' and the two requirements may be combined into a unitary inquiry under the PSLRA." *In re Capstone Turbine Corp. Sec. Litig.*, 2018 WL 836274, at *5 (C.D. Cal. Feb. 9, 2018).

Crucially, Defendants fail to offer any competing non-fraudulent inference. Instead of identifying any plausible innocent explanation, Defendants improperly seek to "attack individual allegations in isolation," which "cannot overcome the overwhelming evidence drawn from a holistic view." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 710 (9th Cir. 2012).

### 1. Defendants' Significant Accounting Violations Contribute to a Strong Inference of Scienter

To plead scienter for accounting violations, a "plaintiff must show with particularity how the adjustments affected the company's financial statements and whether they were material in light of the company's overall financial position." *Daou*, 411 F.3d at 1018; *see also In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *9 ("when significant GAAP violations are described with particularity in the complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves").

The SAC alleges several compelling inferences that Defendants acted intentionally or with deliberate recklessness. First, the magnitude of the accounting violations and simplicity of the rules (¶¶296-305) supports a strong inference of scienter. *See Capstone Turbine*, 2018 WL 836274, at *8 ("[i]f the GAAP violations involve substantial clients or significant inflation of revenue, 'a strong inference arises that senior management intentionally misstated earnings'"). The SAC pleads with specificity that, as of each quarter during the Class Period, the Harrah Loans represented an enormous portion of Hanmi's nonperforming loans, ALLL, TDRs, and income. For example, correctly accounting for the Broadway Loan in Q2 2018 would have nearly tripled Hanmi's non-performing loans, evaporated its pre-tax income of $21.4 million into a loss of $4.3 million, ballooned its ALLL from $31.8 million to $56.2 million, and more than doubled its impaired loans from $26.9 million to $65.8 million. ¶¶137-152; *see, e.g., In re Daou Sys., Inc.*, 411 F.3d 1006, 1020 (9th Cir. 2005) ("[c]ertainly, prematurely recognizing millions of dollars in revenue is not minor or technical in nature"). The Motion's argument that the SAC fails to "allege

- 17 -

with any specificity how the 'Harrah Loans massively affected every aspect of Hanmi's operations and financial disclosures'" is simply wrong. Motion at 20. The SAC painstakingly details the magnitude across a plethora of metrics for each reporting period. In addition to the quantifiable magnitude, Hanmi's highest ranking executives were directly involved in the restructurings of the Harrah Loans. ¶295

Second, the fact that Hanmi violated its own internal accounting policies in addition to GAAP, supports a strong inference of scienter. *See May v. KushCo Holdings, Inc.*, 2020 WL 6587533, at *5 (C.D. Cal. Sept. 25, 2020) ("the violation of both GAAP *and* the company's own policy related to that GAAP made it 'more likely that the Defendants were aware of the violations'") (emphasis in original). The SAC explains that Hanmi's publicly-disclosed accounting policies for recognizing TDRs (¶¶105-110) and measuring impairment (¶¶120-122) matched the relevant GAAP. *See Provenz v. Miller*, 102 F.3d 1478, 1490–91 (9th Cir. 1996) (evidence that defendants violated both GAAP and the company's own internal accounting policies sufficient to defeat summary judgment). The fact that Hanmi's internal accounting policies matched GAAP demonstrates that Defendants were aware of the relevant accounting standards they violated. *See In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 393 (S.D.N.Y. 2007) (defendants knew accounting standard because they "applied and quoted the standard in the Company's financial statements"). This allegation yet again distinguishes this case from *Lloyd*, where the complaint did not allege that defendants violated internal accounting policies. Santarosa also served as an audit senior manager at PwC (¶25), which further supports the inference he was aware that Hanmi's accounting treatment of the Harrah Loans was improper. *See In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21–22 (D.D.C. 2000) (violating stated policy is evidence of conscious choice).

### 2. Knowledge Can Be Imputed to Defendants

Courts can infer scienter from allegations of facts that "were prominent enough that it would be absurd to suggest that top management was without knowledge of

the matter." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008).[7] Fuhr's personal handling of the restructuring, and Kum's inspection of the collateral, demonstrates that the highest levels of Hanmi's management were focused on the loans to Harrah. ¶295. The SAC adequately alleges scienter against Hanmi because "[t]he scienter of a corporation can be imputed from that of its officers." *S.E.C. v. Platforms Wireless Int'l Corp.*, 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008). Further, as Chief Credit Administration Officer with full authority over individual lending, Fuhr's knowledge can be imputed to both Hanmi and the Individual Defendants. *See In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1192 (N.D. Cal. 2010) (one of five executive officer's direct involvement in fraudulent transaction "support[s] an inference that the other executive officers were aware of certain key facts" about the transactions).

