Ekwan E. Rhow – State Bar No. 174604
    erhow@birdmarella.com
Darren L. Patrick – State Bar No. 310727
    dpatrick@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
DROOKS, LINCENBERG & RHOW, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California 90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Naeun Rim – State Bar No. 263558
    nrim@manatt.com
MANATT, PHELPS & PHILLIPS, LLP
2049 Century Park East, Suite 1700
Los Angeles, California 90067
Tel: (310) 312-4000
Fax: (310) 312-4224

*Attorneys for Defendants Hanmi Financial
Corporation, Bonita I. Lee, Romolo
C. Santarosa, and C. G. Kum*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KILLYOUNG OH, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>HANMI FINANCIAL CORPORATION, BONITA I. LEE, ROMOLO C. SANTAROSA, and C. G. Kum,<br><br>Defendants. | CASE NO. 2:20-cv-02844-FLA-JC<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Hearing<br>Date:  August 6, 2021<br>Time:  1:30 p.m.<br>Place:  Courtroom 6B<br>        First Street Courthouse<br>        350 West First Street<br>        Los Angeles, CA 90012<br><br>Action Filed:  March 26, 2020<br><br>Assigned to Hon. Fernando L. Aenlle-Rocha |

# TABLE OF CONTENTS

Page

I.      INTRODUCTION .................................................................................. 1

II.     THE SAC'S ALLEGATIONS CONCERNING HANMI'S "KNOWLEDGE" ARE CONCLUSORY AND SELF-CONTRADICTORY ................................................................................. 2

III.    THE SAC'S OTHER "FALSITY" ALLEGATIONS ARE INSUFFICIENT TO PLEAD FRAUD .............................................................. 8

IV.     HANMI'S REPEATED DISCLOSURES DURING THE CLASS PERIOD STRONGLY NEGATE SCIENTER ................................................. 14

V.      PLAINTIFF MISCHARACTERIZES *LLOYD* AND RELIES ON INAPPOSITE AUTHORITIES REGARDING GAAP ................................. 14

VI.     THE SAC'S REMAINING SCIENTER ALLEGATIONS ARE INSUFFICIENT TO SHOW FRAUD ............................................................ 19

VII.    CONCLUSION ..................................................................................... 21

REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acito v. IMCERA Grp., Inc.*,
   47 F.3d 47 (2d Cir. 1995) ....................................................................................19

*In re: Bofi Holding, Inc. Sec Litig.*,
   No. 3:15-CV-02324-GPC-KSC, 2016 WL 5390533 (S.D. Cal. Sept.
   27, 2016) .......................................................................................................10, 11

*In re Cadence Design Sys., Inc. Sec. Litig.*,
   692 F.Supp.2d 1181 (N.D. Cal. 2010)..............................................................7, 8

*Crafton v. Powerwave Techs., Inc.*,
   No. SACV 07-65 PSG (MLGx), 2008 WL 11338622, at *7 (C.D.
   Cal. Apr. 17, 2008) ......................................................................................17, 20

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ...........................................................................20

*In re Downey Sec. Litig.*,
   No. CV 08-3261-JFW(RZx), 2009 WL 2767670 (C.D. Cal. Aug. 21,
   2009) ........................................................................................................3, 17, 18

*DSAM Glob. Value Fund v. Altris Software, Inc.*,
   288 F.3d 385 (9th Cir. 2002) ...............................................................................9

*Fialkov v. Microsoft Corp.*,
   72 F.Supp.3d 1220 (D.C. Wash. 2014) ................................................................6

*In re GlenFed, Inc. Sec. Litig.*,
   42 F.3d 1541 (9th Cir. 1994) ................................................................................5

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
   242 F.Supp.3d 950 (C.D. Cal. 2017)....................................................................6

*Levin v. Res. Cap. Corp.*,
   No. 15 Civ. 7081 (LLS), 2016 WL 5867451 (S.D.N.Y. Oct. 5, 2016).............13

*Lloyd v. CVB Fin. Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ...........................................................................14

ii

*Lloyd v. CVB Fin. Corp.*,
   No. CV 10-06256 MMM, 2012 WL 12883517 (C.D. Cal. Aug. 21, 2012) ...................................................................................*passim*

*Lloyd v. CVB Fin. Corp.*,
   No. CV 10-06256 MMM, 2012 WL 12883522 (C.D. Cal. Jan. 12, 2012) ........................................................................................15

*Lloyd v. CVB Fin. Corp.*,
   No. CV 10-06256 MMM, 2013 WL 12120506 (C.D. Cal. May 9, 2013) ......................................................................13, 14, 15, 16

*Longo v. OSI Sys., Inc.*,
   No. CV 17-8841 FMO, 2021 WL 1232678 (C.D. Cal. Mar. 31, 2021) .....................................................................................19, 20

*In re Loudeye Corp. Sec. Litig.*,
   No. C06-1442MJP, 2007 WL 2404626 (W.D. Wash. Aug. 17, 2007) ..........2, 11

*May v. KushCo Holdings, Inc.*,
   No. 8:19-CV-00798-JLS-KES, 2020 WL 6587533 (C.D. Cal. Sept. 25, 2020) ........................................................................................18

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) ...............................................1, 4, 7, 8

*In re Obalon Therapeutics, Inc.*,
   No. 3:18-CV-0352-AJB-WVG, 2019 WL 4729461 (S.D. Cal. Sept. 25, 2019) .................................................................................17, 18

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ......................................................18

*S.E.C. v. Mozilo*,
   No. CV 09-3994-JFW, 2009 WL 3807124 (C.D. Cal. Nov. 3, 2009) .........11, 12

*Sanders v. Realreal, Inc.*,
   No. 19-CV-07737-EJD, 2021 WL 1222625 (N.D. Cal. Mar. 31, 2021) .......................................................................................9, 10

*In re Silicon Graphics Inc., Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) .......................................................3, 5

*In re Silicon Storage Technology, Inc.*,
   No. C 05-0295 PJH, 2006 WL 648683 (N.D. Cal. 2006) ....................................6

