UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

KILLYOUNG OH,

Plaintiff,

v.

HANMI FINANCIAL CORPORATION, et al.,

Defendants.

Case No. 2:20-cv-02844-FLA (JCx)

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED CLASS ACTION COMPLAINT**

## RULING

Before the court is Defendants Hanmi Financial Corporation ("Hanmi"), Bonita I. Lee ("Lee"), Romolo C. Santarosa ("Santarosa"), and C.G. Kum's ("Kum") (collectively, "Defendants") Motion to Dismiss the Second Amended Class Action Complaint ("Motion"). Dkt. 55 ("Mot."). On August 5, 2021, the court found this matter appropriate for resolution without oral argument and vacated the hearing set for August 6, 2021. Dkt. 63; *see* Fed. R. Civ. P. 78(b); Local Rule 7-15.

For the reasons stated herein, the court DENIES Defendants' Motion. Defendants shall file their Answer to the Second Amended Class Action Complaint ("SAC") within 14 days of this Order.

**BACKGROUND**

Plaintiff Killyoung Oh ("Oh" or "Plaintiff") brings this putative class action suit against Defendants for alleged violations of federal securities laws. The proposed class consists of "all persons who purchased the publicly traded Hanmi common stock between August 9, 2018 and April 30, 2020, both dates inclusive (the 'Class Period')." Dkt. 45 (Second Amended Complaint ("SAC")) ¶ 1. In considering the subject Motion, the court treats the following allegations from the SAC as true. *See Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012).

Plaintiff's claims arise out of Hanmi's statements regarding a troubled loan relationship between Hanmi and Orange County real estate developer Michael Harrah ("Harrah"). SAC ¶¶ 5, 36. On March 15, 2016, Hanmi agreed to lend approximately $41.2 million to One Broadway Plaza, LLC ("Broadway LLC"), an entity controlled by Harrah (the "Broadway Loan"). *Id.* ¶ 49. On December 26, 2018, Hanmi agreed to make an approximately $15.5 million business loan to Caribou Industries, Inc., an entity whose President and sole principal is Harrah (the "Caribou Loan").[1] *Id.* ¶ 57.

Plaintiff alleges Hanmi made materially false and misleading statements in its filings with the United States Securities and Exchange Commission ("SEC"), beginning on August 9, 2018, when it failed to include the Broadway Loan as a nonperforming troubled debt restructuring ("TDR"). *Id.* ¶¶ 136-139. Further, Plaintiff alleges the Broadway Loan was a nonperforming asset under Hanmi's own accounting policies. *Id.* ¶ 168. With respect to the Caribou Loan, Hanmi accepted Harrah's automobile collection as collateral based on a one-page valuation letter that had been prepared for and provided by Harrah, was signed by a friend of Harrah's, and did not list or value the individual vehicles. *Id.* ¶¶ 60-62, 215-17. According to Plaintiff, Hanmi's acceptance of this appraisal violated the Federal Deposit Insurance

[1] The Broadway Loan and Caribou Loan will collectively be referred to as the "Harrah Loans."

Company's ("FDIC") Statement of Policy on Interagency Appraisal and Evaluation Guidelines, as well as Hanmi's own publicly disclosed underwriting policies and practices, which required an independent appraisal of the value of any collateral offered to secure a loan. *Id.* ¶¶ 63-65.

Plaintiff alleges Hanmi first indicated troubles with the loan relationship on July 19, 2019, when Hanmi disclosed that, at the request of its bank examiners, Hanmi would reevaluate its allowance for loan and lease losses with respect to a "single credit relationship." *Id.* ¶ 10. Later that month, on July 31, 2019, Hanmi indicated the reevaluation had not concluded and its stock price would be "weighed down" until its completion. *Id.* On August 12, 2019, Hanmi filed a Form NT 10-Q with the SEC stating it was unable to file timely its Form 10-Q for the quarter that ended June 30, 2019, "because the Company and its auditor are evaluating the classification of a single $40.7 million credit relationship … as well as a possible internal control deficiency primarily relating to construction lending, which may affect prior periods." *Id.* ¶ 11. Following this disclosure, shares of Hanmi stock fell 6.4% to close at $18.59 per share on August 12, 2019. *Id.* On August 22, 2019, Hanmi announced it had received a notice from NASDAQ that the Company was no longer in compliance with NASDAQ rules due to its untimely quarterly disclosure and was in danger of being delisted. *Id.* ¶ 12. Hanmi stock dropped another 4.6% to $17.33 as a result. *Id.*