Importantly, Defendants deliberately concealed the true state of the Harrah Loans and disabled investors from evaluating the risk they posed to Hanmi. ¶¶314-16. Even after Hanmi's bank examiner finally forced it to disclose the existence of the impaired loans in August 2019[8], Defendants refused to provide any information about the Harrah Loans to investors, including any information about the borrower, the collateral, the origination date, the dates and descriptions of recent appraisals, or any other information necessary for investors to understand Hanmi's accounting of the loans. ¶¶128-135. Hanmi knew that the SEC required these disclosures because the SEC had informed Hanmi of these requirements in correspondence dated September 23, 2011, and Hanmi publicly assured the SEC that the Company would provide such information in future filings. *Id.*

---

[7] Defendants had access to a plethora of public information and private information the Bank should have learned through its purported review process about Harrah's troubled financial position. ¶¶32, 34-35, 63-65, 294.

[8] Defendants' attempt to conceal the Second Caribou Restructuring is particularly damning. ¶¶70, 316.

- 19 -

### 3. Suspicious Firings and Departures Support an Inference of Scienter

The high number of suspicious personnel changes during the period in which Hanmi's bank examiner forced the Company to disclose the Harrah Loans supports a strong inference of scienter.[9] First, the Bank abruptly dismissed KPMG as its long-time auditor on June 26, 2019 just two months after recommending that shareholders ratify KPMG's appointment for another year and just one month after over 97% of voting shareholders voted to ratify KPMG's appointment. ¶¶85-86, 306-7. Hanmi replaced KPMG with much smaller and non-independent Crowe LLP. *Id*; *see, e.g., Turner Ins. Agency, Inc. v. Farmland Partners Inc.*, 2019 WL 2521834, at *6 (D. Colo. June 18, 2019) (denying motion to dismiss and finding that scienter can be inferred from resignation of certain directors and change in auditors); *In re Seitel, Inc. Sec. Litig.*, 447 F. Supp. 2d 693, 709 (S.D. Tex. 2006) (denying dismissal and finding strong inference of scienter, in part, based on suspicious dismissal of auditor).

Second, on November 18, 2019—just weeks after the Hanmi revealed its material weakness and took a $15.7 million specific allowance—Hanmi announced Chief Risk Officer Jean Lim was leaving Hanmi. ¶¶308-310. Lim had served as the Bank's CRO since August 2008. *Id*. Finally, the fact that Santarosa took over Lim's information technology authority—despite Santarosa having no experience in information technology—just one week after the Hanmi dismissed KPMG adds to the suspicious nature of the personnel changes following Lee's ascension as CEO. *Id*. Moreover, the same quarter that Lim left her role as CRO Hanmi disclosed yet another material weakness related to ineffective information technology general controls. *Id*.

---

[9] *See, e.g., Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (resignation of the company's president bolstered the strong inference of scienter alleged); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1187–1188 (C.D. Cal. 2007) ("highly suspicious" resignation leaned "heavily towards a finding of scienter").

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

The suspicious timing of the resignation of Lim and the termination of KPMG strongly imply either that new management was trying to cover up the fraud or that the Bank had been recklessly misstating its revenues since at least the start of the Class Period. *See In re Mercator Software, Inc. Sec. Litig.*, 161 F. Supp. 2d 143, 150 (D. Conn. 2001) (denying dismissal and finding scienter, in part, because "one could deduce that the company had been having financial difficulties for some time" from departure of key officers at the same time company restated financials).

Defendants' citation to *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009), further reinforces the inference of scienter. Motion at 23-25. In *Zucco*, the Ninth Circuit held that allegations of suspicious personnel changes are not compelling unless accompanied by "allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns." *Id.* Here, Plaintiff alleges that KPMG was abruptly fired after serving as Hanmi's external auditor for over 18 years, and Lim was forced out after serving as CRO for over 11 years. ¶¶306-310*; see Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *10 (N.D. Ill. Oct. 30, 2012) ("the timing of [a corporate officer's] resignation lends weight to a finding of scienter").