*In re Software Toolworks Inc.*,
   50 F.3d 615 (9th Cir. 1994) ...............................................................................9

*Strathclyde Pension Fund v. Bank OZK*,
   No. 4:18-CV-793-DPM, 2020 WL 1650834 (E.D. Ark. Apr. 3, 2020) ..............................................................................................................17

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ...........................................................................................1

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ...........................................................................6

*In re Worlds of Wonder Sec. Litig.*,
   35 F.3d 1407 (9th Cir. 1994) .............................................................................9

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) ...........................................................1, 19, 20, 21

**Federal Statutes**

Private Securities Litigation Reform Act (PSLRA) ........................................*passim*

**Other Authorities**

Federal Rules of Civ. Proc., Rule 9(b) ................................................................1, 4

REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT

## I.    INTRODUCTION

In its Opposition, Plaintiff parrots the insufficient allegations in the Second Amended Complaint ("SAC"), ignores Defendants' principal arguments for dismissal, mischaracterizes controlling Ninth Circuit authorities, and relies on case law that is plainly inapposite and readily distinguishable.  Despite having now had three bites at the apple, what Plaintiff does not do in the Opposition is show how the SAC states a cognizable securities fraud claim, or how it could do so by way of further amendment.

Critically, as Plaintiff should by now be aware, the Private Securities Litigation Reform Act ("PSLRA") – which was designed "to curb frivolous, lawyer-driven litigation" – imposes even higher standards for securities fraud complaints than the already-stringent pleading requirements of Rule 9(b).  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 320-22 (2007) (citation omitted).  Following *Tellabs*, the Ninth Circuit has cautioned that a securities fraud complaint must not "mistake[] quantity for quality" in attempting to allege the existence of an actionable false statement.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008) ("[T]he sheer volume of alleged false statements and claims … do not overcome the lack of specificity that the PSLRA requires.")  The Ninth Circuit has also cautioned that, when amending a securities fraud complaint, a plaintiff cannot "assume that compiling a large quantity of otherwise questionable allegations will create a strong inference of scienter through the complaint's emergent properties."  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1008 (9th Cir. 2009).

The SAC does just what *Metzler* and *Zucco* caution against, and the Opposition does little to mitigate its deficiencies.  As explained in Defendants' Motion, the SAC – despite its length – fails to meet the PSLRA's "exacting requirements for pleading falsity," *Metzler*, 540 F.3d at 1070, nor does it present a

"cogent and compelling" inference that the defendants acted with the "intent to deceive, manipulate, or defraud." *Tellabs,* 551 U.S. at 319, 324.

At best, Plaintiff's additional allegations suggest that Defendants were negligent for having entered into the loan with Harrah, and for not having discovered its problems earlier. Such allegations are insufficient to rise to the level of securities fraud, which requires an intent on the part of Defendants to deceive or cheat. *See, e.g., Lloyd v. CVB Fin. Corp.*, No. CV 10-06256 MMM (PJWx), 2012 WL 12883517, at *18-19 (C.D. Cal. Aug. 21, 2012) (scienter "is not mere negligence"); *In re Loudeye Corp. Sec. Litig.,* No. C06-1442MJP, 2007 WL 2404626, *7 (W.D. Wash. Aug. 17, 2007) ("[I]ncompetence, even gross incompetence, is no basis for a securities fraud claim.") (quoting *In re Watchguard Sec. Litig.,* No. C05-678LR, 2006 WL 2927663, *10 (W.D. Wash. Oct. 12, 2006)).

Having now had the benefit of two rounds of briefing at the motion to dismiss stage, Plaintiff's inability to sufficiently plead securities fraud is fatal. The SAC must be denied with prejudice.

## II.   THE SAC'S ALLEGATIONS CONCERNING HANMI'S "KNOWLEDGE" ARE CONCLUSORY AND SELF-CONTRADICTORY

The key factual allegation that underpins the SAC's fraud theory is that Hanmi purportedly "knew by the start of the Class Period in August 2018 that the collateral for the Broadway Loan—the undeveloped land—was worth less than the principal of the loan, which required Hanmi to impair the loan at the difference between the principal and the value of the collateral." Opp. at 2; SAC ¶ 5. As alleged in the SAC, the Broadway Loan was "collateral-dependent" and "repayment … was expected to be provided solely by the underlying collateral." SAC ¶ 119. Thus, Plaintiff's theory goes, Hanmi's SEC filings and other public statements during the class period were false because they did not reflect the "impaired"

collateral value that Hanmi purportedly knew about.[1]  These allegations fail to plead an actionable securities fraud claim for multiple reasons.

First, the SAC remains devoid of any specific allegations "reflecting the who, what, when, where, and how" of Hanmi's purported knowledge about the undeveloped land's actual value.  *See In re Silicon Graphics Inc., Sec. Litig.,* 183 F.3d 970, 998 (9th Cir. 1999).  The SAC nowhere alleges what the undeveloped land was worth in March 2016 when the Broadway Loan was made.  The SAC also does not allege what the undeveloped land was worth at the start of the Class Period in August 2018.  Nor does the SAC allege what the undeveloped land was worth in December 2018, when Hanmi allegedly loaned an additional $15 million to Harrah.  SAC ¶ 57.  There are also no allegations in the SAC about what Harrah's car collection, which was used as collateral for the Caribou Loan, was worth – or even what Hanmi *believed* it to be worth – in December 2018 when the Caribou Loan was made.  SAC ¶ 60.  At most, the SAC vaguely asserts that Defendant Kum allegedly "went to view the cars" at an unspecified time.[2]  SAC ¶ 295.

Accordingly, the SAC does not (and cannot) allege "when and to what level the loans should have been written down" on account of the undeveloped land's value, or "when and to what level [Hanmi's] allowances should have been changed"

---

[1]    Plaintiff repeats this basic allegation as to each of Hanmi's SEC filings during the class period.  *See*, *e.g*., SAC ¶ 173 (alleging that the "Q3 2018 10-Q's reported $31.7 million amount of ALLL was materially false and misleading because it did not include any allowance for the impaired Broadway Loan"); SAC ¶¶ 267-276 (making similar allegations regarding Hanmi's November 12, 2019 Form 10Q for the period ending September 30, 2019); SAC ¶ 239 (alleging that Hanmi's Q1 2019 10-Q filing was false or misleading because GAAP "required Hanmi to charge off or take a specific allowance for the $14.8 million difference between the $28.0 million outstanding principal and $13.2 million fair value of the collateral").