On October 4, 2019, Hanmi disclosed it had moved the entire $40.7 million loan relationship into nonaccrual status, lowered its rating, and would take a $15.7 million provision for loan and lease losses. *Id.* ¶ 13. Plaintiff alleges Hanmi later took additional specific allowances for the Harrah Loans beyond the initial $15.7 million, including a $6.9 million allowance, reported on January 28, 2020, and a further allowance of $2.6 million, reported on April 30, 2020. *Id.* ¶¶ 14-15. In total, Hanmi recorded $25.2 million in specific allowances for the Harrah Loans. *Id.* ¶ 15. The price of Hanmi shares declined approximately 60% during the Class Period, from $25.65 to $10.34. *Id.* ¶ 16.

Hanmi underwent several changes throughout this period. Lee assumed the role of CEO and joined Hanmi's board of directors on May 3, 2019. *Id.* ¶ 84. Hanmi ratified the reappointment of KPMG as Hanmi's outside auditor on May 23, 2019, only to dismiss KPMG one month later in favor of another auditor, Crowe LLP. *Id.* ¶¶ 306-07. On November 18, 2019, Hanmi announced its Chief Risk Officer, Jean Lim ("Lim"), was leaving the company. *Id.* ¶ 310. According to Plaintiff, Santarosa and Lee pushed Lim out of Hanmi so they could assume duties related to information technology control. *Id.* ¶ 308. Santarosa received a grant of restricted shares in recognition of his additional responsibilities, including oversight over information technology, deposit operations, legal, and facilities. *Id.*

Plaintiff filed the Class Action Complaint on March 26, 2020, asserting two claims for: (1) violation of section 10(b) of the Securities Exchange Act and Rule 10b-5 against Defendants Hanmi, Lee, and Santarosa; and (2) violation of section 20(a) of the Securities Exchange Act against Defendants Lee and Santarosa. On September 17, 2020, Plaintiff filed the First Amended Class Action Complaint ("FAC"), asserting the same claims against the same Defendants. On November 2, 2020, Defendants moved to dismiss the FAC, Dkt. 33, which the court granted with leave to amend, Dkt. 44. Plaintiff filed the operative SAC on April 6, 2021, asserting the same claims and adding Defendant Kum. Dkt. 45.

Defendants now move to dismiss the SAC on the grounds that Plaintiff does not plead (1) any actionable false or misleading statement by Defendants or (2) scienter, with the specificity required by Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). Mot. 2.[2] Plaintiff opposes the motion. Dkt. 59 ("Opp'n").

/ / /

[2] The court cites documents by the page numbers added by the CM/ECF system rather than page numbers listed on the documents themselves.

# DISCUSSION

## I. Legal Standard

Under Fed. R. Civ. P. 12(b)(6), a party may file a motion to dismiss a complaint for "failure to state a claim upon which relief can be granted." A district court properly dismisses a claim under Rule 12(b)(6) if the complaint fails to allege sufficient facts "to support a cognizable legal theory." *Caltex Plastics, Inc. v. Lockheed Martin Corp.*, 824 F.3d 1156, 1159 (9th Cir. 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

When evaluating a complaint under Rule 12(b)(6), the court "must accept all well-pleaded material facts as true and draw all reasonable inferences in favor of the plaintiff." *Wilson*, 668 F.3d at 1140. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Id.* (internal citations omitted). Legal conclusions, however, "are not entitled to the assumption of truth" and "must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