### 4. Defendants Had Motive and Opportunity to Commit Fraud

#### a. Defendants Attempted to Use Price-Inflated Shares As Merger Currency

Just before the Class Period, on May 21, 2018, Hanmi announced it had entered into an agreement to acquire SWNB Bancorp, Inc. ("SWNB") using Hanmi stock as currency for the deal. ¶317. Since the aggregate consideration of the transaction was based on the $28.65 price of Hanmi stock of as of May 18, 2018, Defendants were highly motivated to keep Hanmi's stock price at or near that level to secure approval from SWNB shareholders on August 16, 2018. ¶¶317-18; *see, e.g., In re Daou Sys., Inc.*, 411 F.3d, at 1023 (allegation that company used inflated stock to acquire other

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

companies contributed to finding strong inference of scienter).[10]

The Motion argues that the Court should discount this allegation because "the merger never occurred." Motion at 22. The Motion "confuses expected with realized benefits." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008) (Posner, J.); *see also Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661–62 (8th Cir. 2001) (reversing dismissal and finding scienter adequately pleaded because "[j]ust as we cannot countenance pleading fraud by hindsight, neither can we infer innocence by hindsight because the alleged misdeeds did not pay off").[11] This allegation adds to a strong inference of scienter. *See In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *9 (D. Ariz. Aug. 9, 2010). ("[w]hen a defendant's violation of accounting principles allows a company to obtain a financial benefit or a competitive advantage, courts generally find at least some inference of scienter").

**b.    Compensation Directly Tied To Area Of Fraud**

The individual Defendants each stood to personally profit from concealing the fact that the Harrah Loans were non-performing because each had significant incentive pay directly tied to Hanmi's NPA Ratio. ¶¶311-313. Had Defendants properly accounted for the Harrah Loans as non-performing assets from the start of the Class Period, Hanmi's NPA Ratio would have more than tripled from 0.3% to 1.02%. ¶152, 155. Accordingly, Each of the Individual Defendants was motivated to fraudulently misreport the Harrah Loans as fully performing rather than non-performing. *See Longo v. OSI Sys., Inc.*, 2021 WL 1232678, at *8 (C.D. Cal. Mar.

[10] *See also Crafton v. Powerwave Techs., Inc.*, 2008 WL 11338622, at *7 (C.D. Cal. Apr. 17, 2008) (finding scienter, in part, because executives "sought to increase stock price to purchase other companies").

[11] For these same reasons, Defendants' argument that it is "implausible" that Hanmi would extend Harrah's loans to avoid disclosing a loss—despite knowing the collateral was insufficient (Motion at 14-15)—fail. *See Tellabs Inc.*, 513 F.3d 702 ("[t]he fact that a gamble - concealing bad news in the hope that it will be overtaken by good news - fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble").

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

31, 2021) (denying dismissal and finding scienter in part based on incentive program directly tied to area of fraud); *Richard v. Nw. Pipe Co.*, 2011 WL 3813073, at \*4–5 (W.D. Wash. Aug. 26, 2011) (finding inference of scienter, in part, because of incentive program tied to net income—which defendants overstated).

The Motion argues that the incentives described in Hanmi's 2020 proxy statement are irrelevant because Hanmi disclosed the Harrah Loans were nonperforming in October 2019. Motion at 21-22. The Motion is wrong; the 2020 proxy described the incentives for the 2019 fiscal year. The Motion also argues that an otherwise strong inference of scienter is "negated when there is an absence of stock sales or where such sales are minimal." Motion at 22-23. This argument is also wrong; the absence of insider trading allegations "neither supports nor negates scienter." *Resh v. China Agritech, Inc.*, 2019 WL 1055240, at \*6 (C.D. Cal. Jan. 8, 2019); *see also In re Alphabet, Inc. Sec. Litig.*, No. 20-15638, 2021 WL 2448223, at \*13 (9th Cir. June 16, 2021) (reversing dismissal and holding that "[a]llegations of suspicious stock sales or information from confidential witnesses are not needed where, as here, other allegations in the complaint raise a strong inference of scienter").