[2] If anything, this allegation suggests Defendants were being prudent and personally wanted to inspect the potential collateral before approving changes to the loan.

during the class period, as would be required to state a cognizable securities fraud claim. *See In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZx), 2009 WL 2767670, at *4 (C.D. Cal. Aug. 21, 2009) (dismissing securities fraud complaint based on allegations of insufficient loan loss reserves). Having failed yet again to specify the who, what, where, when, and why with respect to Defendants' knowledge of the true value of any collateral, the SAC's allegations do not even meet the standards for pleading fraud under Rule 9(b), much less the "exacting requirements for pleading falsity" imposed by the PSLRA. *Metzler*, 540 F.3d at 1070.

Second, the SAC includes detailed factual allegations explaining why Hanmi was *not* aware of the collateral's insufficient value until July 2019 – *i.e.*, just before Hanmi began publicly announcing problems with the loan and its internal control deficiencies. Specifically, according to the SAC, Hanmi allegedly "did not have the required policy documentation describing the criteria for when collateral dependent impaired loan fair value is required." SAC ¶ 299. Hanmi allegedly "fail[ed] to adequately train its credit risk personnel on the collateral dependent impaired loan fair value review process." SAC ¶ 301. And Hanmi allegedly "fail[ed] to require documentation when concluding a fair value review is not warranted." SAC ¶ 302. According to the SAC, these very "accounting violations ***caused Defendants' failure to even identify the troubled loan relationship*** for an impairment valuation" any earlier than July 2019. *See* SAC ¶ 299 (emphasis added).

Thus, Plaintiff's own allegations make clear that Hanmi did not know the extent of the loan's impairment until just before it was scheduled to issue its financials for the end of June – *exactly when Hanmi began disclosing potential problems with the loan in its securities filings.*[3] *See, e.g.,* SAC ¶ 263 ("Hanmi's

---

[3] On July 19, 2019, Hanmi first announced it was delaying its filings for the quarter ending June 30, 2019, to review the loan for possible impairment. SAC ¶ 10. And

4

bank examiners forced Hanmi to review the [Broadway Loan] for impairment just days before Hanmi was scheduled to issue its financial results for the quarter ended June 30, 2019"); SAC ¶ 284 ("Hanmi only reviewed the Caribou Loan for impairment because Hanmi's bank examiners forced [it] to do so").  While Plaintiff goes to great lengths to create the impression that Hanmi somehow knew about the loan's impairment before it had even reviewed the loan, the SAC is devoid of any fact-specific allegations to support this "hunch."

Third, the SAC impermissibly relies on a "fraud by hindsight" theory based on allegations that Hanmi ultimately recorded a $25.2 million loss for the loan on April 30, 2020 – the last day of the class period.  According to the SAC, the April 2020 write-off was an "admission" that Hanmi knew the true value of the undeveloped land all along.  *See* SAC ¶ 148 (alleging that Hanmi "eventually admitted when they charged off all but $13.2 million of the Broadway Loan, the fair value of the undeveloped land serving as collateral for the Broadway Loan was just $13.2 million.").  The SAC makes similar conclusory allegations about Hanmi's purported "knowledge" of the value of Harrah's car collection, which served as additional collateral for the Caribou Loan. *See*, *e.g*., SAC ¶ 273 (alleging that Hanmi "eventually admitted when they charged off all but $1.1 million of the Caribou Loan, the fair value (minus the costs to sell) of the car collection serving as collateral for the Caribou Loan was just $1.1 million.").

These allegations are the very definition of "pleading fraud by hindsight" that "Congress enacted the PSLRA to put an end to." *See Silicon Graphics*, 183 F.3d at 988.  As the Ninth Circuit holds, "there is no reason to assume that what is true at the moment plaintiff discovers it was also true at the moment of the alleged

in its next SEC filing on August 12, 2019, Hanmi disclosed the internal control deficiency and announced an estimated $15.7 million loss for the loan.  SAC ¶ 11; Dkt. 33-1 (Request for Judicial Notice), Ex. A (8/12/19 Notification) at p. 2.

misrepresentation, and that therefore simply because the alleged misrepresentation conflicts with the current state of facts, the charged statement must have been false." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994). Rather, a complaint must allege specific facts showing that a challenged statement was "false or misleading when made." *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1089 (9th Cir. 2002).

Indeed, the "Ninth Circuit has repeatedly reaffirmed" the fraud-by-hindsight rule, explaining that the fact that a company's 'forecast turned out to be incorrect does not retroactively make it a misrepresentation.'" *Fialkov v. Microsoft Corp.*, 72 F.Supp.3d 1220, 1230 (D.C. Wash. 2014) (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 389 (9th Cir. 2002); *see also Knox v. Yingli Green Energy Holding Co. Ltd.*, 242 F.Supp.3d 950, 964 (C.D. Cal. 2017) (holding that falsity was inadequately pleaded where the defendant "had no actual knowledge" of the facts allegedly rendering its earlier statements false or misleading); *In re Silicon Storage Technology, Inc.,* No. C 05-0295 PJH, 2006 WL 648683, at *7 (N.D. Cal. 2006) (rejecting as "fraud by hindsight" plaintiffs' allegations that "because [defendant] wrote down its inventory in December 2004, the statements about inventory made prior to that time must have been false because the inventory turned out not to be worth what [defendant] had previously said it was worth").