When ruling on a Rule 12(b)(6) motion to dismiss a Section 10(b) action, "courts must consider the complaint in its entirety, as well as … [1] documents incorporated into the complaint by reference, and [2] matters of which a court may

take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

A plaintiff alleging securities fraud must comply with the requirements of Fed. R. Civ. P. 8(a), 9(b), and the PSLRA, 15 U.S.C. § 78u-4(b). *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012). Under Rule 8(a), a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a)(2). Under Rule 9(b), a plaintiff alleging fraud must plead "the circumstances constituting fraud or mistake … with particularity." Fed. R. Civ. P. 9(b). The heightened pleading requirements of Rule 9(b) are designed "to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Neubronner v. Milken*, 6 F.3d 666, 671-72 (9th Cir. 1993). To provide this required notice, "the complaint must specify such facts as the times, dates, places, and benefits received, and other details of the alleged fraudulent activity." *Id.* at 672. Further, "a pleader must identify the individual who made the alleged representation and the content of the alleged representation." *Glen Holly Entertainment, Inc. v. Tektronix, Inc.*, 100 F. Supp. 2d 1086, 1094 (C.D. Cal. 1999).

The PSLRA requires a plaintiff to state with particularity both the facts constituting the alleged violation and the facts evidencing that the defendants had the required state of mind. *Rigel*, 697 F.3d at 876-77. "The PSLRA has exacting requirements for pleading 'falsity.'" *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1070 (9th Cir. 2008). To properly allege falsity, a securities fraud complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, … state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *Metzler*, 540 F.3d at 1070. This particularity requirement "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a

particularized explanation stating why the defendant's alleged statements or omissions are deceitful." *Metzler*, 540 F.3d at 1061.

## II. Count I: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (Against All Defendants)

The "elements that must be pleaded to state a claim for securities fraud are strenuous but well established." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1224 (9th Cir. 2017). To state a claim for violation of Section 10(b), a plaintiff must prove: (1) a material misrepresentation or omission by the defendant (i.e., falsity); (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008). Not all types of statements or omissions are actionable under Section 10b and Rule 10b-5. *See Knox v. Yingli Green Energy Holding Co.*, 242 F. Supp. 3d 950, 963 (C.D. Cal. 2017) (explaining statements amounting to "fraud by hindsight" are not actionable). Defendants challenge the misrepresentation and scienter elements of Plaintiff's first claim.

### A. Plaintiff's Allegations of Material Misrepresentations or Omissions

#### 1. Whether Hanmi's Financial Disclosures Were False and Misleading Because They Did Not Include the Broadway Loan and Caribou Loan as a Troubled Debt Restructuring

Plaintiff alleges Hanmi's financial disclosures were false and misleading because they did not include the Harrah Loans as nonperforming TDRs. SAC ¶¶ 136-52, 157, 241-244 (discussing Hanmi's Q2 2018 Form 10-Q); ¶¶ 153-55, 157 (September 5, 2018 presentation); ¶¶ 158-60 (October 23, 2018 Form 8-K); ¶¶ 161-81 (Q3 2018 Form 10-Q); ¶¶ 181-85 (November 14, 2018 presentation); ¶¶ 186-88 (2018 Form 8-K); ¶¶ 189-92 (January 15, 2019 investor call); ¶¶ 193-217 (2018 Form 10-K); ¶¶ 217-21 (March 5, 2019 presentation); ¶ 222 (April 3, 2019 Form 8-K); ¶¶ 223-24 (April 23, 2019 investor call); ¶¶ 225-40, 245-50 (Q1 2019 Form 10-Q). According to

Plaintiff, the Broadway Loan should have been a TDR under both Generally Accepted Accounting Principles ("GAAP") and Hanmi's own accounting policies. *Id.* ¶ 139.