### 5. The Inference of Scienter Is At Least As Compelling as Defendants' Suggested Inference

The SAC pleads a strong inference of scienter. However, even if each individual scienter allegations are insufficient, the Court must "conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (reversing dismissal and finding a strong inference of scienter). The holistic review must consider even "[v]ague or ambiguous allegations" because "federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

- 23 -

The Motion primarily relies on the holding in *Lloyd* to support its scienter argument. Motion at 18-20. This reliance is misplaced for several reasons. First, as explained *supra*, the complaint in *Lloyd* did not allege that the defendants violated the company's own accounting policies, which is a key determinant of scienter in accounting fraud actions that the SAC pleads with specificity. Second, the borrower in *Lloyd* continued to amortize the principal of the loans, while Harrah did not. *Lloyd*, 2013 WL 12120506, at *14 (finding inference that defendant believed cash infusion would allow borrower to stay afloat was the more compelling inference because "it is undisputed that, after receiving the additional $10 million loan, Garrett continued to pay interest and amortize principal"). Third, the defendant in *Lloyd* categorized the loans as "classified/substandard" which means "there is a 'distinct possibility that the institution will sustain some loss if the deficiencies are not corrected.'" *Id*. at *16. The court held that "the disclosure supports an inference that when concerns arose regarding the status of the Garrett loan portfolio, defendants made efforts to disclose the situation in a timely manner." *Id*. In stark contrast, Hanmi did not categorize the Harrah loans as substandard or warn investors that the loans were risky until its bank examiner forced the Company to disclose they were non-performing.

Defendants impermissibly contest scienter by attacking each scienter allegation in isolation,[12] which the Supreme Court has explicitly rejected. *Tellabs*, 551 U.S. at 326 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"). "Viewed in isolation, any one allegation may not compel an inference of scienter. However, when we consider the allegations holistically, the inference that [defendants] were deliberately reckless as to the truth of their financial reports and related public statements is at least as compelling as any

---

[12] *See* Motion at 18 & n.5 ("GAAP violations are insufficient"); *id*. at 19 ("cannot infer fraud from the size of the loans alone"); *id*. at 20 (no "fraudulent intent merely because a defendant's compensation was based in part on such successes"); *id*. at 22 (incentives to consummate merger, "without more," are insufficient).

- 24 -

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

opposing inference." *VeriFone*, 704 F.3d at 698–99 (overturning dismissal and finding scienter).

Defendants do not, and cannot, suggest any non-fraudulent inference to compete with the strong inference of fraud pleaded by the SAC. The Motion argues the SAC merely pleads negligence rather than fraud because "the SAC alleges that Hanmi 'attempted to make the best of a bad situation.'" Motion at 17 (citing ¶54). This argument fails because it is based on a misunderstanding of the relevant accounting rules. GAAP states that "[w]hatever the form of concession granted by the creditor to the debtor in a troubled debt restructuring, the creditor's objective is to make the best of a difficult situation." ASC 310-40-15-6; *see* ¶105. The fact that Hanmi made concessions to Harrah in TDRs is neither fraudulent nor negligent. Rather, Defendants' false and misleading statements to investors were fraudulent because Defendants knew, or were deliberately reckless in not knowing, that (i) the Harrah Loans were nonperforming TDRs; (ii) GAAP and Hanmi's own accounting policies required Hanmi to disclose them as nonperforming TDRs, and (iii) the loans were material to Hanmi's financial statements. The Motion's misunderstanding of this critical concept undermines its primary argument against scienter.

## IV.   CONCLUSION[13]

The Motion should be denied in its entirety. Alternatively, if the Court grants any portion of the Motion, Plaintiff respectfully requests leave to amend.[14]

---

[13] Plaintiffs have adequately pleaded liability under Section 20(a) by alleging primary violations and that Defendants were in positions of control. ¶¶23-26; *see In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *21 (S.D. Cal. May 23, 2017).

[14] *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (holding that leave to amend should be freely granted unless "the pleading could not possibly be cured by the allegation of other facts"); *Osher v. JNI Corp.*, 183 F. App'x 604, 605 (9th Cir. 2006) ("[l]eave to amend is to be granted with extreme liberality in securities fraud cases, because the heightened pleading requirements imposed by the PSLRA are so difficult to meet").

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Dated: July 6, 2021

**THE ROSEN LAW FIRM, P.A.**

By: _Laurence M. Rosen, Esq._
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Daniel Tyre-Karp (pro hac vice)
275 Madison Avenue, 40th Floor
New York, NY
dtyrekarp@rosenlegal.com

_Lead Counsel for Lead Plaintiff_

**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke (SBN 241521)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kwolke@glancylaw.com

_Additional Counsel for Lead Plaintiff_

- 26 -

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 6, 2021                              /s/ Laurence M. Rosen
                                                          Laurence M. Rosen

- 27 -
CERTIFICATE OF SERVICE