The SAC attempts to remedy these pleading deficiencies by including extraneous, unrelated facts about the status of the One Broadway construction project. *See*, *e.g*., SAC ¶ 5 (alleging that, by August 2018, "Harrah still had (i) no permit to begin construction on the land beyond a partial foundation, (ii) no financing to build the tower, and (iii) no tenants to fill the proposed tower"). These allegations, of course, have nothing to do with the value of the "*undeveloped land*" that Plaintiff alleges throughout the SAC was the "sole" expected source of repayment for the loan. *See* SAC ¶¶ 119 (alleging that repayment was "*to be provided solely by the underlying collateral*") (emphasis added)*; see also* SAC ¶¶

57, 111, 143, 148, 169, 174, 201, 206, 232, 239, 255-56, 270-71, 289-90 (repeatedly alleging how "the undeveloped land was used as collateral for the loan"). Nor do these allegations provide any clarity as to *when* Hanmi or any Defendant learned that the real value of the undeveloped land was less than the amount of the loan.

As for Plaintiff's contention that Hanmi "conceded the value of the undeveloped land was worth less than the principal of the Broadway Loan when they sought additional collateral in the Caribou Loan in December 2018," Opp. at 11, these conclusory allegations also do not meet the PSLRA's "exacting requirements" for pleading falsity. *Metzler*, 540 F.3d at 1070. And, as explained in the Motion, it is simply implausible that any bank would lend $41 million *knowing* that the only collateral for the loan – the "undeveloped real property" – was only worth $13 million; or that a bank would accept a car collection as collateral for a $15 million loan *knowing* it was worth only $1.1 million. SAC ¶¶ 174, 207. Unable to explain why Hanmi would knowingly take such risks against its own self-interest, Plaintiff reverts to hindsight bias, pointing to steps Hanmi took to *strengthen* the loan's collateral base as "proof" of its impairment.

In the Opposition, Plaintiff argues that because Matthew Fuhr, Hanmi's Chief Credit Administration Officer, "personally handled" the Caribou Loan, his "knowledge can be imputed to both Hanmi and the Individual Defendants." Opp. at 19; *cf.* SAC ¶ 295. But again, the relevant question is whether the SAC alleges, with the specificity required under the PSLRA, *what* Mr. Fuhr "knew." It does not. As such, Plaintiff's reliance on *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F.Supp.2d 1181 (N.D. Cal. 2010), for the proposition that an executive's knowledge can be "imputed" to the company is misplaced.

In *Cadence*, a technology company had falsely classified two of its most significant "subscription" licenses as "term" licenses." *Id. at* 1185. Importantly, Cadence had a clear incentive for the misclassification: while the company could recognize the revenue from "term" licenses immediately, it could not do so with

7

REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT

"subscription" licenses, and so misclassifying them as "term" licenses allowed the company to materially inflate its revenue. *Id*. Unlike the SAC, the complaint in *Cadence* included specific allegations showing that the license agreements had been manipulated to turn what was previously a subscription agreement into a term agreement. Specifically, the complaint contained numerous specific factual allegations describing how the executive "gave specific instructions to re-structure" one of the licenses "that was already in place because Cadence needed to count this deal as revenue." *Id*. at 1189-90 (quotation marks omitted). The complaint also included allegations that one of the company's top executives was personally involved in the negotiation of the licenses at issue. Given the material difference between the way revenue could be recognized for term versus subscription licenses, the court found the executive "knew or should have known" that the "term" licenses "were, in substance, subscription agreements at the time that the false statements regarding Cadence's inflated earnings were made by the other Individual Defendants." *Id*. at 1191-92.

Here, by contrast, the SAC contains no allegations regarding what Mr. Fuhr knew as he "personally handled" the Caribou Loan, much less how this "knowledge" rendered Hanmi's public statements false or misleading. It does not allege at what point Mr. Fuhr knew the true value of the collateral; it does not allege a plausible reason why Mr. Fuhr would knowingly sign Hanmi up to lose millions of dollars on a deficient loan; and, unlike the amended complaint in *Cadence*, it does not allege that Mr. Fuhr gave specific instructions to manipulate the loan documents to hide the value of the security. Having failed to establish that Mr. Fuhr himself had the requisite knowledge to meet the PSLRA's standards, Plaintiff cannot rely on *Cadence* to "impute" that knowledge to Defendants.

## III.   THE SAC'S OTHER "FALSITY" ALLEGATIONS ARE INSUFFICIENT TO PLEAD FRAUD

The "sheer volume of alleged false statements and claims" in a securities

8                                    Case No. 2:20-cv-02844

REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT

fraud complaint cannot "overcome the lack of specificity that the PSLRA requires." *Metzler*, 540 F.3d at 1070 (it is insufficient to allege that "virtually every statement made by [the defendant] during the Class Period related to the company's financial health or performance was, by definition, false"). The SAC's remaining "falsity" allegations are also insufficient to avoid dismissal here.

First, as explained in the Motion, the SAC's allegations about Hanmi's "puffing" statements – including that it had "excellent asset quality" as of June 30, 2018, and that its "asset quality metrics" were "about as strong as you can get" – are not actionable. *See* Mot. at 15-16; *cf.* SAC ¶¶ 154-57, SAC ¶ 189. In the Opposition, Plaintiff cites to *Sanders v. Realreal, Inc.*, No. 19-CV-07737-EJD, 2021 WL 1222625, at *9 (N.D. Cal. Mar. 31, 2021), for the proposition that statements capable of "objective verification" are not "inactionable puffery." Opp. at 14. Plaintiff contends that Hanmi "did not just generalize that its credit metrics are superior to those of its peers," but that Defendant Kum stated that Hanmi had "NPA-to-assets of 30 bps vs. median of 50 bps for $3 to $10 billion U.S. bank" as of the end of the second quarter of 2018. *Id*. This accounting-related statement, according to Plaintiff, was "verifiably false because Hanmi's NPA Ratio (the percentage of Hanmi's assets that were nonperforming) as of the end of the second quarter was 102 bps—more than twice as high as the median of Hanmi's peers— once the Broadway Loan was properly included among Hanmi's non-performing assets." *Id*.