GAAP requires companies to disclose TDRs to investors and defines a loan restructuring or modification as a TDR "if the creditor, for economic or legal reasons related to the debtor's financial difficulties, grants a concession to the debtor that it would not otherwise consider." *Id.* ¶ 105 (citing ASC 310-40-15-5). Hanmi's stated accounting policies for TDRs match GAAP. *Id.* ¶ 108. For example, Hanmi's Form 10-Q for the quarter ending on June 30, 2018 stated that the company considered loans TDRs "if they were restructured through payment structure modifications such as reducing the amount of principal and interest due monthly and/or allowing for interest only monthly payments for three months or more." *Id.* Likewise, Hanmi included the following definition of a TDR in its 2018 Form 10-K:

> [a] loan is identified as a troubled debt restructuring ('TDR') when a borrower is experiencing financial difficulties and, for economic or legal reasons related to these difficulties, the Bank grants a concession to the borrower in the restructuring that it would not otherwise consider. The Bank has granted a concession when, as a result of the restructuring, it does not expect to collect all amounts due, including principal and/or interest accrued at the original terms of the loan. The concessions may be granted in various forms, including a below-market change in the stated interest rate, a reduction in the loan balance or accrued interest, an extension of the maturity date, or a note split with principal forgiveness.

*Id.* ¶ 109.

In their Motion, Defendants argue that the alleged failure to identity the Broadway Loan as a "troubled debt restructuring" is not actionable. Mot. 20. Defendants cite *Lloyd v. CVB Financial Corp.*, 2013 WL 12120506, at *22 (C.D. Cal. May 9, 2013), *aff'd in part, rev'd in part and remanded,* 811 F.3d 1200 (9th Cir. 2016), to argue that "courts in this Circuit have consistently ruled that GAAP violations … are not actionable as false statements, nor are they probative of scienter." Mot. 20. Defendants' reliance on *Lloyd*, 2013 WL 12120506, at *22, is misplaced. While the district court in *Lloyd, id.*, held that the plaintiff's allegations regarding

GAAP violations were insufficient to plead falsity adequately, the Ninth Circuit did not affirm that portion of the ruling and held only that the plaintiff had failed to plead scienter sufficiently. *Lloyd*, 811 F.3d at 1207.[3]

To the contrary, the Ninth Circuit has recognized that alleged GAAP violations may qualify as actionable misrepresentations when they are significant. *See In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005) ("If properly pled, overstating of revenues may state a claim for securities fraud, as under GAAP, revenue must be *earned* before it can be recognized.") (citations omitted, emphasis in original). "To properly state a claim for accounting fraud, plaintiffs must plead facts sufficient to support a conclusion that [the] defendant prepared the fraudulent financial statements and that the alleged financial fraud was material." *Id.* (quotation marks and brackets omitted).

"Additionally, when pleading irregularities in revenue recognition, plaintiffs should allege (1) such basic details as the approximate amount by which revenues and earnings were overstated; (2) the products involved in the contingent transaction; (3) the dates of any of the transactions; or (4) the identities of any of the customers or [company] employees involved in the transactions." *In re Obalon Therapeutics, Inc.*, No. 3:18-cv-00352-AJB-WVG, 2019 WL 4729461, at *8 (S.D. Cal. Sept. 25, 2019) (citing *In re McKesson*, 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000) (quotation marks omitted). "Plaintiffs need not allege each of those particular details, but they must allege enough information so that a court can discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *Id.*

---

[3] Further, the complaint in *Lloyd* failed to allege the elements to classify a transaction as "troubled debt restructuring." Namely, the complaint failed to allege that the lender "made a 'concession'" and, thus, the transaction did not qualify as "troubled debt restructuring." *Lloyd*, 2013 WL 12120506, at *22.

Here, Plaintiff alleges "Defendants made multiple concessions by extending the maturity date to give Harrah more time to repay the outstanding principal on the Broadway Loan" and that "Hanmi made each of these concessions solely because Harrah's financial difficulties rendered him unable to pay the balloon payment for the foreseeable future." SAC ¶¶ 112-13; *see also id.* ¶¶ 52-58, 68-70 (discussing the extensions and concessions Hanmi provided to Harrah on the Broadway Loan despite repeated defaults and failure to pay required balloon payments). Further, Plaintiff alleges Hanmi agreed to restructure the Caribou Loan based on "Hanmi's understanding of the borrower's financial difficulties and unlikelihood of repaying the loan's principal and interest." *Id.* ¶ 230; *see also id.* ¶¶ 69-70.