This argument fails. The Ninth Circuit has repeatedly held that "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (citation omitted); *DSAM Glob. Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390 (9th Cir. 2002) ("[M]ere allegations that an accountant negligently failed to closely review files or follow GAAP cannot raise a strong inference of scienter."); *In re Software Toolworks Inc.*, 50 F.3d 615, 628 (9th

9

Cir. 1994) ("Scienter requires more than a misapplication of accounting principles.").

*Realreal* is also readily distinguishable. There, the defendant – an online marketplace that purportedly sold "authenticated, consigned luxury goods" – publicly stated that it "authenticate[d] every item posted to the online marketplace" using "in-house experts." *Realreal*, 2021 WL 1222625, at *1, *10, *11. The court found that the complaint adequately alleged these statements were misleading based on particularized allegations that, in fact, the personnel who authenticated the goods were "copywriters ... not expert authenticators"; that the "small group of authenticators employed by the company did not authenticate every item, or even most items" on the website; and that the copywriters "who did authenticate the vast majority of items ... had little experience, received inadequate training in authentication … and operated under a strict quota system that did not allow copywriters to spend sufficient time with each item in order to adequately authenticate it." *Id.* at *10, *11. No such allegations are present here. In fact, Plaintiff concedes in the SAC that Hanmi had retained KPMG, a reputable firm known as one of the "Big Four" consulting firms in the country, to handle its accounting; and that when problems arose on KPMG's watch, Hanmi terminated KPMG, hired another accounting firm, and promptly disclosed its internal control deficiencies. *See* SAC ¶¶ 85-86.

Next, the Opposition points to Defendant Kum's alleged statement, during a January 15, 2019 investor call, that Hanmi "continued to maintain our normal conservative underwriting standards." Opp. at 14; *cf.* SAC ¶ 189. Plaintiff contends this statement is actionable because, in making the Caribou Loan, Hanmi had allegedly relied on a "one-page" appraisal letter prepared by a third party who was – unbeknownst to Hanmi – a personal friend of Harrah's. *See* Opp. at 14-15 (citing *In re: Bofi Holding, Inc. Sec Litig.*, No. 3:15-CV-02324-GPC-KSC, 2016 WL 5390533, at *9 (S.D. Cal. Sept. 27, 2016); *cf.* SAC ¶¶ 60-65.

Again, *Bofi* is readily distinguishable.  There, the complaint included "detailed allegations" that a senior underwriter "described being pressured by senior management to underwrite loans that [he] felt uncomfortable approving, refusing to recommend highly-leveraged loans that senior management ultimately approved, and noting that it 'started to become very rare that we would deny a loan.'"  *Id*. at *9-10.  Under these particularized facts – which are absent from the SAC – the court held that the company's statement that it "continued to adhere to conservative loan underwriting practices and … had not loosened credit guidelines in order to increase loan volume" were misleading.  *Id*. at *9.  By contrast, there are no allegations in the SAC to suggest that Hanmi's underwriters ever disapproved of the Broadway Loan or the Caribou Loan; nor does the SAC allege that Hanmi knew about the purported close relationship between Harrah and the individual who prepared the appraisal of his car collection.

Further, as explained in the Motion, Hanmi's alleged failure to conduct its own appraisal of the cars points, at most, to negligence – not fraud.  *See* Mot. at 15; *Lloyd,* 2012 WL 12883517, at *18-19 ("Under the applicable case law, however, scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.' It is not mere negligence.") (citation omitted); *Loudeye,* 2007 WL 2404626, at *7 ("[I]ncompetence, even gross incompetence, is no basis for a securities fraud claim.").

Finally, the Opposition – just like Plaintiff's Opposition to Defendant's prior motion to dismiss – cites *S.E.C. v. Mozilo*, No. CV 09-3994-JFW (MANx), 2009 WL 3807124, at *4–5 (C.D. Cal. Nov. 3, 2009), for the proposition that a "lender's statements touting its underwriting standards" can be "materially false and misleading."  Opp. at 15.  As explained in Defendant's prior briefing, *Mozilo* is inapposite because the PSLRA's pleading standards are higher than the pleading standards that apply to SEC enforcement actions.  *See id.* at *13, fn.6.  Moreover, *Mozilo* is based on starkly different facts than those alleged in the SAC.  There, the

SEC instituted an action against senior executives of Countrywide for public statements they made in the period leading up to the subprime mortgage meltdown that caused the 2008 financial crisis. The executives had publicly stated that Countrywide had "backed away from the subprime area because of our concern over credit quality" when, in reality, it had not. *Mozilo*, 2009 WL 3807124, at *4. Specifically, Countrywide "categorized loans as 'prime' even though they were issued to borrowers with FICO scores below 620"; "did not consider any FICO score too low to be included in its 'prime' category"; and stated that subprime mortgages were "a sound investment for our Bank and a sound financial management tool for customers." *Id*. at *5. Meanwhile, "Defendant Mozilo and other members of senior management internally expressed grave concerns about the quality or viability of these loans." *Id*. at *5.

Even under a lower pleading standard, the allegations in *Mozilo* are far afield from Plaintiff's threadbare allegation that Hanmi "repeatedly described Hanmi's underwriting standards as 'conservative.'" *See* Opp. at 14 (citing SAC ¶ 189). Notably, there are no allegations in the SAC explaining how Hanmi's underwriting standards were riskier than reported, nor does the SAC allege that Hanmi's officers were aware of the loan impairment (or of Hanmi's internal control deficiencies) before they were disclosed.

The Opposition's strained attempts to identify an actionable false statement do not end there. Plaintiffs cite next to a stray allegation in the SAC that, during an April 23, 2019 investor call, Defendant Kum allegedly discussed an unrelated "$25 million commercial loan relationship" that "experienced a labor issue that has caused a business interruption." Opp. at 15; SAC ¶ 223. When an analyst allegedly asked about the "broader trend in criticized/classified assets this quarter," Mr. Kum allegedly responded that the loss in question was a "one-off issue" and that "there are no other significant increases in the criticized or any other grade categories." SAC ¶ 223. But clearly the SAC nowhere alleges that "labor issues" or "business

interruption" were responsible for the alleged impairment of the Harrah loan. More fundamentally, the SAC contains no allegations, much less particularized ones, about Defendant Kum's knowledge of the impairment.