According to Plaintiff, by failing to identify the Harrah Loans as nonperforming TDRs, Hanmi falsely reported a significantly lower ratio of non-performing assets ("NPAs") and nonperforming loans ("NPLs") than the actual figures. *E.g.*, *id.* ¶¶ 138-39, 152-56, 159-60, 162-63, 178. During this period, Kum gave presentations on behalf of Hanmi, in which he relied on these lowered NPA figures to claim that Hanmi had a lower NPA ratio than the median for comparable banks. *Id.* ¶ 154 ("Kum's presentation [on September 5, 2018] stated, in relevant part, that Hanmi had '[e]xcellent [a]sset [q]uality' due to its 'NPA-to-assets of 30 bps vs. median of 50 bps for $3 to $10 billion U.S. bank' as of the end of the second quarter of 2018."); *id.* ¶ 183 ("Kum's presentation [on November 14, 2018] stated, in relevant part, that Hanmi had '[e]xcellent [a]sset [q]uality' due to its 'NPA-to-assets of 35 bps vs. median of 59 bps for $3 to $10 billion U.S. bank' as of the end of the third quarter of 2018.").

For purposes of the present Motion, Plaintiff has sufficiently alleged that Hanmi's financial disclosures, according to both GAAP and its own accounting policies, were false and misleading because they did not include the Broadway Loan or Caribou Loan as nonperforming TDRs.

/ / /

/ / /

### 2. Whether Hanmi's Financial Disclosures Were False and Misleading Because Hanmi Failed to Establish an Adequate Loss Reserve or Promptly Charge Off the Loan

Next, Plaintiff alleges that Hanmi's Q2 2018 Form 10-Q, Q3 2018 Form 10-Q, 2018 Form 8-K, Q1 2019 Form 10-Q, Q2 2019 Form 10-Q, Q3 2019 Form 10-Q, and 2019 Form 8-K were false and misleading because they failed to take provisions for, and promptly charge off, the difference between the fair value of the collateral for the Harrah Loans and the recorded investment of those loans. Opp'n 59; *see* SAC ¶¶ 116-27. Defendants contend Hanmi's alleged failure to establish an adequate loss reserve or promptly charge off the Harrah Loans is not actionable because a plaintiff must plead that the "challenged statements were false 'when made.'" Mot. 21.

With respect to the Broadway Loan, Plaintiff alleges "Defendants knew by the start of the Class Period in August 2018 that the collateral for the Broadway Loan was worth less than the principal of the loan." SAC ¶ 5. In support of his allegations, Plaintiff notes that Defendants "eventually admitted" that the fair market value of the undeveloped land serving as collateral for the Broadway Loan was $13.2 million.[4] *Id.* ¶ 239. Thus, Plaintiff alleges GAAP and Hanmi's accounting policies required Hanmi to charge off or take an allowance for the difference between the outstanding loan principal and the fair market value of the collateral. *Id.* In further support that Defendants were aware of the difference between the fair market value of the collateral and investment in the Broadway Loan, Plaintiff alleges Defendants concealed basic information regarding the loan, including the borrower, loan origination date, purpose of the loan, and collateral underlying the loan. *Id.* ¶ 6. Taken together, Plaintiffs sufficiently allege Defendants were aware of the difference between the principal and value of the collateral, such that Defendants' failure to

---

[4] In paragraph five of the SAC, Plaintiff alleges Hanmi admitted the undeveloped land was worth around $15 million. SAC ¶ 5.

establish an adequate loss reserve or promptly charge off the Broadway Loan made Defendants' financial statements false and misleading.