As for the SAC's allegation that Hanmi described the Harrah loans as "current" in its October 4, 2019 SEC filing, the Opposition fails to show that this statement was "materially misleading" or actionable. *See* Opp. at 15; cf. SAC ¶ 262. The SAC openly concedes that Harrah was, in fact, making timely interest payments. *See* Opp. at 11 (alleging that, after the restructure, Harrah continued to make "interest-only payments for a total of 1021 days"); SAC ¶ 112. Moreover, allegations that a lender "purportedly made certain loans appear 'current' for reporting purposes by extending loan due dates" are insufficient to plead fraud. *Lloyd v. CVB Fin. Corp.*, No. CV 10-06256 MMM (PJWx), 2013 WL 12120506, at *1 (C.D. Cal. May 9, 2013). Finally, in the very same SEC filing referring to the loan as "current," Hanmi disclosed that it had placed the "entire" Harrah loan at issue on "nonaccrual status" as a "nonperforming asset" and a "troubled debt restructuring." SAC ¶ 13. Its impairment was, therefore, clearly disclosed.

Plaintiff is also incorrect that *Levin v. Res. Cap. Corp.*, No. 15 Civ. 7081 (LLS), 2016 WL 5867451, at *1 (S.D.N.Y. Oct. 5, 2016), is "particularly instructive" as to whether Hanmi's statement that the loans were "current" was materially misleading. Harrah continued to make interest payments; but in *Levin*, the lender had agreed to a loan modification under which the borrower "stopped paying interest on its loan." *Id*. at *1. Based on this plainly distinguishable fact, the court concluded that the lender's subsequent statement that the "borrower in financial difficulty was 'current' and 'performed' by not paying interest" was "counter-intuitive." *Id*. at *1. Plaintiff's claim that *Levin* is "instructive" on this point is nothing short of frivolous.

## IV.   HANMI'S REPEATED DISCLOSURES DURING THE CLASS PERIOD STRONGLY NEGATE SCIENTER

As explained in the Motion – and ignored in the Opposition – Plaintiff concedes in the SAC that Hanmi repeatedly disclosed the existence of the internal control deficiencies that were allegedly responsible for Hanmi's failure to identify the loan for impairment sooner than it did.  Specifically, "[o]n July 19, 2019, Hanmi issued a press release announcing that the Company was delaying its earnings release and conference call for the quarter ending June 30, 2019, in order to evaluate adjustments to its ALLL [allowances for loan losses] requested by its banking examiner."  SAC ¶ 10.  Then, on August 12, 2019, Hanmi disclosed a "possible internal control deficiency primarily relating to construction lending," and that it anticipated taking a $15.7 million loss provision in connection with the loan.  SAC ¶ 11.  On October 4, 2019, in its very first quarterly financial statement after the July 19, 2019 press release, Hanmi announced that it had placed the entire loan on nonaccrual status and was taking a corresponding $15.7 million specific loss provision.  SAC ¶¶ 13, 262.  These disclosures continued throughout the class period.  *See* Mot. at pp. 7-8.  Far from showing that Hanmi attempted to hide these weaknesses or misled investors, the SAC itself confirms that Hanmi was forthcoming in its public filings.  Unsurprisingly, Plaintiff does not even attempt to address this argument.

## V.   PLAINTIFF MISCHARACTERIZES *LLOYD* AND RELIES ON INAPPOSITE AUTHORITIES REGARDING GAAP

As discussed in the Motion, the district court in *Lloyd*, 2013 WL 12120506 (C.D. Cal. May 9, 2013) considered and rejected GAAP-related allegations that are nearly identical to those in the SAC – including that the defendant purportedly failed to classify a loan as a "troubled debt restructuring" in its SEC filings.  (Mot. at 12-13, 15-16.)  As the Opposition appears to concede, the Ninth Circuit affirmed *all* the holdings in the district court decision that Defendants rely on in their Motion.  *See*

14

Case No. 2:20-cv-02844

REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT

*Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1211 (9th Cir. 2016).

In its Opposition, Plaintiff attempts to distinguish *Lloyd*, vaguely asserting that "the allegations here are far stronger than those previously addressed by the Ninth Circuit." (Opp. at 3.) This argument is unavailing. In *Lloyd*, the complaint alleged that the lender restructured "more than $53 million" in loans at a time when the borrower was in "perilous financial condition," "on the verge of bankruptcy," "hanging on by a thread," and "behind on payments associated with prior loans." *Lloyd*, 2013 WL 12120506, at *2. Meanwhile, the "properties financed by [the lender] sat vacant for years, generating no income." *Id*. The lender had also made a second $10 million loan while the borrower was "already ninety days behind on payments associated with prior loans." *Id*. The complaint in *Lloyd* further alleged that "defendants consistently overvalued the properties that served as collateral" and that "this practice was particularly misleading given [the lender's] repeated claim in periodic filings that it 'strive[d] to have a maximum loan-to-value ratio of 65-75%.'" *Id*. The lender in *Lloyd* had also allegedly "extended [the] lines of credit or refinancing packages on at least five occasions before and during the class period, sometimes in amounts as large as $53 million." *Lloyd v. CVB Fin. Corp.*, No. CV 10-06256 MMM (PJWx), 2012 WL 12883522, at *18 (C.D. Cal. Jan. 12, 2012). These allegations are substantially similar to – indeed stronger than – those in the SAC.[4]

And yet, the *Lloyd* court held that they were insufficient "to plead with particularity either falsity or scienter" because they "***depend[ed] heavily on the***

---

[4] *See*, *e.g*., SAC ¶ 9 ("By the quarter ended March 31, 2019, Harrah had defaulted on the Broadway Loan four times, and Hanmi had restructured the loan five times to accommodate Harrah's inability to repay."); SAC ¶ 33 (alleging that Hanmi "claims that its … loan-to-value ratios at time of origination … do not exceed 75 percent"); SAC ¶ 214 (alleging that "Hanmi had just issued a new collateral-dependent loan to Harrah—the Caribou Loan—on December 26, 2018 despite the fact that Harrah had defaulted three times on the Broadway Loan.").