With respect to the Caribou Loan, Plaintiff alleges the valuation of Harrah's rare automobile collection was not supported by an independent assessment when the loan was initially made and that Hanmi "never receiv[ed] a credible appraisal or valuation of the collateral." *Id.* ¶¶ 62, 214. Hanmi allegedly accepted the automobile collection as collateral based on a one-page letter from Custom Auto Service, an entity owned by a friend of Harrah's. *Id.* ¶¶ 215-16. According to Plaintiff, Hanmi failed to "make any effort to determine the quality, expertise, or independence of the Custom Auto Service valuation prior to extending the Caribou Loan." *Id.* ¶ 217. Plaintiff alleges this violated the FDIC Statement of Policy on Interagency Appraisal and Evaluation Guidelines and Hanmi's publicly-disclosed internal policies, which required it to obtain an independent appraisal of any collateral used to secure a loan. *Id.* ¶¶ 63-65; *see also id.* ¶ 63 ("Specifically, the FDIC policy statement requires that 'An institution or its agent must directly select and engage appraisers. … ***An institution's use of a borrower-ordered or borrower-provided appraisal violates the Agencies' appraisal regulations.***'") (emphasis in original).

Plaintiff's allegations regarding Hanmi's acceptance of the valuation of Harrah's automobile collection provided by Harrah, and its failure to conduct an independent valuation support an inference that Defendants knew or were reckless in not knowing that there was not a credible appraisal or valuation of collateral for the Caribou Loan. Thus, Plaintiffs adequately allege that Hanmi's financial statements were false or misleading because Hanmi failed to establish an adequate loss reserve or promptly charge off the Caribou Loan.

### 3. Plaintiff's Remaining Allegations and Puffery

"To be misleading, a statement must be 'capable of objective verification.'" *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). "'[P]uffing'—expressing an opinion rather than

a knowingly false statement of fact—is not misleading." *Id.* "Puffing statements are optimistic statements by corporate executives that 'are generally not capable of objective verification, and lack a standard against which a reasonable investor could expect them to be pegged.'" *Knox v. Yingli Green Energy Holding Co. Ltd.*, 242 F. Supp. 3d 950, 961 (C.D. Cal. 2017). In *Lloyd*, 811 F.3d at 1207 (quotation marks omitted), the Ninth Circuit found that a company's statements that "[t]he overall credit quality of the loan portfolio is sound," "[the company's] credit metrics are superior to those of its peers," "strong credit culture and underwriting integrity remain paramount at [the company]," and "the company's culture has limited its exposure to problem credits" constituted "vague, optimistic statements" constituted non-actionable puffery.

Defendants argue the SAC's remaining allegations are inadequately pleaded because they are non-actionable puffery. Mot. at 23-24. According to Defendants, the remaining allegations are similar to statements the Ninth Circuit has held are not actionable in *Lloyd*, 811 F.3d at 1206-07, and include statements such as that: "Defendants falsely touted Hanmi's 'excellent' asset quality and claimed that Hanmi's asset quality metrics were superior to those of peer banks" and that Defendant Kum made public statements such as that Hanmi had "excellent asset quality" and that its "asset quality metrics" were "about as strong as you can get." Mot. 23 (citing SAC ¶¶ 2, 154-57, 159, 189). Plaintiff counters that Defendants do not quote the challenged statements fully, and that the SAC identifies statements by Defendants that "were specific and verifiable," and, thus, false and misleading. Opp'n 21. The court agrees with Plaintiff.

Defendants selectively quote from the SAC, omitting the objectively verifiable portions of Plaintiff's remaining allegations. For example, Plaintiff alleges Defendant Kum stated during a September 2018 presentation that "Hanmi had '[e]xcellent [a]sset [q]uality' due its 'NPA-to-assets of 30 bps vs. median of 50 bps for $3 to $10 billion U.S. bank' as of the end of the second quarter of 2018." SAC ¶ 154. According to Plaintiff, "[t]he stated 0.30% NPA Ratio in Kum's presentation was materially false

and misleading because, for the reasons described in paragraphs 142-143 and 152, Hanmi's NPA Ratio as of the quarter ended June 30, 2018 was 1.02%." *Id.* ¶ 155. Kum's statements regarding Hanmi's NPA ratio in the September 2018 presentation are not vague and optimistic opinions, but objectively verifiable statements of fact regarding Hanmi's asset portfolio. *See Lloyd*, 811 F.3d at 1206, 1209 (finding defendant's alleged statements in its SEC filings that it was "not aware of any other loans … for which known credit problems of the borrower would cause serious doubts as to the ability of such borrowers to comply with their loan repayment terms" to be an actionable misrepresentation in light of the company's knowledge that there was a basis for serious doubts about the ability of the company's largest borrower to repay).