Case No. 2:20-cv-02844

REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT

*assumption that defendants knew of problems in [its] loan portfolio during the early months of the class period*." *Lloyd*, 2013 WL 12120506, at \*21-22 (emphasis added). That assumption – like the bare allegation in the SAC that Hanmi "knew by the start of the Class Period in August 2018 that the collateral … was worth less than the principal of the loan," SAC ¶ 5 – was not enough to plead fraud. *Lloyd*, 2013 WL 12120506, at \*22, fn.197 (noting that "the complaint does not plead facts showing that [lender] knew the $10 million loan was not adequately secured").

The Opposition's attempt to distinguish *Lloyd* on the grounds that the borrower in that case "continued to amortize the principal of the loans, while Harrah did not," is disingenuous at best. *See* Opp. at 24. As the SAC expressly alleges, the Harrah loan was, from its very inception, a "balloon" loan requiring interest-only payments until maturity. SAC ¶ 54. Moreover, the SAC acknowledges that Harrah was, in fact, making the required interest payments, even in October 2019 when Hanmi placed the entire loan on "nonaccrual" status and identified it as a nonperforming asset in its SEC filings. SAC ¶ 262. Equally disingenuous is Plaintiff's attempt to distinguish *Lloyd* on the basis that the defendants in that case "made efforts to disclose the situation in a timely manner." *See* Opp. at 24 (citing *Lloyd*, 2013 WL 12120506, at \*16). As alleged in the SAC, Hanmi *did* disclose problems with the loan – as well as an estimated $15.7 million loss – in August 2019, shortly after it allegedly learned of its internal control deficiencies for the first time. *See* Mot. at 7-8; SAC ¶¶ 10-13, 299-302.

Finally, the *Lloyd* court did not – as Plaintiff claims in the Opposition – reject plaintiff's "troubled debt restructuring" allegations solely because the complaint failed to allege a "concession" necessitating a "troubled debt restructuring" ("TDR") disclosure. Opp. at 13. In fact, the court dismissed the plaintiff's TDR claims for the additional reason that there was "no allegation that the additional loan was offered at a below market interest rate, or that [the lender] knew it would not be repaid." *Id*. at \*22. The SAC should be dismissed for the same reason: as explained

16

above, it is devoid of any allegations showing that Hanmi "knew" about the true value of its collateral at the time of its challenged SEC filings.

Failing to distinguish *Lloyd* in any real way, the Opposition relies on a host of inapposite authorities that are – unlike *Lloyd* – plainly distinguishable. Plaintiff contends, for example, that in *Strathclyde Pension Fund*, a district court denied dismissal based on facts "nearly identical to those alleged" in the SAC. Opp. at 13 (citing *Strathclyde Pension Fund v. Bank OZK*, No. 4:18-CV-793-DPM, 2020 WL 1650834, at *4 (E.D. Ark. Apr. 3, 2020)). Not so. In *Strathclyde*, the plaintiff specifically alleged how the bank was aware of a troubled loan that had been on its books for "nearly a decade." *Id*. at *2. In fact, the bank had internally "deliberat[ed] between forbearance and foreclosure," while repeatedly telling the public that the loan was "pristine." *Id*. The *Strathclyde* complaint also alleged that the bank's real estate division leader – who was "intimately involved" with the loan – suddenly "exercised [his] stock options and resigned" before the bank disclosed any problems. *Id*. By contrast, the SAC does not allege any basis for Hanmi's knowledge of the true status of the loan, much less any internal "deliberations" concerning foreclosure. Critically, the SAC also does not allege any stock sales by any of the individual defendants. *See* Mot. at 22-23; *Downey*, 2009 WL 2767670, at *13 (A "strong inference of scienter is negated when there is an absence of stock sales or where such sales are minimal.").[5]

---

[5]  In the Opposition, Plaintiff contends that the "absence of insider trading allegations neither supports nor negates scienter," Opp. at 23, but the cases cited in the Opposition – including *Strathclyde* – show otherwise. *See id*.; *see also Crafton v. Powerwave Techs., Inc.*, No. SACV 07-65 PSG (MLGx), 2008 WL 11338622, at *7 (C.D. Cal. Apr. 17, 2008) (finding scienter based on particularized allegations "***in conjunction with Plaintiffs' other allegations that Powerwave's executives engaged in insider stock sales***") (emphasis added).

REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT

Plaintiff's reliance on *In re Obalon Therapeutics, Inc.*, No. 3:18-CV-0352-AJB-WVG, 2019 WL 4729461, at *8 (S.D. Cal. Sept. 25, 2019), is equally misplaced.  In *Obalon* (another revenue recognition case), unlike here, the complaint "provide[d] the basic details such as the approximate amount by which revenues were overstated, and the transactions involved that led to the purported overstatement."  *Id.* (citation and punctuation omitted).  Again, the SAC alleges no details about when or in what amount Hanmi should have written down the loans sooner than it did.  *See In re Downey Sec. Litig.*, 2009 WL 2767670, at *4 (a securities fraud complaint must allege "when and to what level the loans should have been written down" and "when and to what level [loss] allowances should have been changed" during the class period).

*Provenz v. Miller* is yet another inapposite revenue-recognition case cited in Plaintiff's Opposition.  There, "defendants recognized revenue before binding agreements existed and before contract requirements were completed," allegations that are not remotely similar to those in the SAC.  *Provenz v. Miller*, 102 F.3d 1478, 1485 (9th Cir. 1996).  At the summary judgment phase, the court found sufficient evidence that the defendant knew that the purported "contract" revenue at issue should not have been recognized because its policy documents stated that "technology revenue is recognized upon the completion of contract requirements." *Id*. at 1494.  Again, the issue here is whether the SAC adequately alleges that Hanmi was aware of the difference between the loan value and the collateral value at the time of its challenged SEC filings.  There are no such allegations in the SAC.