Likewise, Plaintiff's other allegations, that Defendants identify, were made with objectively verifiable statements of fact. For example, Plaintiff alleges Hanmi filed a Form 8-K with the SEC on October 23, 2018, with an attached press release that included the statement: "Excellent asset quality; Nonperforming assets at 0.35% of total assets and net charge-offs of 0.03%." *Id.* ¶¶ 158-59. At another investor call in January 2019, Kum allegedly stated:

> Importantly, we continued to maintain our normal conservative underwriting standards and our overall asset quality remains excellent. During the quarter, criticized loans declined 17.6% from $71.3 million to $58.7 million. Nonperforming loans were $15.5 million or 34 basis points of loans at quarter end, representing sequential improvement of 15.3% from third quarter non-performing loans of $18.3 million or 40 basis points of loans. We recorded a $3 million loan loss provision in the quarter and our allowance for loan losses held steady at 70 basis points of loans and leases at year-end.

*Id.* ¶ 189. Kum allegedly also stated that "[o]verall, our asset quality metrics have remained excellent" and that Hanmi's "asset quality metrics" were "about as strong as you can get." *Id.*

As discussed, Plaintiff alleges these statements were false and misleading because Hanmi excluded the nonperforming Harrah Loans and their specific

allowances by failing to identify them as nonperforming TDRs, thus, altering the asset quality metrics. *Id.* ¶¶ 190, 192. Plaintiff further alleges that Hanmi's SEC filings included other false or misleading statements, including that "both loans were current" as of October 2019. *E.g., id.* ¶ 263.

These statements all constitute statements of objectively verifiable fact regarding Hanmi's asset portfolio, which do not constitute puffery. Defendants' argument, thus, fails, and the court will not grant the Motion on this basis.

**B. Scienter**

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). A defendant acts with the required state of mind, or scienter, only if she makes false or misleading statements either intentionally or with deliberate recklessness. *See In re Daou*, 411 F.3d at 1015 (citing *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999)). To qualify as a "strong inference" under 15 U.S.C. § 78u-4(b)(2)(A), "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 310 (emphasis in original).

Defendants argue there are no allegations to suggest Defendants acted with scienter and, at most, the allegations in the SAC demonstrate negligence. Mot. 25. Plaintiff counters that the SAC, viewed holistically, adequately alleges scienter. Opp'n 23-24. The court agrees with Plaintiff.

First, "[v]iolations of GAAP standards can … provide evidence of scienter." *In re Daou*, 411 F.3d at 1016; *see id.* (citing *In re McKesson*, 126 F. Supp. 2d at 1273) ("[W]hen significant GAAP violations are described with particularity in the

complaint, they may provide powerful indirect evidence of scienter. After all, books do not cook themselves.").

Defendants cite cases including *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994), to argue that the Ninth Circuit has repeatedly held "the mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." Mot. 26. Defendants further argue that "[t]o raise a strong inference of scienter, the SAC must allege facts demonstrating that defendants 'knowingly and recklessly engaged in an improper accounting practice….'" *Id.* (citing *Lloyd*, 811 F.3d at 1207).