Finally, the Opposition cites to *May v. KushCo Holdings, Inc.*, No. 8:19-CV-00798-JLS-KES, 2020 WL 6587533, at *5 (C.D. Cal. Sept. 25, 2020), for the proposition that when a lender "violate[s] its own internal accounting policies," this "supports a strong inference of scienter."  Opp. at 18.  In fact, the *KushCo* court *granted* defendant's motion to dismiss and *rejected* plaintiff's GAAP and "accounting policy" allegations as insufficient to show scienter.  *See id*. at *9

(holding that the complaint's allegations regarding the "magnitude and length of the time of the GAAP violations" and the defendants' "alleged awareness of the relevant GAAP principles" were insufficient to plead fraud).

## VI.   THE SAC'S REMAINING SCIENTER ALLEGATIONS ARE INSUFFICIENT TO SHOW FRAUD

A plaintiff cannot "assume that compiling a large quantity of otherwise questionable allegations will create a strong inference of scienter." *Zucco*, 552 F.3d at 1008. The SAC's remaining scienter allegations similarly mistake quantity for quality.

First, as explained in the Motion, the SAC's allegations that "Hanmi's executives were highly motivated to hide the troubled loans from investors because their bonuses were directly tied to Hanmi's ability to avoid nonperforming loans," SAC ¶ 311, are not actionable because the SAC "fails to provide specifically, with comparisons to prior years['] bonuses, the correlation between [the individual defendants'] compensation and [defendant's] bottom line." *Zucco*, 552 F.3d at 1005.[6] Moreover, Plaintiff appears to allege that Hanmi knew about the loan's deficiencies at its *inception*, not simply that Defendants hid the loan's impairment. It is simply not plausible that bank executives would be compensated for knowingly approving a loan backed by insufficient collateral that would ultimately cost the bank millions of dollars in losses.

The Opposition cites *Longo v. OSI Sys., Inc.*, No. CV 17-8841 FMO (SKx), 2021 WL 1232678, at *8 (C.D. Cal. Mar. 31, 2021), as purported contrary authority

---

[6]  *See also Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation is without merit. If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.").

that executive bonuses can be indicative of scienter. But in *Longo*, unlike the SAC, the plaintiff met the standards described in *Zucco* by specifically alleging that the individual defendant's "salary in 2017 was increased by approximately 14%" as a result of a fraudulent contract in which that defendant was directly involved. *Id*. at *8, fn.8. Specifically, the executive had orchestrated an "arrangement with an undisclosed partner" under which the company transferred – for a mere $4.50 – 49% of its rights under a contract worth "approximately $200 million" while, at the same time, touting the profitability of the contract to the company in public statements. *Id*. at *5, *7.

The SAC's allegations that Hanmi had a "motive" to keep its stock price high to consummate a merger with another bank, SAC ¶ 317, also cannot save the SAC from dismissal. *See* Mot. at 21-22. The Opposition's purported authorities to the contrary are, once again, readily distinguishable because they involved insider stock sales that are not pleaded in the SAC. *See Crafton*, 2008 WL 11338622, at *7 (finding scienter adequately pleaded based on "allegations that Powerwave's executives engaged in insider stock sales, benefited from a cash bonus program, and sought to increase stock price to purchase other companies"); *In re Daou Sys., Inc.*, 411 F.3d 1006, 1024 (9th Cir. 2005) (finding scienter where complaint alleged that, "in addition to the suspicious insider trading by defendants, other Daou executives as well as defendants' family members 'dumped' a grand total of 2.5 million shares of Daou stock during the class period at artificially inflated prices").

Finally, as explained in the Motion, the SAC relies on nearly identical allegations about "suspicious personnel decisions" that the Ninth Circuit squarely rejected in *Zucco*. According to the SAC, Hanmi "abruptly" dismissed KPMG in June 2019 and hired Crowe LLP. SAC ¶¶ 306-07. Just as in *Zucco*, this alleged termination of KPMG occurred in the same month in which Hanmi allegedly "graded [the Loan] substandard and classified it as impaired." *See* FAC ¶ 62; *cf. Zucco*, 552 F.3d at 1002 *("[T]he resignation of KPMG as [defendant's]*

*independent accounting firm a month after the [disclosure] was issued is not surprising—it had just been partially responsible for the corporation's failure to adequately control its accounting procedures.  This is not enough to support a strong inference of scienter*.") (emphasis added).

In the Opposition, Plaintiff urges this Court to find that *Zucco* "further reinforces the inference of scienter" in this case because "the termination of KPMG strongly impl[ies] either that new management was trying to cover up the fraud or that the Bank had been recklessly misstating its revenues."  Opp. at 21.  Of course, the more plausible and indeed cogent explanation is that Hanmi acted responsibly in firing KPMG for failing to detect problems with the loan sooner.  Plaintiff's interpretation of *Zucco* is squarely at odds with its actual holding.  Finally, Plaintiff's argument about a "cover-up" is also contradicted by the SAC's own allegations that in August 2019 – just weeks after KPMG was terminated – Hanmi publicly disclosed the internal control deficiencies that its new auditor had identified, specifically tied these problems to "construction lending," and stated that it anticipated taking a $15.7 million loss on the loan.  *See* Mot. at 8; SAC ¶ 11.

## VII.   CONCLUSION

For the reasons stated above and in the Motion, Plaintiff's Second Amended Complaint should be dismissed with prejudice.

21

DATED:  July 21, 2021                Respectfully submitted,

Ekwan E. Rhow
Darren L. Patrick
Bird, Marella, Boxer, Wolpert, Nessim,
Drooks, Lincenberg & Rhow, P.C.

Naeun Rim
MANATT, PHELPS & PHILLIPS, LLP

By:        */s/ Darren L. Patrick*
                Darren L. Patrick
        *Attorneys for Defendant Hanmi Financial
        Corporation, Bonita I. Lee, Romolo C.
        Santarosa, and C. G. Kum*

REPLY ISO MOTION TO DISMISS SECOND AMENDED COMPLAINT