As stated, Plaintiff alleges Defendants committed multiple GAAP violations throughout the class period, including by failing to identify the Harrah Loans as nonperforming TDRs, that gave rise to materially false and misleading statements regarding Hanmi's asset portfolio, NPA ratio, and performance relative to other comparable banks. SAC ¶¶ 99-290. Plaintiff further alleges "Hanmi admitted that one of the Company's top executive officers had personally negotiated the concessions with Harrah," after "Harrah … defaulted on the Broadway Loan four times between March 2018 and January 2019 by failing to pay the outstanding loan principal when the loan matured." *Id.* ¶¶ 3-4; *see also id.* ¶¶ 51-75 (discussing concessions provided on the Harrah Loans); *id.* ¶ 71 n. 8 ("Bartlett has served as Executive Vice President and Specialty Lending Officer with Hanmi since February 2017. Bartlett signed the Change in Terms Agreements on Hanmi's behalf for all five restructurings of the Broadway Loan, the original loan documents for the Caribou Loan, and both restructurings of the Caribou Loan").

The SAC alleges sufficient facts regarding Hanmi's senior officers' direct involvement in the production of false accounting statements to plead scienter. *See In re Daou*, 411 F.3d at 1022-23 (holding allegations defendant's executives manually adjusted percentage-of-completion numbers to inflate revenues artificially, in violation of GAAP and defendant's stating accounting policy, were sufficient to plead

scienter); *see also In re McKesson*, 126 F. Supp. 2d at 1273 (holding allegations of revenue inflation exceeding 25% in some quarters and details of "numerous individual transactions during the class period, involving a variety of customers around the country and [defendant's officials], revenue from which was recognized and subsequently reversed," were sufficient to plead "improper recognition was so widespread at [defendant] that senior management must have known of the practice" and to establish "powerful circumstantial evidence of scienter").

Second, Plaintiff alleges "the highest levels of Hanmi's management were focused on the loans to Harrah," SAC ¶ 295, and that Hanmi intentionally withheld information about the Harrah Loans from investors, *id.* ¶¶ 314-16. The SAC further alleges Hanmi executives were motivated to hide the troubled Harrah Loans from investors because their compensation was tied to Hanmi's nonperforming asset ratio. *Id.* ¶¶ 311-13. Defendant contends these allegations are insufficient because it is common for executive compensation to be based in part on achieving certain corporate goals. Mot. 28, 30 (citing *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) ("[A]llegations of routine corporate objectives such as the desire to obtain good financing and expand are not, without more, sufficient to allege scienter.")). While the mere allegation that certain Hanmi executives' compensation was tied to the NPA ratio, standing alone, would not be enough to support an inference of scienter, these allegations, combined with Plaintiff's allegations that Hanmi executives intentionally withheld information and committed significant violations of GAAP and the company's own accounting protocols, are sufficient to support an inference of scienter.

Finally, Defendant argues the absence of allegations of insider trading negates any inference of scienter. Mot. 22. However, "[a]llegations of suspicious stock sales … are not needed where, as here, other allegations in the complaint raise a strong inference of scienter." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021), *cert. denied sub nom. Alphabet Inc. v. Rhode Island*, 142 S. Ct. 1227, 212 L.

Ed. 2d 233 (2022). Thus, the absence of any allegations regarding insider stock sales does not negate the inference of scienter established by other allegations in the SAC.[5]

**C. Conclusion for Count I**

In sum, the court finds the SAC pleads facts with sufficient particularity to state the material misrepresentation or omission and scienter elements of a Section 10(b) claim. *See Stoneridge*, 552 U.S. at 157. The court, therefore, DENIES the Motion with respect to Count I of the SAC.

**III. Count II: Violations of Section 20(a) of the Exchange Act (Against the Individual Defendants)**

Defendants contend Plaintiff's claim under Section 20(a) of the Exchange Act fails because it requires an underlying Section 10(b) violation. Mot. 33 (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1052 (9th Cir. 2014)). Having denied Defendant's Motion as to Plaintiff's Section 10(b) claim, the court similarly DENIES the Motion with respect to the Section 20(a) claim.

**CONCLUSION**

For the foregoing reasons, the court DENIES Defendants' Motion to Dismiss in its entirety.

IT IS SO ORDERED.

Dated: August 15, 2022

FERNANDO L. AENLLE-ROCHA
United States District Judge

[5] Because the court finds Plaintiff adequately pleads scienter, the court does not address the parties' remaining arguments regarding personnel decisions.